1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  ROBERT C. WELSH (S.B. #130782)
   rwelsh@omm.com
3  DREW E. BREUDER (S.B. #198466)
   dbreuder@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Defendants
   Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II
8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                                    Case No. CV10-7181-DDP (SSx)

12  RICHARD REINSDORF,                Hon. Dean D. Pregerson

13              Plaintiff,            **DEFENDANTS SKECHERS U.S.A.,
                                      INC. AND SKECHERS U.S.A., INC. II'S
14       v.                          NOTICE OF MOTION AND MOTION
                                      *IN LIMINE* TO EXCLUDE EXPERT
15  SKECHERS U.SA., INC.;            TESTIMONY FROM FRANK LUNTZ;
    SKECHERS U.S.A., INC. II; and    AND MEMORANDUM OF POINTS
16  DOES 1-10,                       AND AUTHORITIES IN SUPPORT
                                      THEREOF**
17              Defendants.
                                      **[DECLARATIONS OF PROFESSOR
18                                    CAROL A. SCOTT, Ph.D. AND
                                      JEFFREY A. BARKER; AND
19                                    [PROPOSED] ORDER** filed and/or
                                      lodged concurrently herewith]
20
                                      Courtroom:    3 (2nd Floor)
21                                    Hearing Date: June 18, 2012
                                      Time:         10:00 a.m.
22

23                                    Discovery Cutoff:    May 15, 2012
24                                    Pretrial Conference: July 2, 2012
                                      Trial Date:          July 10, 2012
25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on June 18, 2012 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3 (2nd Floor) of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California 90012, defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II (collectively, "Skechers") will and hereby do move *in limine* for an order precluding Plaintiff Richard Reinsdorf from seeking to introduce any purported expert testimony from Dr. Frank Luntz.

This motion is made pursuant to Federal Rules of Evidence 402 and 702 and Federal Rule of Civil Procedure 37(b) on the grounds that (1) Dr. Luntz's proposed testimony is speculative and not based on reliable principles and methods; (2) Dr. Luntz's proposed testimony is not based on sufficient facts or data; and (3) Dr. Luntz has failed to produce the underlying data for his survey even though such data was requested by subpoena and ordered produced by Magistrate Judge Segal.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Professor Carol A. Scott, Ph.D. in Support of Skechers' Motion in Limine (and the exhibits attached thereto), the Declaration of Jeffrey A. Barker in Support of Skechers' Motions in Limine (and the exhibits attached thereto), the pleadings and other materials on file in this action, and on such other and further evidence or argument as the Court may consider at or before the hearing on this motion.  This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on May 18, 2012.

Dated:  May 21, 2012          O'MELVENY & MYERS LLP


By: /s/ Robert C. Welsh
    Robert C. Welsh
Attorneys for Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   THE LUNTZ "SURVEY" FAILS TO ADHERE TO GENERALLY
      ACCEPTED STANDARDS FOR LITIGATION SURVEYS AND IS
      INHERENTLY UNRELIABLE ....................................................... 2

      A.   Surveys Being Used for Litigation Purposes Are Subject to Well Known
           and Rigorous Standards.............................................................. 2

      B.   Dr. Luntz Provides No Rationale for the Population Studied or How
           Respondents Were Selected ....................................................... 4

      C.   The Survey Asked Improper and Biased Questions That Were
           Purposefully Designed to Increase the Number of Respondents Who
           Would Identify "Skechers" ........................................................ 7

      D.   The Luntz Survey Lacked A Proper Control ........................................... 11

      E.   The Luntz Survey Report Contains Other Flaws
           That Warrant Exclusion .................................................................. 12

III.  DR. LUNTZ'S SURVEY AND OPINIONS SHOULD BE EXCLUDED
      DUE TO HIS FAILURE TO PRODUCE CRITICAL DATA AND OTHER
      DOCUMENTS RESPONSIVE TO SKECHERS' SUBPOENA .................... 13

IV.   CONCLUSION............................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ................................................................................. 2, 3, 4

*Gray v. Faulkner*,
    148 F.R.D. 220 (N.D. Ind. 1992) ....................................................... 16

*Herring v. Clark*,
    2011 WL 2433672 (E.D. Cal. June 14, 2011) .................................. 16

*IGT v. Alliance Gaming Corp.*,
    2008 WL 7084606 (D. Nev. Oct. 21, 2008) ........................................ 3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .............................................................................. 2

