WILLIAM J. BRIGGS II (BAR NO. 144717)
HENRY L. SELF III (BAR NO. 223153)
LAVELY & SINGER
PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
Email: wbriggs@lavelysinger.com
        hself@lavelysinger.com

Attorneys for Plaintiff
RICHARD REINSDORF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD REINSDORF, an individual, | CASE NO. CV10-7181-DDP (SSx) |
| Plaintiff, | PLAINTIFF RICHARD REINSDORF'S OPPOSITION TO MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM FRANK LUNTZ; DECLARATION OF HENRY L. SELF, III, IN SUPPORT THEREOF |
| v. | |
| SKECHERS U.S.A., INC., a Delaware corporation; SKECHERS U.S.A., INC. II, a Delaware corporation; and DOES 1–10, inclusive, | [Hon. Dean D. Pregerson, Room 3] |
| Defendants. | Date:          July 9, 2012<br>Time:          10:00 a.m.<br>Ctrm:          3 |
| | Discovery Cut-Off:     May 15, 2012<br>Pretrial Conference:    July 2, 2012<br>Trial Date:             July 10, 2012 |

1    Plaintiff Richard Reinsdorf ("Reinsdorf") hereby opposes the Motion *In*
2  *Limine* to Exclude Expert Testimony from Frank Luntz (the "Motion") filed by
3  Defendants Skechers U.S.C., Inc. and Skechers U.S.A., Inc. II (together,
4  "Skechers").  Luntz's testimony is admissible, will assist the Court in determination
5  of the issues, and is provided based upon his expert opinion, experience and
6  knowledge.   The Motion should be denied in its entirety.
7
8  I.    INTRODUCTION
9    "Vigorous cross-examination, presentation of contrary evidence, and careful
10  instruction on the burden of proof are the traditional and appropriate means of
11  attacking shaky but admissible evidence."[1]  *Daubert v. Merrell Dow Pharms., Inc.*,
12  509 U.S. 579, 596 (1993).  Nevertheless, Skechers attempts to exclude the expert
13  testimony of Frank Luntz ("Luntz") by conducting a purely theoretical critique of
14  Luntz's expert testimony based upon Skechers' interpretations of the suggestions of
15  a treatise – the *Reference Guide on Survey Research* in the REFERENCE MANUAL ON
16  SCIENTIFIC EVIDENCE, 3d Ed., published by the Federal Judicial Center in 2011(the
17  "Reference Manual")  – and upon the accompanying Declaration of Professor Carol
18  A. Scott, Ph.D. in support of the Motion (the "Scott Decl.").   The Reference
19  Manual, Scott Declaration and arguments asserted in connection therewith pertain
20  only to the weight of Luntz's testimony, provide *absolutely no rebuttal evidence of*
21  *any kind*, and cannot justify exclusion of his testimony.  Luntz's survey and
22  testimony are based on reliable principles and result from a thorough survey of
23  appropriate consumers, the results of which have not been rebutted or even drawn
24  into serious question.  Instead, Dr. Scott has nitpicked Luntz's survey in numerous
25  debatable and highly technical ways.  As a matter of law, the existence of a
26
27  _____
28    [1]  Reinsdorf does not concede that Luntz's survey or testimony is "shaky" – his survey
is thorough, easily satisfying the *Daubert* requirements – but highlights *Daubert's* guidance
that disputes as to the accuracy of expert testimony are best decided by the trier of fact.

theoretical critique of Luntz's survey and testimony does not render it inadmissible. *See Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) aff'd, 296 F.3d 894 (9th Cir. 2002).

The only other contention set forth in the Motion is an allegation that Luntz failed to produce the "underlying data" for the survey he conducted. The contention is moot. The last of that data was produced on May 22, 2012, the day after the Motion was filed. (*See* Declaration of Henry L. Self, III (the "Self Decl."), ¶ 3.) Moreover, the "underlying data" is simply the individually logged survey results of *each individual survey participant*, the value of which is precisely zero given that Luntz had already produced the *aggregate survey data* with his expert report on April 13, 2012 (*i.e.*, the "underlying data" is simply the aggregate data prior to aggregation or in an individualized format). In other words, Skechers at all pertinent times possessed the aggregate survey results, separated question-by-question and documenting in detail the survey answers to each distinct answer option in Luntz's survey. Skechers merely complains that it didn't have all individually logged answer sets from each individual survey participant in separate, individual documents. As of May 22, Skechers was provided with that (redundant) information as well. (Self Decl., ¶ 3.) The underlying data dispute was and remains a red herring created by Skechers to attempt to undermine Luntz's expert testimony, and should be ignored.[2]