*Lanphere Enters. v. Jiffy Lube Int'l*,
    2003 U.S. Dist. LEXIS 16205 (D. Or. July 9, 2003) ........................... 4

*Marlo v. UPS*,
    251 F.R.D. 476 (C.D. Cal. 2008) ......................................................... 3

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................. 4

*Vigil v. Michelin N. Am., Inc.*,
    2007 WL 2778233 (W.D. Tex. Aug. 23, 2007) ..................................... 3

*Watec Co. Ltd. v. Liu*,
    2002 WL 34373489 (C.D. Cal. May 21, 2002) ..................................... 3

OTHER AUTHORITIES

Shari S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE
    MANUAL ON SCIENTIFIC EVIDENCE 359-418 (Federal Judicial Center 3d
    ed. 2011) ..................................................................................... *passim*

SKECHERS' NOTICE OF MOTION AND
MOTION IN LIMINE RE FRANK LUNTZ
CV10-7181-DDP (SSX)

**RULES**

Fed. R. Civ. P. 37(b) ................................................................ 1, 16

Fed. R. Evid. 402 ...................................................................... 1, 2

Fed. R. Evid. 702 ................................................................. 1, 2, 4

## MEMORANDUM OF POINTS AND AUTHORITIES

I.  **INTRODUCTION**

Plaintiff Richard Reinsdorf's expert witness, Dr. Frank Luntz, proposes to testify to the results of and opinions based upon an Internet survey he conducted concerning the ability of consumers to recognize the Skechers "brand" using finished marketing images that incorporated photographs taken by Plaintiff.  His survey is severely flawed, however, and is neither based on reliable principles and methods nor on facts that are applicable to the issues in dispute in this litigation.  As a result, neither his survey results nor any opinion based on them is admissible for purposes of summary judgment or at trial.

Contrary to established principles and methods for surveys being used for litigation purposes, Dr. Luntz's survey:

- Is not directed to the appropriate survey population, which should have the same demographic characteristics of Skechers' customer base, and should target actual or prospective purchasers;

- Employs inappropriate stimuli and uses questions likely to produce biased results; and

- Fails to use adequate or appropriate controls.

In addition to the foregoing methodological flaws, Dr. Luntz's survey fails to comply with basic scientific standards of transparency.  Dr. Luntz has refused to produce key information, including the underlying responses from individual participants in the survey, in an effort to prevent a meaningful opportunity to evaluate his conclusions based on the raw data.[1]  This failure alone is grounds for

---

[1] This is not the first time Dr. Luntz has failed to disclose the methodological details of his survey research.  In 1997, The Executive Council of the American Association for Public Opinion Research found Dr. Luntz to be in violation of its Code of Professional Ethics and Practices for refusing to provide basic facts about an opinion poll.  (*See* Declaration of Jeffrey A. Barker in Support of Skechers' Motions in Limine ("Barker Decl.") ¶ 5, Ex. 3 (5/12/12 Deposition of Frank Luntz ("Luntz Depo.")) at 237:14-20; *see also* http://www.aapor.org/Content/aapor/Resources/ForMedia/ArchivedPressReleases/AAPORFindsFrankLuntzinViolationofEthicsCode/default.htm.)

SKECHERS' MEMORANDUM OF
POINTS AND AUTHORITIES
CV10-7181-DDP (SSX)

exclusion of his survey and testimony because he admits that the raw responses data were within his control, but he failed to produce them in response to Skechers' subpoena and a court order compelling him to produce all requested documents.

Finally, even if Dr. Luntz's survey had been targeted at the right population and properly performed, he purports to offer conclusions that are not supported by his data. Specifically, as established by Skechers' survey expert Professor Carol A. Scott, Ph.D., of the UCLA Anderson Graduate School of Management—who Dr. Luntz acknowledged is "very academic, very accomplished" and "very impressive"[2]—Dr. Luntz's survey results do not support his proffered conclusion that the finished marketing images consistently or conclusively positively influenced consumers' feelings toward the ad or brand that the respondents believed were being advertised.

As a result, Dr. Luntz's survey and proffered opinions are not admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Moreover, they are irrelevant to any fact of consequence in this litigation and should be excluded under Federal Rule of Evidence 402.