The Motion does not demonstrate that Luntz's testimony is unreliable or unreasonable. At its most compelling, the Motion presents interesting questions of fact as between two qualified experts in the fields of survey administration, one of

---

[2] Skechers' contention is also undercut by the fact that Skechers failed and refused to produce financial data and specific sales data on its various product lines during pertinent periods of time. In short, Skechers has prevented Reinsdorf from obtaining direct proof of the sales of the pertinent product lines. (*See* Declaration of William J. Briggs in Support of Plaintiff Richard Reinsdorf's Opposition to Defendant's Motion for Summary Judgment, ¶¶ 26–27.) Skechers should not be rewarded for on the one hand complaining about being delayed in its receipt of non-aggregated data while on the other actively concealing crucial data about sales of the various product lines marketed by using Reinsdorf's images.

1   whom, in Luntz's case, is also an extremely qualified and celebrated expert in

2   branding.  Because the Motion amounts to nothing more than an intellectual dispute

3   between Dr. Luntz and Dr. Scott, their testimony should be heard and its weight

4   determined by the trier of fact.  *Daubert*, 509 U.S. 596 (1993).

5

6       A.    Luntz's Qualifications

7       Luntz is a recognized expert in quantitative and qualitative market and

8   language research, holding a Bachelor of Arts degree in history and political science

9   from the University of Pennsylvania, and a Ph.D. in politics from Oxford

10  University.  Luntz has spent more than 25 years consulting and researching in the

11  fields of branding, language and consumer opinion.  Luntz is the Chief Executive

12  Officer of Luntz Global, and before assuming that position that he worked for other

13  language and image consulting research firms.  (Luntz Report, p. 2.)

14      In his professional career he has provided professional services including

15  focus groups, management of brands, creation of advertising campaigns, public

16  relations management, and market research surveys for numerous companies

17  (including Fortune 100 companies).  Luntz possesses comprehensive knowledge of

18  survey methodology, having either performed or supervised "every possible job task

19  related to fielding surveys and gauging consumer opinion."  (Luntz Report, p. 2.)

20  He has been retained in litigation as a marketing and survey expert on two occasions

21  prior to this action.  (5/12/12 Deposition of Frank Luntz ("Luntz Depo.") at

22  10:5–11:13.)  Finally, he has authored three New York Times Best Sellers on the

23  use of language and images in branding efforts (*Words That Work*, *What Americans*

24  *Really Want . . . Really*, and *WIN: The Key Principles to Take Your Business from*

25  *Ordinary to Extraordinary*).

26  ///

27  ///

28  ///

B.   <u>Skechers' Attempt to Attack Luntz's Professional Credibility is
Reckless, Inappropriate and Entirely Misleading</u>

With regard to the alleged failure to produce certain survey data, Skechers sacrifices credibility by alleging that "this is not the first time Dr. Luntz has failed to disclose the *methodological details* of his survey research.   In 1997, The Executive Council of the American Association for Public Opinion research found Dr. Luntz to be in violation of its Code of Professional Ethics and Practices for refusing to provide basic facts about an opinion poll." (Motion, p. 1, fn. 1, lines 24–28 (emphasis added).)   The accusation is irrelevant and misleading – there is no "methodological detail" that Skechers can possibly claim to have lacked at any point.   The circumstances noted in the Motion bear absolutely *no resemblance* to the meek allegations utilized by Skechers to twist Luntz's comprehensive production of survey materials into some species of professional failure.[3]

Luntz produced each and every survey result, each and every survey question, each and every survey image, all details about the sample of survey participants, and the aggregate results split into discrete answers to each discrete question.   Indeed, Dr. Scott was able to comprehensively analyze Dr. Luntz's survey in order to perform a (purchased) critique thereof *because Dr. Luntz provided all relevant information*.   The issue noted in the Motion arose 15 years ago and related to an alleged failure to disclose "the wording of questions and other basic methodological details when poll findings [were] made public." (Self Decl., ¶ 2, Ex. A.)   It is an