## II. THE LUNTZ "SURVEY" FAILS TO ADHERE TO GENERALLY ACCEPTED STANDARDS FOR LITIGATION SURVEYS AND IS INHERENTLY UNRELIABLE

### A. Surveys Being Used for Litigation Purposes Are Subject to Well Known and Rigorous Standards

Under Federal Rule of Evidence 702, an expert opinion is admissible only if it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Rule 702 requires that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). While less rigorous or sloppy practices might be tolerated by a corporation or other private client, such practices will not pass muster in a court of law. To insure accuracy and

---

[2] Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 222:15-223:5.

reliability, a survey for use in litigation must be conducted with "proper safeguards." *IGT v. Alliance Gaming Corp.*, 2008 WL 7084606, at *8 (D. Nev. Oct. 21, 2008).  These safeguards include the following:

(1)    "a proper universe must be examined and a representative sample must be chosen";

(2)    "the persons conducting the surveys must be experts";

(3)    "the data must be properly gathered and accurately reported";

(4)    "the sample design, the questionnaires and the manner of interviewing [must] meet the standards of objective surveying and statistical techniques"; and

(5)    if a survey design is seeking to establish a causal link, an appropriate control must be used to properly determine the effect of the test stimulus.

*Id.*; *see generally* Shari S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359-418 (Federal Judicial Center 3d ed. 2011) [hereinafter "Diamond, Fed. J. Ctr. Ref. Guide"].

Where, as here, proposed survey evidence exhibits "such gross indifference to the scientific method as to call into question the validity of *any* testimony that [the expert] would offer," district courts will exclude the survey under *Daubert* as unreliable and lacking any probative value.  *Vigil v. Michelin N. Am., Inc.*, 2007 WL 2778233, at *11 (W.D. Tex. Aug. 23, 2007); *see also Marlo v. UPS*, 251 F.R.D. 476, 485-86 (C.D. Cal. 2008) (Pregerson, J.) (rejecting survey evidence in class action because it was "unreliable" and "ha[d] essentially no probative value").

As the party offering the Luntz survey, Plaintiff bears the burden of establishing the survey's admissibility by a "preponderance of proof." *Daubert*, 509 U.S. at 592.  Plaintiff must "demonstrate that the survey has been conducted pursuant to accepted principles of survey research." *Watec Co. Ltd. v. Liu*, 2002 WL 34373489, at *2 (C.D. Cal. May 21, 2002).  These standards apply equally at

summary judgment as they do at trial.  *See, e.g.*, *Lanphere Enters. v. Jiffy Lube Int'l*, 2003 U.S. Dist. LEXIS 16205, at **35-36 (D. Or. July 9, 2003) (striking survey from summary judgment record where results were irrelevant to facts at issue and were based on "imprecise, confusing, and vague questions"); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231, 235-41 (S.D.N.Y. 2010) (excluding plaintiff's trademark survey because it was "not a reliable indicator of consumer confusion").  As discussed below, Plaintiff cannot establish by a preponderance of the evidence that Dr. Luntz's survey passes muster under Rule 702 and *Daubert*.

**B.    Dr. Luntz Provides No Rationale for the Population Studied or How Respondents Were Selected**

According to Dr. Shari Diamond, the author of the *Reference Guide on Survey Research* that is published in the Federal Judicial Center's Reference Manual on Scientific Evidence, a key requirement of a properly conducted survey is a "carefully" defined survey universe.  Diamond, Fed. J. Ctr. Ref. Guide at 376; *see also* Declaration of Professor Carol A. Scott, Ph.D. in Support of Skechers' Motion in Limine ("Scott Decl.") ¶ 24.  The "target population" of a survey consists of all individuals whose perceptions the survey is intended to represent.  Diamond, Fed. J. Ctr. Ref. Guide at 376.  The definition of the relevant population is "crucial" because of potential "systematic differences in the responses of members of the population and nonmembers," *id.*, and because "[a] survey that provides information about a wholly irrelevant population is itself irrelevant."  *Id.* at 377.  Likewise, the sample of respondents selected for a survey must be representative of the target population.  *Id.* at 380.