---

[3]  A true and correct copy of the report noted in the Motion is attached to the Self Declaration as Exhibit 2.   The report states that "AAPOR holds that researchers must disclose, or make available for public disclosure, the *wording of questions* and other *basic methodological details* when poll findings are made public. This disclosure is important so that claims made on the basis of opinion research findings *can be independently evaluated*." (Self Decl., ¶ 2, Ex. A.)   It is alleged that Dr. Luntz failed to do so in that instance.   It is unbelievable that Skechers contends that this alleged incident from fifteen (15) years ago has any bearing on the current dispute.   Among other things, Skechers cannot possibly contend that Luntz failed to produce the wording of questions or basic methodological details – he comprehensively produced both.   Moreover, Dr. Scott in fact *did* independently evaluate the survey's technical and methodological details.   Any contention meant to suggest the contrary is reckless, unprofessional and irrelevant to the issues raised in the Motion.

1  irrelevant and extremely misleading effort to demean Dr. Luntz's professional
2  achievements and credibility, and should be disregarded.

3

4      C.    The Survey

5      The survey conducted by Luntz was designed to test two things.  First, it was
6  designed to test whether Reinsdorf's photography was directly linked to the
7  Skechers' brand by determining whether survey participants could identify a
8  Skechers brand advertisement when visual cues, *other than Reinsdorf's*
9  *photographs*, of the Skechers brand were removed from the images used.  Second,
10 it was designed to determine whether potential consumers were influenced by
11 Reinsdorf's images to purchase the product they believed was presented in the image
12 (which was, again, scrubbed of all brand identifiers).   After conducting a
13 randomized survey of 817 participants between the age of 16 to 24 and
14 approximately evenly split between men and women, Luntz concluded that the
15 results of the survey were conclusive, and that there is a "direct and compelling
16 brand recognition score attached with the Skechers brand as represented by
17 Reinsdorf's photography."  (Luntz Report, p. 3–4.)

18

19 II.   ARGUMENT
20      A.    The Motion Must Fail Because it Pertains Only to the Weight of
21            Luntz's Testimony.
22      It is axiomatic that "surveys are to be admitted as long as they are conducted
23 according to accepted principles" and that *"[t]echnical unreliability goes to the*
24 *weight accorded a survey, not its admissibility."*   *Mattel, Inc. v. MCA Records,*
25 *Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) aff'd, 296 F.3d 894 (9th Cir.
26 2002) (emphasis added); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967
27 F.2d 1280, 1292 (9th Cir. 1992) ("As noted above, *it is routine to admit a relevant*
28 *survey*; any technical unreliability *goes to weight, not admissibility."*); *Prudential*

1   *Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1156 (9th

2   Cir. 1982) ("Technical unreliability goes to the weight accorded a survey, not its

3   admissibility."). Indeed, "criticisms related to the *format of the questions* or the

4   *manner in which the survey was taken* go to the weight of the evidence, not its

5   admissibility." *F.T.C. v. John Beck Amazing Profits, LLC*, 2012 WL 2044791, at

6   *6 (C.D. Cal. 2012) (citing *Fortune Dynamics, Inc. v. Victoria's Secret Stores

7   Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal quotations and

8   brackets omitted)) (emphasis added). The Motion therefore fails at the outset: Dr.

9   Scott's, and by extension the Motion's, approach is to critique the survey

10  methodology on technical grounds in an attempt to attack the reliability of Luntz's

11  testimony and work. Because Skechers merely critiques the technical reliability of

12  Luntz's survey the Motion must fail as a matter of law. *Mattel*, 28 F. Supp. 2d

13  1133; *E. & J. Gallo Winery*, 967 F.2d 1292; *Prudential*, 694 F.2d 1156; *Watec*,

14  2002 WL 34373489 at *1. No further argument need be conducted to reach the

15  correct result.

16

17        B.    <u>Luntz's Testimony is Admissible</u>.

18        As admitted by Skechers in the Motion, an expert opinion is admissible if it

19  "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*,

20  509 U.S. at 597. Here, Luntz has provided a thorough survey of 817

21  demographically accurate potential purchasers of Skechers products, in which he

22  sought to identify whether the advertisements utilizing Reinsdorf's images were

23  effective in generating brand recognition and/or sales of Skechers products. No

24  evidence has been submitted to suggest counter the evidence resulting from Luntz's

25  work. Reinsdorf has satisfied the initial burden of providing a reliable and relevant

26  expert opinion.