Dr. Luntz admits that he has never reviewed or consulted Dr. Diamond's treatise on litigation survey methodology.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 78:9-20.)  Dr. Luntz surveyed 817 respondents between the ages of 16 and 24, with the total sample being split approximately equally between men and women.  (Scott Decl. ¶ 9, Ex. D (Expert Report of Frank Luntz ("Luntz Report")) at 3; *id.* ¶ 11,

SKECHERS' MEMORANDUM OF
POINTS AND AUTHORITIES
CV10-7181-DDP (SSX)

Ex. E (Luntz Depo. Ex. 510), PowerPoint slide titled, "Survey Demographic Statistics.")  When asked at deposition why he selected that survey population, Dr. Luntz replied that consumers in the 16-24 age range are the "meat of the athletic wear purchaser" based on his "looking around and doing research myself." (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 104:10-105:5.)  The initial flaw in Dr. Luntz selecting such a universe for a study is that Skechers is *not* an "athletic wear" company; instead, it "offer[s] a vast array of fashionable footwear that satisfies their active, casual, dress casual and dress footwear needs."  (*See, e.g.,* Barker Decl. ¶ 6, Ex. 4 (2006 Skechers' Form 10-K) at SKR000791; *see also id.* at SKR000791-95 (discussing broad range of Skechers products).)

Putting aside that fundamental flaw in the universe he sought to survey, Dr. Luntz also was unable to provide any support for his contention that he had the right universe even for "athletic wear purchasers" because he claimed to have kept no records of any of the research he purportedly conducted.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 105:6-16, 109:2-110:10.)  Moreover, although survey participants were drawn from five U.S. geographic regions, Dr. Luntz admitted that he had no idea whether that distribution was similar to the geographic distribution of Skechers' advertising or sales, and that he had not conducted any analysis to determine whether the advertising images used in his survey were ever used in any of the five regions.  (*Id.* at 113:8-20, 114:21-115:9.)

To be valid, a survey must be directed at a population that is "representative of the target market for the company's goods."  (Scott Decl. ¶ 27.)  The survey sample selected by Dr. Luntz would only be appropriate, however, if Skechers' target market "was limited to consumers between the ages of 16 and 24" and Skechers' consumers "were equally likely to be men or women."  (*Id.*)  As even Dr. Luntz admitted, though, Skechers' actual customer base in fact has more women than men.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 119:4-11.)

Dr. Luntz also fails to survey only actual or prospective purchasers of Skechers products.  At his deposition, Dr. Luntz suggested that he could confirm prospective purchaser interest by questions at the very end of his survey.  (*Id.* at 214:23-215:6.)  However, Dr. Luntz did not ask these questions at the outset of his survey as a screening mechanism (*id.* at 216:16-19), and he *never* asked participants about their actual purchasing behavior.  (*Id.* at 216:10-15.)  Instead, he asked only about the degree to which the images participants were shown increased or decreased their level of interest in purchasing the promoted shoes.  (Scott Decl. ¶ 12, Ex. F (Luntz Depo. Ex. 511 – Survey Questionnaire) at 61-62.)  As Dr. Scott explains, "[i]ncreasing one's *interest* in the product is not at all the same as increasing one's *purchase* of a product."  (Scott Decl. ¶ 22.)  In other words, Dr. Luntz asked the wrong questions at the wrong point of his survey for purposes of identifying which respondents surveyed are actual or potential customers of Skechers products.

Yet another flaw in Dr. Luntz's survey is his failure to provide any information about how the survey participants were recruited, screened, and qualified, and the procedures used to validate participants' qualifications.  (*See* Scott Decl. ¶¶ 26-30.)  Because Dr. Luntz's survey was conducted over the Internet and Internet surveys are impersonal and involve remote respondents, additional precautions are required to ensure the integrity of the data collected and to avoid, for example, self-selection of participants based on their particular interest in the topic of the survey.  (*See id.* ¶¶ 29-30.)  At deposition, however, Dr. Luntz could only say that certain Internet users were sent a link that, when clicked, took them to the survey questionnaire.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 123:24-124:4.)  Dr. Luntz admitted that he did not know which list of Internet users was used to select potential participants for his survey.  (*Id.* at 124:11-25.)  He was also ignorant of other crucial sampling data, such as the response rate for Internet users who were

invited to take the survey and the demographic information of users who declined to participate.  (*Id*. at 125:22-126:13.)