27        Also as noted by Skechers in the Motion, Federal Rule of Evidence 702

28  requires that an expert "employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Rule 702 provides guidelines for the admissibility of expert testimony:

> "A witness who is qualified as an expert by *knowledge, skill, experience, training, or education* may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, *technical*, or *other specialized knowledge* will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case."

F.R.E. 702 (emphasis added).

In the context of survey evidence, the bar for exclusion is very high.  It is axiomatic that survey evidence must be extremely flawed for courts to exclude it. District courts will exclude survey evidence where the evidence exhibits "such gross indifference to the scientific method as to call into question the validity of any testimony that [the expert] would offer." *Vigil v. Michelin N. Am. Inc.*, 2007 WL 2778233, at *11 (W.D. Tex. Aug. 23, 2007).  Put differently in a 2002 decision rendered by this Court, survey evidence will be excluded where the "survey cannot qualify as common proof . . . because it is unrepresentative, unreliable, and has essentially no probative value." *Marlo v. United Parcel Services, Inc.*, 251 F.R.D. 476, 485–485 (C.D. Cal. 2008) (Pregerson, J.).  The surveys rejected as fatally flawed in reported decisions bear little or no resemblance to the survey conducted by survey veteran Luntz.  Moreover, the cases relied upon by Skechers concern surveys that are not remotely comparable to Luntz's survey.

In *Marlo*, the rejected survey was flawed in numerous ways, including most dramatically the fact that it was not designed by anyone having any knowledge relating to survey methodology.  The alleged expert who produced the survey

testified that "she did not know whether the survey sample was representative, did not do anything to evaluate whether the sample was representative, and was unaware of any guidelines for ensuring that a survey provides representative evidence." *Marlo*, 251 F.R.D. 485. Moreover, the alleged expert *did not design the survey* – instead, "*[p]laintiff's counsel* wrote the survey questions." *Id.* (emphasis added). In support of the flawed survey, the *Marlo* plaintiff attempted to utilize testimony from another person with "no background in survey methodology, no knowledge of the purpose of the survey or facts of [the] case, and [having] no role in designing the survey." *Id.* Because the survey was designed by counsel and conducted by a person admittedly lacking survey expertise, and because it contained "vague and ambiguous" questions, it was rejected by this Court. However, the Court *still* entertained admission of the deeply flawed survey, explaining that "[e]ven if the Court were to stretch the rules of reliability and permit this evidence to be presented to the jury, the . . . survey asked vague and ambiguous questions that largely did not address elements of the [case] and thus has essentially no probative value." *Id.*

Here, by comparison, an extremely experienced and credentialed survey expert conducted a survey wholly created by him and designed to accurately reflect consumer awareness and the impact of the selected images on the Skechers brand. (Luntz Depo. at 88:16–88:20.) The questions were presented randomly to each participant in the survey to ensure that any bias in the survey was eliminated. (Luntz Depo. at 88:21-88:25, 89:1–89:5.) Also unlike the *Marlo* survey, Luntz was careful to restrict the pool of survey participants to purchasers understood by him to be the majority of purchasers of Skechers products, *i.e.* individuals between the ages of sixteen (16) to twenty-four (24). (Luntz Depo. at 104:22–104:25, 105:1–105:8.) To date, no evidence has been presented to counter his analysis of the appropriate set of survey participants. Moreover, contrary to Skechers' contention that Luntz provided no rationale for the population studied, Luntz carefully mapped the survey pool to his researched understanding of the accurate

pool of potential purchasers of Skechers products.  Neither the Motion nor the Scott Declaration present one iota of evidence that Luntz has an incorrect sample of survey participants.  At most, Dr. Scott has demonstrated that it *may* be possible to demonstrate that a better pool of survey participants could have been selected.  Her other critiques are similar.  At their most persuasive, the arguments set forth in the Motion are relevant to the weight of Luntz's testimony but do not bear on the admissibility thereof.