Dr. Luntz has failed to offer sufficient information about how he identified, selected, and screened his survey population for the Court to admit his survey as reliable and appropriate evidence of anything.  Nor can these flaws be remedied by a declaration in opposition to this motion.  By subpoena, Skechers specifically sought production of "ALL DOCUMENTS RELATING TO preliminary questions regarding participation and/or demographic information (i.e., 'screening questions') asked of potential survey participants."  (Barker Decl. ¶ 7, Ex. 5 (4/20/12 Subpoena to Frank Luntz ("Luntz Depo. Ex. 514 - Subpoena")) at 8 (Request No. 5).)  After Dr. Luntz and Plaintiff initially refused to comply with the subpoena, Magistrate Judge Segal ordered Plaintiff's counsel to produce the "responsive documents to Defendants' subpoenas" by no later than "6:00 p.m. on May 9, 2012."  (*Id.* ¶ 8, Ex. 6 (5/9/12 Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motion for Order to Show Cause and to Compel Depositions ("Magistrate Judge Order")) at 6.)  Having failed to produce the required documents on May 9 or even at Dr. Luntz's May 12 deposition, neither Plaintiff nor Dr. Luntz should be permitted to offer additional evidence regarding the screening and selection of the survey population at this late date.

## C.  The Survey Asked Improper and Biased Questions That Were Purposefully Designed to Increase the Number of Respondents Who Would Identify "Skechers"

Another fundamental principle of survey research is that questions should be clear, precise, and unbiased.  Diamond, Fed. J. Ctr. Ref. Guide at 387-89.  The Luntz survey violates this precept as well.

Initially, the questions presented to respondents were biased based on the stimuli provided.  Respondents were shown a series of advertising images and then asked which company they believed the images were promoting.  They were given

SKECHERS' MEMORANDUM OF
POINTS AND AUTHORITIES
CV10-7181-DDP (SSX)

five alternative answers—Skechers, Adidas, Converse, Nike, and Reebok—but were not given the option to say "none of the above" or "I don't know."  (Scott Decl. ¶ 12, Ex. F (Luntz Depo. Ex. 511 – Survey Questionnaire) at 4-15.)  This design creates two biases.

First, whereas the Skechers ads Dr. Luntz used in his survey emphasized fashion and style, the ads that he used from other companies were principally athletically oriented—a point that even Dr. Luntz conceded at deposition.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 172:24-173:20.)  For example, Dr. Luntz showed male respondents the following Skechers advertisements:



Whereas, in stark contrast to the foregoing ads, he then used three athletically-oriented images from Adidas, Converse, Nike, or Reebok:



(Scott Decl. ¶ 12, Ex. F (Luntz Depo. Ex. 511 – Survey Questionnaire) at 9-15.) Female respondents were shown similarly slanted materials, with only the Skechers

SKECHERS' MEMORANDUM OF
POINTS AND AUTHORITIES
CV10-7181-DDP (SSX)

1  ads being focused on style and fashion.  (*Id.* at 2-8.)  Given the alternative stimuli

2  presented, it should not be at all surprising that the lone fashion-oriented company

3  (Skechers) would be highly selected for the fashion-oriented ads.

4        The biased selection of stimuli was compounded by Dr. Luntz's failure to

5  include an "I don't know" option or at least an open-ended question asking

6  respondents ***why*** they had identified an ad with a particular company.  With a finite

7  set of responses provided, and no option to say "I don't know," respondents were

8  essentially forced to guess.  (*See* Scott Decl. ¶¶ 33-34.)  Incredibly, Dr. Luntz

9  admitted that, had he used an "I don't know" option, his identification rates

10  undeniably would drop because he would "lose[] people who have an impression, a

11  perception, an expectation, but they're not actually sure."  (Barker Decl. ¶ 5, Ex. 3

12  (Luntz Depo.) at 142:8-15.)  As for his failure to include an open-ended question

13  that would have identified those respondents who said "Skechers" simply because it

14  was the only fashion/style choice (or because the rest of the companies were

15  athletic footwear makers, or because of the "style" of the ads and not the

16  photographic elements taken by Mr. Reinsdorf), Dr. Luntz had no clear answer.

17  Instead, he had to agree that in one of his books published just a few years ago, he

18  had been an advocate for including open-ended questions in surveys.  (*Id.* at 150:1-

19  6.)  But, at least for purposes of this study, he had simply changed his mind about

20  using open-ended questions.  (*Id.* at 148:25-149:12.)