Similarly, the Motion cites the unreported *Watec Co. Ltd. v. Liu*, 2002 WL 34373489 (C.D. Cal. 2002), decision for the proposition that a deeply flawed survey is not admissible.  (Motion, p. 3, lines 27–28.)  In *Watec*, the proponent of the survey was provided with a list of 3,000 relevant companies who were potential respondents to the survey in question.  The surveyor augmented that list with 351 of the defendant's direct customers, a benefit not extended to the plaintiff in the survey sample.  Then, exacerbating the flaw, the surveyor only propounded survey questions to 102 persons, 19 of whom were actual customers of the defendant.  *Id.* at *1.  Finally, destroying the value of the survey, the surveyor supplemented the survey with *new questions* after it had already begun, and failed to indicate in her report that this change had been made midstream.  *Id.*  That survey, in which a "stacked deck" was used for no apparent reason *and* in which different respondents responded to different questions, was deemed inadmissible.  *Id.* at *2.

*Watec* simply bears no resemblance to the current dispute.  Luntz has committed none of these errors, nor any errors similarly egregious (if he has committed any errors at all).  Indeed, in *Watec* the surveyor intentionally sought responses from advantageous participants.  Skechers does not – because it cannot – allege such seriously and intentionally flawed work.  Moreover, *Watec* is clear that "*at the summary judgment stage, survey evidence, even if flawed, may be sufficient to raise a triable issue of fact and defeat summary judgment.*"  *Id.* at *1 (citing *Mattel*, 28 F.Supp.2d 1133-1135 (emphasis added)).  Here, Luntz has

produced a reliable survey based upon his expertise in the field of conducting marketing surveys, and it has been critiqued by another survey expert. Their dispute amounts to nothing more than a technical dispute regarding the reliability of the survey. The Luntz report's reliability is therefore appropriate for adjudication by the jury, and must not be excluded at this early juncture. *See Mattel*, 28 F. Supp. 2d 1133; *E. & J. Gallo Winery*, 967 F.2d 1292; *Prudential*, 694 F.2d 1156.

        C.    <u>Luntz Provided All Raw Data</u>.

As explained above, the Motion's remaining contention in connection with the alleged failure to provide raw data is a red herring that has been both answered and handled. The data was provided to Skechers on May 22, 2012. (Self Decl., ¶ 3, Ex. B.) Skechers will therefore have ample opportunity to generate critiques of Luntz's survey before trial. Skechers has suffered no harm because, among other things, as a matter of law Luntz's survey cannot be excluded at this juncture and because the redundant information Skechers complains Luntz withheld did not augment Skechers' ability to analyze Luntz's survey or work. The Motion's request for exclusion as an effective discovery sanction must fail.

///
///
///
///
///
///
///
///
///
///
///

III.     <u>CONCLUSION</u>

For the foregoing reasons, the Motion should be denied in its entirety, Luntz's survey is admissible and Luntz should be allowed to testify as an expert witness.


DATE: June 18, 2012                          LAVELY & SINGER
                                             PROFESSIONAL CORPORATION
                                             WILLIAM J. BRIGGS II
                                             HENRY L. SELF III

                                                  S/William J. Briggs, II
                                             By:_____
                                                  WILLIAM J. BRIGGS, II
                                             Attorneys for Plaintiff
                                             RICHARD REINSDORF

## DECLARATION OF HENRY L. SELF, III

I, Henry L. Self, II, declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts of this state and am an attorney with the law firm Lavely & Singer Professional Corporation, attorneys for Plaintiff Richard Reinsdorf ("Reinsdorf") herein.  I have personal and first hand knowledge of the matters set forth in this Declaration and, if called and sworn as a witness, I could and would testify competently thereto under oath.

2.      On information and belief, the Motion *In Limine* to Exclude Expert Testimony from Frank Luntz cites a document available at web address http://www.aapor.org/Content/aapor/resources/formedia/archivedpressreleases/aaporfindsfrankluntzinviolationofethicscode/default.htm.  On June 18, 2012, I visited the above web address and printed a true and correct copy of the document hosted at that address.  A true and correct copy of the document is attached hereto as Exhibit "A."