21        In short, Dr. Luntz stacked the deck towards identifying Skechers ads with

22  Skechers using biased stimuli, and then used closed-ended questions to prompt

23  respondents to always take a guess at the "right" answer.  Without an open-ended

24  question to determine the reasons why respondents identified Skechers ads with

25  Skechers, the survey is basically meaningless and Dr. Luntz's *ipse dixit* conclusion

26  that it "has" to be because of the photographs taken by Mr. Reinsdorf (*see, e.g., id.*

27  at 184:8-15) is sheer speculation.  As Dr. Scott points out, absent data establishing

28  the relative importance of Mr. Reinsdorf's images as compared with other elements

SKECHERS' MEMORANDUM OF
POINTS AND AUTHORITIES
CV10-7181-DDP (SSX)

of the ads being viewed, there is "no reasonable basis to assess the importance of Mr. Reinsdorf's images to Skechers' overall marketing campaigns." (Scott Decl. ¶ 41.)

The second half of Dr. Luntz's survey that supposedly measures "purchasing power" is similarly biased and flawed. After proceeding through the foregoing biased "brand recognition" questions, respondents are shown a series of Skechers-only ads and are then asked to rate each of those ads on a scale of 0 to 10 on five characteristics: how exciting do you consider this ad, how enthusiastic the visual makes you about the brand of footwear you believe it represents; how appealing this ad is to you; how likely are you to purchase the brand of footwear you believe this ad represents; and how influential might this ad be in your decision to purchase the footwear that you believe this visual represents. (Scott Decl. ¶ 12, Ex. F (Luntz Depo. Ex. 511 – Survey Questionnaire) at 16-35 (women) and 36-55 (men).) Again, no open-ended questions are asked about *why* respondents are giving the ratings that they did. No legitimate scientific rationale exists for these questions, as they only further coach respondents to focus on the Skechers style- and fashion-based ads. (*See* Scott Decl. ¶ 42.)

At this point, Dr. Luntz showed the respondents five ads and asked which one of them is "an advertisement for Skechers." (Scott Decl. ¶ 12, Ex. F (Luntz Depo. Ex. 511 – Survey Questionnaire) at 56-57 (women) and 58-59 (men).) By purposefully identifying Skechers in his question, Dr. Luntz has now suggested to respondents who the sponsor of the survey might be and has introduced another "bias of an unknown nature and proportion," because "[p]articipants may respond either more positively or more negatively than they would if the researchers' particular interest in Skechers had been masked or disguised." (Scott Decl. ¶ 44.) This is yet another violation of the generally accepted rules for litigation surveys, which typically require that a questionnaire "provide no explicit or implicit clues

about the sponsorship of the survey" in order to ensure the survey's objectivity. Diamond, Fed. J. Ctr. Ref. Guide at 410-11.

### D. The Luntz Survey Lacked A Proper Control

Where, as here, a survey seeks to test a "causal proposition" (*i.e.*, whether the photographic images taken by Plaintiff and used in Skechers' ads are associated with Skechers),[3] the survey must include a proper control group or question to eliminate errors based on guessing, preexisting beliefs, or any other irrelevant sources of information. *See* Diamond, Fed. J. Ctr. Ref. Guide at 397-401.[4]  The Luntz survey used no such controls.

As can be seen from the biased stimuli and alternative response options to "Skechers" discussed in the preceding section, Dr. Luntz used protocols that *facilitated* guessing as opposed to identifying when such guessing occurred.  But, even if Dr. Luntz had not stacked the deck with biased stimuli, his survey design still would have required additional controls.  As Dr. Scott explains, "[t]he images shown to the respondents were not complete Skechers advertisements.  Nor were the images solely Mr. Reinsdorf's images.  Instead the images shown contained some of Mr. Reinsdorf's photos as well as some aspects added or modified by Skechers."  (Scott Decl. ¶ 46.)  As a result, without open-ended questions to determine the reasons for why selections are being made,[5] "[a] control group is needed to separate the effects that might have been due to Mr. Reinsdorf's images versus the effects that might have been due to the products shown, the particular

---

[3] Skechers does not concede—and in fact disputes—that such an association, if proven, would be relevant to any issue in this case.  The proposition being tested by Dr. Luntz's survey is being identified for information only.

[4] "Surveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions." *Id.* at 397.

[5] As Dr. Luntz conceded at deposition, another way to determine why respondents were associating a particular ad image with a given brand would have been to ask a follow-up "why" question.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 166:12-167:9.)  Indeed, Dr. Luntz expressed an interest in revisiting his survey to ask that question (*id.*), even though the deadline for conducting any such work has long passed.

model that was hired, or other aspects that were added by Skechers to make a complete advertisement." (Scott Decl. ¶ 46.) Dr. Luntz likewise acknowledged at deposition that the presence of particular styles of shoes used in the ad images also could impact respondents' expectations of which brand is being advertised. (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 158:2-6.)