3.      Attached hereto as Exhibit "B" is a true and correct copy of an email sent by me to Drew Breuder, counsel to Defendants Skechers U.S.A., Inc. and Skechers, U.S.A., Inc. II ("Skechers").  Attached to that email was an excel spreadsheet entitled ReinsdofSurvey-CompleteDataset.xlsx, which contained the raw survey data requested by Skechers.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of June, 2012, at Los Angeles, California.


S/Henry L. Self III

HENRY L. SELF, III

# EXHIBIT "A"



**The leading association of public opinion and survey research professionals**


About AAPOR | Advocacy & Initiatives | Resources & Education | Events Calendar | Career Center | Member Connect | Annual Conference | Find a Researcher | Survey Transparency | Join or Volunteer

Home > Resources & Education > For Media > Archived Press Releases > AAPOR Finds Frank Luntz in Violation of Ethics Code

Resources & Education

For Researchers
For Media
For Students
Poll & Survey FAQ
Webinars

## AAPOR FINDS FRANK LUNTZ IN VIOLATION OF ETHICS CODE

Wednesday, April 23, 1997 – The Executive Council of the American Association for Public Opinion Research (AAPOR) announced Wednesday that a 14 month investigation found pollster Frank Luntz violated the Association's Code of Professional Ethics and Practices.

AAPOR found Luntz, who heads the Luntz Research Companies in Arlington, Virginia, repeatedly refused to make public essential facts about his research on public attitudes about the Republicans' "Contract with America." In particular, the AAPOR inquiry focused on Luntz's reporting, prior to the November elections in 1994, that his research showed at least 60 percent of the public favored each of the elements in the GOP "Contract." When later asked to provide some basic facts about this research, Luntz refused.

AAPOR holds that researchers must disclose, or make available for public disclosure, the wording of questions and other basic methodological details when poll findings are made public. This disclosure is important so that claims made on the basis of opinion research findings can be independently evaluated. Section III of the AAPOR Code states: "Good professional practice imposes the obligation upon all public opinion researchers to include, in any report of research results, or to make available when that report is released, certain essential information about how the research was conducted."

Richard A. Kulka, chair of AAPOR's Standards Committee noted that AAPOR's investigation of Luntz began in January 1996, after receiving a complaint from a member. According to Kulka, "AAPOR tried on several occasions to get Luntz to provide some basic information about his survey, for example, the wording of the questions he used. For about a year, he ignored these requests. Subsequently, he provided partial information, but still refused o let us make any of the information public, arguing that the results were roprietary, even though he had been discussing the conclusions of the survey n public for nearly two years."

AAPOR's President, Diane Colasanto, adds "When researchers make ublic arguments based on their research data, then refuse to say how their esearch was conducted, that harms the public debate on issues and reduces he credibility of all survey and public opinion research."

AAPOR is an organization of over 1,400 research professionals from government agencies, colleges and universities, non-profit organizations, and commercial polling firms. It is the primary professional association representing public opinion researchers, and has a strong interest in protecting and strengthening the credibility of survey research. The organization was founded in 1947 by such pioneers of polling as George Gallup, Hadley Cantril, and Paul Lazarsfeld.

Luntz is not a member of the organization.

© American Association for Public Opinion Research
111 Deer Lake Road, Suite 100 | Deerfield, IL 60015

  

HOME | CONTACT | SITE MAP

**EXHIBIT "B"**

**Henry L. Self**

| | |
|---|---|
| **From:** | Henry L. Self |
| **Sent:** | Tuesday, May 22, 2012 1:10 PM |
| **To:** | 'Breuder, Drew' |
| **Subject:** | FW: RE: Dr. Luntz Expert Testimony in R. Reinsdorf Case |
| **Attachments:** | ReinsdorfSurvey-CompleteDataset.xlsx |

Please see attached.

From: lindsay@luntzglobal.com
To: filuntz@aol.com
CC: matt@luntzglobal.com
Sent: 5/21/2012 3:17:51 P.M. Eastern Daylight Time
Subj: RE: Dr. Luntz Expert Testimony in R. Reinsdorf Case

Frank and Matt,

 Attached is the full data set from the Reinsdorf survey.  Each line shows a respondent's unique ID number, followed by his or her individual responses.

 I have sorted the data first by gender (Q2), then by age (Q1).  Also attached again, for reference, is the survey Word doc.

 Please let me know if there is anything else I can do to tailor this to the client's needs.

6/15/2012