One simple way to rule out these rival explanations would have been to employ a control that used a similar Skechers advertising image incorporating a photo not taken by Plaintiff. (Scott Decl. ¶ 39.) If the ad with Plaintiff's photos received more Skechers identifications than did the control ad, that might suggest an association between Plaintiff's photos and Skechers. (*Id*.) But, in the absence of such a control, "no conclusions with respect to the impact of [Plaintiff's] photographs can be drawn." (*Id*.)

In addition, as Dr. Scott also points out, the Luntz survey failed to use an adequate control to test for any connection between Plaintiff's images and consumer interest in the Skechers brand. (*Id*. ¶ 46.)

**E.    The Luntz Survey Report Contains Other Flaws That Warrant Exclusion**

The Luntz report is plagued by numerous other flaws that render it unreliable. Specifically:

- In selecting the marketing images to test in his survey, Dr. Luntz relied on Plaintiff's attorneys to provide images that were purportedly representative of the images at issue in this lawsuit. He did not conduct any independent research to verify that the images were representative. (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 21:2-18, 22:23-23:13.)

- In assessing the claimed importance of Plaintiff's images to Skechers' promotional efforts, Dr. Luntz failed to consider other aspects of Skechers' marketing communications mix, including media placement,

frequency of exposure, pricing strategy, and product design.  (Scott Decl. ¶ 41.)  For example, if the Skechers images tested were from ads that were most frequently used, respondents may associate the images with Skechers because of the long history of use and not because of the photos used.  (*See id.* ¶ 37.)

- Dr. Luntz erroneously equates interest in purchasing a brand with a decision to actually buy the product.  (*Id.* ¶ 22.)  It is unclear what role "interest" plays in a decision to actually purchase a Skechers shoe.  (*Id.* ("[O]ne's interest may be increased, but it may still be far from sufficient to stimulate actual purchase").)

- Finally, the survey results do not support Dr. Luntz's ultimate conclusion that the ad images positively influenced consumers' attitudes toward Skechers or conclusively increased the level of interest in Skechers' products.  With one exception, the ad images received ratings by respondents on the five characteristics (exciting, enthusiastic, appealing, likely to purchase, and enthusiastic) that were only slightly above the "completely neutral" point on the scale.  (*Id.* ¶¶ 49-51.)  This is far from a "clear and compelling" result.

### III.   DR. LUNTZ'S SURVEY AND OPINIONS SHOULD BE EXCLUDED DUE TO HIS FAILURE TO PRODUCE CRITICAL DATA AND OTHER DOCUMENTS RESPONSIVE TO SKECHERS' SUBPOENA

One of the other hallmarks of a properly conducted litigation survey is that the expert retain and produce all underlying data for evaluation.  The trustworthiness of a survey and the professionalism of the expert can be gauged by the "completeness of the survey report."   Diamond, Fed. J. Ctr. Ref. Guide at 415.  At a minimum, a properly constructed survey report should provide detailed information about the target population, how respondents were selected, and incomplete or terminated questionnaires, as well as copies of all completed

questionnaires "so that the opposing party has an opportunity to evaluate the raw data." *Id*. at 415-16, 18.  Plaintiff and Dr. Luntz, however, did not comply with these requirements either voluntarily, in response to Skechers' properly served subpoena for Dr. Luntz's records, or even after Magistrate Judge Segal ordered them to produce all responsive records.

Skechers propounded a subpoena that sought all document in Dr. Luntz's possession, custody or control relating to the following topics:

- All documents, data or other information that Dr. Luntz considered or relied upon in formulating his opinions;
- All documents, including bills and invoices, relating to Dr. Luntz's compensation;
- "Any and all electronic databases, spreadsheets or worksheets used in the preparation of [Dr. Luntz's expert report, which included his survey materials], produced in native format with all programs, formulas, and output intact"; and
- All documents "relating to preliminary questions regarding survey participation and/or demographic information (i.e., 'screening questions') asked of potential survey participants."

(Barker Decl. ¶ 7, Ex. 5 (Luntz Depo. Ex. 514 - Subpoena) at 7-8.)

Although Plaintiff accepted Skechers' subpoena on behalf of Dr. Luntz, he later refused to produce the witness for deposition before the discovery cut-off or to produce documents responsive to Skechers' subpoena.  After Skechers moved to compel, Magistrate Judge Segal ordered them to produce all responsive documents by the close of business on May 9.  (*Id*. ¶ 8, Ex. 6 (Magistrate Judge Order) at 6.) In response to the Court's order, Plaintiff and Dr. Luntz largely produced only additional copies of materials attached to Dr. Luntz's expert report.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 45:16-22.)  When Skechers took Dr. Luntz's deposition three days later (again, pursuant to Court order), no more documents were

1   produced.  However, in addition to identifying the unproduced raw data, Dr. Luntz

2   identified the following additional materials that he considered or relied upon in

3   formulating his opinions that also have not been produced:

- Dr. Luntz was provided with 20 to 24 finished marketing images by
  Plaintiff's counsel that he considered in making his final determination of
  which images to include in the survey.  (*Id*. at 18:2-16.)

- On another occasion, Dr. Luntz met with Plaintiff's attorneys at Lavely &
  Singer and was shown another set of visuals that he considered in
  formulating his opinion.  (*Id*. at 33:6-20.)

- Raw data relating to survey respondents' actual responses that are in the
  possession of a third party called Global Marketing Research Services
  ("GMRS").  (*Id*. at 47:10-48:1.)

13      The most critical documents that Plaintiff and Dr. Luntz have suppressed are

14   the "raw" responses of the individual participants to the survey.  Such underlying

15   raw data should be made available upon demand for any properly conducted

16   survey.  *See* Diamond, Fed. J. Ctr. Ref. Guide at 418 ("Copies of all questionnaires

17   should be made available upon request so that the opposing party has an

18   opportunity to evaluate the raw data.").  Without access to this raw data, it is

19   impossible for Skechers' expert Dr. Scott to replicate Dr. Luntz's analyses and

20   check the results he claims to have obtained.  (Scott Decl. ¶ 17.)

21      This data admittedly exists and it is undoubtedly in Dr. Luntz's ***actual***

22   ***control***.  GMRS is a company that Dr. Luntz regularly engages for work on his

23   surveys.  (Barker Decl. ¶ 5, Ex. 3 (Luntz Depo.) at 46:20-47:9.)  He has free access

24   to that data whenever he wants, and can have GMRS run whatever analyses or

25   reports he might request.  (*See, e.g., id.* at 52:15-17 (agreeing that GMRS "would

26   provide you with whatever information you requested"); *see also id.* at 48:5-49:8

27   (agreeing that he has no reason to believe GMRS would refuse to provide raw data

28   if he asked for it, but he has not asked for it); *id.* 51:22-52:8 (agreeing that GMRS

would tabulate the raw data however he requests); *id.* at 94:2-13 (agreeing that GMRS could and did present the raw data differently at his request).)  Under the circumstances, Dr. Luntz was under a legal obligation to contact GMRS and obtain the raw data.  "A recipient of a document production request cannot furnish only that information within his immediate knowledge or possession; he is under an affirmative duty to seek that information reasonably available to him from his employees, agents, or others subject to his control."  *Herring v. Clark*, 2011 WL 2433672, at *5 (E.D. Cal. June 14, 2011) (quoting *Gray v. Faulkner*, 148 F.R.D. 220, 223 (N.D. Ind. 1992)).

Dr. Luntz's failure to comply with the usual rules for litigation surveys, Skechers' subpoena, and Magistrate Judge Segal's order is a clear violation of Federal Rule of Civil Procedure 37(b), which provides for sanctions for the failure to comply with a court order.  Among those sanctions is the option for the court to prohibit the "disobedient party" from "introducing designated matters into evidence."  Fed. R. Civ. P. 37(b)(2)(A)(ii).  Dr. Luntz's failure to produce either the raw data underlying his survey or all documents that he considered or relied upon in formulating his opinions is prejudicial to Skechers both in terms of completing its expert discovery and preparing for trial, as well as in crafting its Motion for Summary Judgment.  As such, Skechers submits that Dr. Luntz's survey and opinions can and should be barred on that basis alone.

## IV.   **CONCLUSION**

For all the foregoing reasons, the Court should issue an order precluding Plaintiff from seeking to introduce any purported expert testimony from Dr. Luntz.

Dated:  May 21, 2012            O'MELVENY & MYERS LLP


By: /s/ Robert C. Welsh
Robert C. Welsh
Attorneys for Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II