1  **WILLIAM J. BRIGGS II (BAR NO. 144717)**
   **HENRY L. SELF III (BAR NO. 223153)**
2  **LAVELY & SINGER**
   **PROFESSIONAL CORPORATION**
3  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
4  Telephone: (310) 556-3501
   Facsimile: (310) 556-3615
5  Email: wbriggs@lavelysinger.com
          hself@lavelysinger.com

Attorneys for Plaintiff
RICHARD REINSDORF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD REINSDORF, an individual, <br><br> Plaintiff, <br><br> v. <br><br> SKECHERS U.S.A., INC., a Delaware corporation; SKECHERS U.S.A., INC. II, a Delaware corporation; and DOES 1–10, inclusive, <br><br> Defendants. <br> _____ | CASE NO. CV 10-7181-DDP (SSx) <br><br> **DECLARATION OF RICHARD REINSDORF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date:   July 23, 2012 <br> Time:   10:00 a.m. <br> Courtroom: 3 <br><br> [Hon. Dean D. Pregerson, Room 3] <br><br> Discovery Cut-Off: May 15, 2012 <br> Pretrial Conference: August 27, 2012 <br> Trial Date: September 11, 2012 |

I, RICHARD REINSDORF, declare:

1. I am the plaintiff in the above captioned action. The facts stated herein are based on my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. As to those matters stated on the basis of information and belief, I am so informed and believe those matters to be true.

2. I am a Los Angeles-based photographer with 20 years of professional experience. I am represented by Opus Reps, a company that represents photographers, art directors and prop stylists. I have created images for leading advertising campaigns, magazine editorials and beauty shoots. My editorial clients include *Seventeen*, *InStyle*, *Vegas*, *Redbook*, *Cosmopolitan*, *Vogue*, *Angeleno* and *Ocean Drive* magazines; my advertising clients include Levi Strauss, Eddie Bauer, Nordstrom, Liz Claiborne, Lands End, Sony, Heineken, Frito Lay, Nautilus, Kohls, JCPenney and many others.

**Skechers Engages Reinsdorf To Help It Create a Marketing Campaign**

3. In 2005, I met with Skechers' former Art Director, Marty Brown. I showed Mr. Brown my portfolio and he hired me to shoot an advertising campaign for Michelle K Shoes, one of Skechers' brands. On a subsequent photo shoot, I worked with a makeup artist named Sole Alberti. Ms. Alberti referred me to Jason Greenberg, Skechers' Senior Vice President of Visual Imaging, who in turn suggested that I meet with Fred Machuca, Skechers' Vice President of Creative Design, about doing a photo shoot for Skechers. Based on their review of my portfolio and my ideas for a Skechers photo shoot, the Skechers executives hired me.

4. My representative, Bobby Heller, was contacted by Mr. Machuca and Jill Simonian, another Skechers employee, to negotiate a contract for my photographic services. I understood that Skechers wanted not just a photographer, but an artist with high energy and the ability to direct a group of models in a single shot, light and capture dynamic moments involving their facial expressions, poses, angles and

1  movement.  Skechers wanted a photographer who would create a "vibe" on set to
2  match and complement the Skechers product.  I satisfied these criteria for Skechers.
3      5.   I met with the Skechers executives to discuss my creative ideas for
4  Skechers' photo shoots.  We spent a great deal of time reviewing my portfolio, talking
5  about my prior work and listening to my ideas for a Skechers photo shoot.  During
6  this meeting, Skechers did not present me with story boards, tear sheets (or "tears")—
7  images torn from magazines—or layouts.

### November 2006 Photo Shoot

9      6.   The first photo shoot I did for Skechers was on November 16, 2006.
10     7.   In advance of the photo shoot, I personally hired Pennie Humphreys, a
11 very experienced art director with whom I had worked in the past, because I knew
12 that Mr. Machuca had very little experience with photo shoots and that he had little
13 experience on set and needed to learn how to run and set up a photo shoot.  Further,
14 because Mr. Machuca did not have tears or story boards, I believed it critical to have
15 Ms. Humphreys work with me.  As the art director for my shoots, Ms. Humphreys
16 provided me with tears that she collected from magazines and catalogs from which
17 I would draw inspiration for my photographs.  The collection of tears and everything
18 posted together by the art director is referred to in my industry as "mood boards."
19     8.   I also hired, directed and paid for digital technicians, photography
20 assistants, prop stylists, set dressers and other production assistants to work with me
21 on the day of the shoot.  I recommended the hair dresser, Frankie Payne, whom
22 Skechers hired for the 2006 photo shoot.
23     9.   Although I was not in charge of the model casting, I was involved in the
24 casting process and recommended certain models such as Chanel Celaya, Bella
25 Bruning and Tracey Long for the Skechers photo shoots.  But more importantly, out
26 of the models that were cast, I selected the ones who I believed would work the best
27 in front of the camera and portray the visual that I wanted to create for Skechers.  I
28 would determine within a few moments of working with a certain model whether I

could pull more out of him or her. For example, if, during a shoot, I saw that a model was not working for what I was trying to create, I would have that model replaced with a stronger model. I had to do that during the Skechers photo shoots.

10. A critical aspect of my job was to correct things on set when they did not look right. In one particular case, I recall that Mr. Greenberg liked a certain model for a shot, but I did not think that model had the right look and suggested a different model who I believed had a much stronger look for the picture and would appeal much more to women buying the Skechers product. Mr. Greenberg initially wanted to release the model whom I preferred for the shoot, but I convinced him to allow me to use the model for the remainder of the shoot. Ultimately, the Skechers executives went with the model I selected for many of the advertisements. I believe that I was responsible for Skechers avoiding a major casting error that day.

11. When I photographed a particular model, I gave him or her direction for poses that evoked unique expressions and images with his or her facial features, body position and hair. I would describe my degree of control over this photo shoot, and all subsequent photo shoots I did for Skechers, as virtually absolute. In other words, I controlled nearly every aspect of the photo shoot including the amount of light used on each set, whether to use colored gels on some of the lights, the props used on the sets, the mood, feel and texture of the images I captured, the specific camera angles used for each shot, the focal length of the lens used for each shot, the shutter speed, aperture setting and the moment to take the picture in order to capture the subtle movements which would affect the look of each model—from his or her hair placement to how and where light was reflected off his or her skin and clothing. In sum, I alone controlled the detail intensive artistic elements of the images I captured to duplicate my conception and vision of what the images and models should look like. The most important part of each shoot was the pre-light. I set up all the sets, I determined the floor space needed and I tested and fine tuned all of my light settings. I would basically run through all the shots the day before the Skechers people were

even involved or present. I would have a member of my crew stand in for the models and fine tune what I was setting up to ultimately capture. I would use each set to interchange for multiple setups. At the pre-lights we would tape our marks for light placement on the studio floor. We would also have pieces of tape on each power pack with the exact settings for each light in each setup clearly marked. All the shots taken at the pre-lights were imported into the capture station and adjustments were made accordingly. This way when an image was imported into the computer on the shoot day, it was already perfect and ready for use. On most setups, the key light or main light on the models was on medium rollers so that it could be mobile and my assistants could move the light or lights as I moved with the models during the photo shoot. I move my angles and the models positioning constantly as I shoot. The only time I would stay still is to catch the model when I would have them jumping through the air and have to be stationary. When the models were more still then I would in turn be constantly changing my camera angles to get different perspectives and create more interesting images. Out of the images I took, there would be countless usable options. Many of them were printed out during the photo shoots.

12. Prior to the shoot, I attended a concept meeting with certain members of the Skechers team. I did most of the talking at the concept meeting and, based on what I observed at that meeting and during a subsequent photo shoot, it was evident to me that the Skechers team had no concrete creative concept in mind for the photo shoot and they intended to rely on my experience, creativity and expertise to come up with ideas for the shoot. In fact, it quickly became apparent to me that Mr. Machuca and the other Skechers designers were averse to taking any creative stand whatsoever. The Skechers team's main concern was to make sure that the product (*i.e.*, the shoes) were well lit and that the Skechers "S" logo was visible on the outside of the shoes.

13. Mr. Machuca relied on me to direct and capture material for Skechers to use. I drew my inspiration from the tears Ms. Humphreys provided to me and from the general ideas that Skechers wanted to convey in its campaign. However, I alone

came up with a concrete means of capturing those general ideas and inspiration I drew from magazine tears. For example, I chose the motifs and props for the shoots, I was responsible for choosing the color pallets for the set, I chose what expressions and emotions to evoke from each model, I posed the models, I created movement to affect the models' hair and overall form, I chose the lighting scheme, which would affect the models' skin tone, and I determined which models worked best in front of the camera. It was my vision and concepts that were captured in my photographs.

14.     An additional example of my control over the photo shoots was when, in 2006, I came up with the idea of using solid cubes of various colors and dimensions to create a set environment where the models could position themselves comfortably or simply be standing in an open space. (I had previously used solid cubes for a Walmart shoot in New York, the year before the Skechers photo shoot. Because of my prior use of cubes and how I posed the models on and around those cubes, I thought it would be a good idea to use them for Skechers.) I hired a prop stylist to gather cubes in the various dimensions that I requested, and to paint the cubes and the background of the set. By combining cubes of different colors and sizes and arranging (and rearranging) them in different configurations, I created a variety of sets each with a unique and eye-catching effect. This was in direct contrast to Skechers' initial desire to have me shoot in an empty studio with a white background. Mr. Machuca, in particular, was afraid that using color would detract from the models and the Skechers product. I made sure to keep the lighting on the models neutral to avoid the appearance of altering the color of the product.

15.     The models were able to incorporate the cubes in their poses and position their bodies in ways that would otherwise be impossible had the cubes not been used. The models could position their bodies comfortably while expressing desirable attitudes and emotions and effectively displaying the Skechers product. During each and every shot, I lit the props, directed my crew to turn them in various direction and altered my camera as well as the set angles until I captured some dynamic moments.

Attached as ***Exhibit 1***, and incorporated by reference herein, are true and correct copies of several of my copyrighted photographs demonstrating the use of the cubes and the lighting schemes I created.

16. Messrs. Machuca and Greenberg told me that they were impressed with my use of the cubes and they were extremely pleased with the photographs that I took incorporating the cubes. After seeing how excited they were about the use of the solid cubes, I came up with another idea and suggested that we have the models pose inside hollow cubes. I was looking ahead to future photo shoots. Ultimately, I had an adjustable plexiglass light-box created in order to form a hollow cube (that could be converted into a rectangle by adding an extra plexiglass panel) inside of which the models could pose in a variety of fashions. I used my concept of the hollow cubes in the April 2008 photo shoot, as described below.

17. Other photographic decisions that I made for the 2006 shoot—and for subsequent shoots—included setting the lighting, determining the number of sets needed, overseeing the building of those sets, deciding on the amount of floor space necessary and directing the models within that space by telling them how to pose and what expressions or emotions to convey. Throughout the shoot I was shouting out direction to the models—so much so that I lost my voice by the end of the day. While Skechers, like all my clients, was entitled to provide some degree of input on the set, in the end, ***it is important that I be the only person who gives the models direction because I am the one who is creating and capturing the images***.

18. Neither Mr. Machuca nor Mr. Greenberg nor any other Skechers executive was involved in the lighting decisions, the set creation, or the direction of the models. I always gave the Skechers executives multiple options for how to best capture and portray the Sketchers products in my photographs. Although not all of my ideas and concepts were accepted by Messrs. Machuca and Greenberg, due primarily to Mr. Greenberg's aversion to spending too much money on photo shoots, they accepted and approved the majority of my ideas and concepts including, but not

limited to, the use of the solid cubes, steel drums, chain link fences and hollow cubes. The Skechers team was highly deferential to my artistic choices in large part because they did not have their own creative vision for the shoot. It was then left entirely to me and my team to translate my ideas and concepts into photographic images.

19.   While the Skechers executives may have initially been skeptical about my ideas for the shoot, they were extremely pleased with the final product and used many of my copyrighted photographs, including uploading my images to the official Skechers website. As an indication of how pleased Skechers was with my work, the Skechers executives rehired me for the 2007 photo shoot and even recommended me to another company.

**September 2007 Photo Shoot**

20.   The second photo shoot I did for Skechers was on September 19, 2007.

21.   As was the case for the 2006 photo shoot, Skechers hired me to capture dynamic images of the models in various positions with motion and expression that best portrayed the Skechers product. I made use of shadows and incorporated other unique lighting effects into my photographs. In some cases, I captured the models in mid-stride, walking, kneeling and even hanging upside down from certain set props, and interacting with other elements on the set. In other cases, I posed the models, positioned them on the set and elicited various emotions and expressions from them. Again, the majority of ideas for this photo shoot came from me alone. Skechers did not provide me with story boards or layouts, and it never presented me with complete designs. I pulled elements that I had used on prior shoots, and incorporated those elements into the Skechers shoots. It was entirely up to me to translate those ideas into photographic images. I solely controlled the creation and conception of sets, color, light, camera angles and determined the models who worked best for each shot.

22.   In one iconic image that I shot for Skechers in 2007, I positioned a dark blond model leaning on a plexiglass counter. I had the model pose with her chin resting on her hands to frame her face, I elicited a slight grin from the model, and had

her look up and off to the side with her eyes.  I controlled the lighting on Chanel Celaya's face to be lighter one side then the other (about a stop and a half from one side of her face to the other to be exact). I felt that it would make the image more dynamic and interesting.  While Machuca showed me a tear sheet for inspiration, the image in the tear sheet contained lighting which was flat with no variation.  Moreover, I relied on Pennie Humphreys as the art director for this shoot, who brought along a number of tears for inspiration.  The image I captured of the model posed with her chin resting on her hands was ultimately incorporated into, and, in fact, became the focal point of the Skechers advertising campaign.  Attached as *Exhibit 2*, and incorporated by reference herein, are true and correct copies of several of my copyrighted photographs from the 2007 shoot, including the iconic image described in this Paragraph and the final Skechers ad into which it was incorporated.  Although Skechers may have given me a tear sheet as inspiration for this shoot, it was I alone who controlled every artistic element of the photo shoot.  I posed the model, I controlled the lighting, I created and conceptualized the set, and to evoke a sense of wonderment, I directed the model to make various facial expressions to capture an image of her appearing amazed and enthusiastic about all possibilities.  No one from Skechers had any input into these artistic elements, and no one from Skechers had anything to do with this photo shoot other than show me a tear sheet.

## 2008 and 2009 Photo Shoots

23. The third photo shoot I did for Skechers was on April 18, 2008.

24. As I had done for the previous two Skechers photo shoots, I selected and arranged the set, chose the color scheme, backdrop, props, accessories and lighting, and I posed the models in front of the camera to evoke the desired expressions from them.

25. Unique to the April 2008 shoot, however, was the use and incorporation of the hollow plexiglass cube that I had mentioned to the Skechers team at a prior shoot.  The plexiglass cube was my idea and concept and, in fact, I created them.

1  (Years before I ever met Skechers I did a concept photo shoot in Miami with art
2  director Jim Webster from Webster Design Group with female models in hollow
3  shapes for Hanes Lovable.  I created the hollow shapes.  I had some of these images
4  posted on my website and we reviewed them at the April 2008 concept meeting. I had
5  the models in many of the same poses I later did in the cube for Skechers. I remember
6  when I showed Fred and Jason these images they got excited and it sealed the deal on
7  them committing to let me run with my hollow cube idea. Attached is a sample of the
8  female models from the girls in the heart shoot in Miami.)  I caused the cube to be
9  fabricated per my specifications.  Skechers had absolutely nothing to do with
10 establishing the concept for the cube or the design, creation, or manufacturing of it.
11 The rough drawing of the cube that Skechers submitted is no more than a doodle
12 created by one of its graphic artist *after* I had already recommended using the cube.
13 Skechers did not provide a complete design of a marketing image—commonly known
14 as "layouts" in which you see all of the copy, graphics, mock-up of the desired
15 photograph, and how the final marketing material would look.

16         26.    At the April 2008 photo shoot, it was I—*not* Skechers—who created the
17 lighting for the cube.  I lit the cube from the outside and had the models pose inside
18 of the cube using the walls of the cube for leverage.  No one from Skechers was
19 present when I set up and lit the hollow cube.  By using this technique, I was able to
20 create unique images with beautiful lighting that showcased the Skechers product
21 exceptionally well.  The Skechers executives were excited about using the cube when
22 I pitched the idea, and they were extraordinarily pleased with the way the final
23 photographs looked. Attached as *Exhibit 3*, and incorporated by reference herein, are
24 true and correct copies of several of my copyrighted photographs from the April 2008
25 shoot demonstrating the use of the hollow plexiglass cube. There are no visible
26 differences to the images of the actual Girls In the Cube that I photographed and
27 those used in Skechers Ads other than removal of the cube.

28         27.    The fourth photo shoot I did for Skechers was on October 2, 2008.

28.     It was during the October 2008 photo shoot that I captured what has become the quintessential brand image for Skechers: the pouted-lip brunette donning sunglasses in front of a disco ball. I came up with the idea of how to light and shoot the disco ball, I posed the model, I suggested that she wear those particular sunglasses, and I suggested that the model pout her lips. I asked the model for multiple poses until I felt that I had captured the image I had in mind. The iconic image is solely of my creation. Skechers has used the disco ball photograph in multiple advertisements and has even used the disco ball by itself in certain advertising material. For example, this photo shoot was to support Skechers' Cali product line. I discovered that contrary to the terms of the limited usage license granted to Skechers for use of the Girl with the Disco Ball image, Skechers used the image on packaging. It was also used to support the entire "Skechers" ,brand as I discovered during my investigation. It was the main Skechers advertisement seen around the world along with being used on the Cali product line boxes. I never granted nor authorized Skechers to use any of my photographs on packaging. Attached as ***Exhibit 4***, and incorporated by reference herein, is a true and correct copy of this copyrighted image I shot for Skechers, which became the main focal point of their advertising campaign. In my professional opinion, Skechers made only minor changes to this photograph when it placed the photograph in its marketing images.

29.     I recommended to the Skechers executives that we rent a disco ball for use at the October 2008 shoot. When setting up for the disco ball shot, it was my idea to rig the disco ball on a boom, rather than hang it from the ceiling, so that my photo assistant could move it in and out of the frame and in any direction I wished as I was shooting. I took multiple exposures and angle tests to determine the exact amount of light and shape of light that would hit the ball at any given time. As with all the other setups, the day before the photo shoot at the pre light, my crew and I spent a lot of time fine tuning the disco ball setup. I tried many different setups until I came up

1  with the formula that I felt would work best and that we wound up using on the shoot
2  day. The lighting that I used for that shot was something that I have done since I
3  started shooting about 20 years ago. The actual light shaping tool I used was a special
4  reflector I got from my first assistant Dwayne Autery. At the shoot, I photographed
5  three different models in the setup and got several usable images. I did not feel that
6  the first pair of mirror aviator sunglasses that the model came on set wearing were
7  working, so I had them changed out to the pair that ultimately were used in the final
8  ad.
9          30.    I shot the model appearing in the iconic disco ball image separately from
10 the disco ball itself.  I chose the background colors and the lighting used in the
11 photograph and, most importantly, I told the model to pout her lips and touch her
12 sunglass in the manner depicted in the photograph. The Skechers executives were not
13 involved in any way creatively with respect to these shots.  In fact, the members of
14 the Skechers team stood in the back of the room during this particular series of
15 photographs.  Specifically, Mr. Machuca was sitting in a corner of the room talking
16 with one of his graphic designers.  In order to have any relevant input in giving
17 direction to the models or establishing a certain look, one would need to be in close
18 proximity to me and paying attention the entire time.  The Skechers executives did
19 not do that.
20         31.    After the October 2008 shoot, the Skechers executives fell in love with
21 the way I shot the model for what became the disco ball photograph and told me
22 multiple times that they were "blown away" by the image.  Also, the CEO Robert
23 Greenberg was blown away and he was the most important person to impress.  Based
24 on their reactions, I felt that I hit a photographic home run that day.  Attached as
25 ***Exhibit 5***, and incorporated by reference herein, is a true and correct copy of the
26 copyrighted photograph I took of the model without the disco ball in the background.
27         32.    In addition to using the disco ball at the October 2008 photo shoot, I also
28 incorporated many other props in that shoot, including a chain link fence, reflective

walls, metal drums and scaffolding. (I have in my archives numerous examples of models climbing on ladders, scaffolding, etc., jumping through the air, on multicolor backgrounds, on chairs, on cubes, in corners, hanging upside down with gravity boots, dancing, back alley street scenes, girls in sunglasses being sexy, numerous groups of models in studio together having fun, and virtually everything I did for Skechers but from years before I ever met them for other clients.) I worked closely with Walter Barnett, the set designer whom I hired and paid for, to create a set where the models could run, jump and swing from various apparatuses. To create movement in the models' hair and clothing, I rented a studio fan similar to the one depicted in ***Exhibit 6*** attached hereto and had it blowing on the models at different times during the photo shoot. In addition, Skechers' graphic designer told me that she had no idea how I was going to use the fence and she was very skeptical about it. After she saw how I set up the shot and positioned the models she was very impressed and excited with the images.

33. I collaborated with my photography team, including the prop stylists and set dressers that I hired to create and/or built the set that I envisioned for the shoot. In fact, Mr. Greenberg did not want to use the props that I requested because they would be too expensive. Ultimately, Skechers refused to pay for many of the props that I insisted upon using so I offered to pay for them out of my own pocket.

34. I arranged the scaffolding and the metal drums in a way that was versatile and allowed me to maneuver the props as I shot to create a variety of images. Attached as ***Exhibit 7***, and incorporated by reference herein, are true and correct copies of several of my copyrighted photographs from the October 2008 shoot demonstrating the use of the various props including the chain link fence and scaffolding.

35. I conducted a fifth photo shoot for Skechers on May 28, 2009. My assistant and studio manager, Danny Luna, attended the 2009 Skechers concept meeting with me. Skechers provided no mock-ups or completed designs for their

marketing images. During the concept meeting it was obvious that Skechers had no real ideas about what they wanted to do for the upcoming photo shoot. I felt it important that I share some of my own ideas. One idea of mine stemmed from a photo shoot that I participated in a few months before where I used metallic shapes that I had created for a Westfield shoot. Since no one at Skechers had any real concrete ideas during the concept meeting, I decided to reuse the same props for the upcoming Skechers shoot in different configurations then I did for Westfield. Attached as ***Exhibit 8***, and incorporated by reference herein, are true and correct copies of photographs of models with the same metallic shapes from the Westfield shoot done months before the Skechers 2009 shoot.

### Reinsdorf's General Practices and Creative Vision

36.　While some photographers shoot "tethered," meaning that their camera is connected to a computer allowing the client to see and comment on the images as they are shot, I never have and never plan to work in that manner because it would mean giving up too much control and would interfere with me capturing my vision. Instead, I shoot "to card," meaning that my digital images are saved to a storage device, and my clients can view and print them in a separate room on a computer known as a "capture station" within approximately three minutes after I shoot the photographs. It would not be atypical, however, for me to be several shots (or possibly even an entire series of shots) ahead of the ones the Skechers team was reviewing on the capture station. For most of the photo shoots that I did for Skechers, I hired two digital technicians. Using color correction cards, these technicians would make adjustments and enhancements to the raw images that I shot and they would print those digitally enhanced images from the capture station in order for me and the client to see what the final images will look like. At the end of each photo shoot, I provided Skechers with a drive that contained color corrected and adjusted images, not only raw photographs. These images were suitable for professional commercial use.

37. Skechers' contention that all of the backgrounds used on set were neutral or solid-colored is incorrect (although what the photographs were shot on is not nearly as important as what the background is in the delivered image). When shooting the model that appears in the iconic disco ball image and other images for Skechers' Cali product line, I added a streak of light in the background to create a fall-off in the image. In the 2007 shoot, I did this with more of a spot effect so that the background was not a solid color, but rather went from light to dark shades. In the images featuring a chain link fence, I likewise used colored gels on a white cove so that the backgrounds fade from blue to an amber color. The metallic shapes in the 2009 photos were certainly not shot on a solid background either; There were highlights and shadows in those pictures. The club scene also had lights with colored gels in the background of some of the images.

38. It was always my objective to create the focal point images that captured the models in moments that would grab attention. What makes a fashion or lifestyle photograph dynamic is the energy the photographer elicits from the model, the way the photographer poses the model and the expressions that photographer captures in his photographs. Sometimes, it is the moments between moments that are the best ones and lead to the most dynamic photographs. In many cases, I would be finished with a shot and then see the models still on set and interacting with each other in a more relaxed manner, or the models' hair might fall perfectly out of place creating a unique look, and I would capture those images.

39. The Skechers team did not think the same way that I did. Any input or ideas they had were very basic and literal. They thought more like business people and less like artists, which is why I understood that my services were of value to them. I drew inspiration for my photographs from various tear sheets, from previous photo shoots that I did, and from the work of some of my favorite photographers. The Skechers team provided me with little to no direction and exercised virtually no creative control at any of the photo shoots.

40. Typically at a photo shoot, a client would ask me to leave room in the margins of my frame for company logos or ad copy. Skechers never gave me any such direction because they had no idea how my photographs would be laid out until they got my final images and started building their advertisements around my photographs. Accordingly, I took the creative license to compose my photographs as I saw fit.

41. My vision for the Skechers photo shoots was to create a sort of playground in the studio for the models where they could move and express themselves in a way that gets across the true energy of the brand. I believe I accomplished that through my use of unique props, interesting camera angles, creative lighting and direct interaction with the models. I exercised extensive, virtually absolute, control over the photo shoots, and I am primarily responsible for most of the ideas and expressions of those ideas as captured in my photographs. I constantly had my goals for the shoot in mind and knew what I needed to achieve with each shot. For instance, if I noticed that a particular model's face looked beautiful under certain light, I would go in quickly to get a beauty shot. Depending on what I saw during a shoot, I would change my camera angle. I might lay on the floor and shoot from below, or might get up high and shoot downward to capture the models' spontaneity and beauty.

42. The Skechers team provided no concrete expression of their ideas for the photo shoots. The Skechers team looked entirely to me to bring spontaneity, contagious energy, alluring attitude and expressions and beauty, originality and creativity to the shoots. A "behind the scenes" video was recorded during the April 2008 photo session. It is evident from watching the video that the Skechers executives used my images as their inspiration for the advertising campaign. Attached as *Exhibit 9*, and incorporated by reference herein, is a screen shot from the "behind the scenes" video, which is available in its entirety at http://www.youtube.com/watch?v=QUJZbw0Swk0. Between 2006 and 2009, I was

engaged by Skechers to take photographs for use in marketing campaigns for its Cali product line, Men's USA, Women's USA, Men's Active, Women's Active, Men's Sport, Women's Sport and Shape Up product lines.

### Reinsdorf's Ownership of His Photographs

43. I registered the copyright for all of the photographs that I took during all of the Skechers photo sessions. (Attached as *Exhibit 10* are true and correct copies of the Copyright Registrations.) I had no intent of sharing authorship of my photographs with Skechers because Skechers did not significantly contribute to the creative process whatsoever. None of Skechers executives, including Messrs. Machuca and Greenberg, ever expressed that they considered Skechers to be a co-author or owner of the photographs I shot. After countless photo shoots with amazing art directors like Brent Watts, Pennie Humphreys and Jim Webster for big and small companies through the years, I have never shared authorship of my photographs with anyone. Even when clients were far more knowledgeable, organized and involved than Skechers ever was in the creative process, I have never shared authorship of my photographs with anyone. Additionally, I never granted Skechers an exclusive right to use my photographs. I have always understood that at the end of the license term, e.g., six months, I could license the images to anyone else. And, I have never considered myself nor did I intend to be a joint author of Skechers' marketing images which contained my photographs. (I understand that Skechers contends that based on my investigation, I should know precisely which image I captured was used by Skechers in its marketing images. It is important to note that when I took a picture it could be one frame of a dozen all essentially the same because of the shutter speed and the rapid nature in which I shoot models. It would be extremely difficult to determine which frame of the dozen Skechers used in the marketing image without Skechers providing me the JPEG file number/name of the frame they used in the marketing image. By way of example, there are at least five to six frames all seemingly the same of the model who appears in the Girl with

the Disco Ball marketing material. Because each digital capture frame was photographed within 1/200th second of each other, it would be very difficult to determine which precise frame Skechers used without the JPEG name/number. Hence, Skechers notion that I should have known which photos were published or unpublished when I registered my copyright in the photographs, is somewhat farfetched because I was never provided the JPEG information prior to registration.)

44. Ultimately, the Skechers executives expressed to me how pleased they were with the images I captured during the photo shoots, and I provided Skechers with a license to use my copyrighted photographs on a limited basis for a limited time and in a limited geographic region. I neither agreed nor intended for any of my photographs to be incorporated into marketing material for which I had not authorized, such as packaging. I never agreed or authorized Skechers to give my images to other companies such as Citibank. I understand that Skechers never requested a buy-out of my photographs. Rather, Skechers only purchased a short term license to use them. Absent a complete buy-out of my photographs, the idea that Skechers would consider itself to be a co-author or owner of my images is offensive to me, and entirely inconsistent with Skechers' conduct throughout the years that I shot photographs for the company.

45. During my investigation for this lawsuit, I have found over 200 of my copyrighted images from the Skechers photo shoots used in Skechers advertisements and in Skechers store and window displays not only in the United States, but also in Europe, South America, Central America, Australia, Africa and Asia, without authorization and in excess of the scope of the license, which was limited to the use of the pictures in the United States only. I have found my images from all the photo shoots - - 2006 through 2009 - - in countries all over the world. I found 2009 images all over the world even though my agreement with Skechers permits only usage in North America. Skechers used my 2009 photos on international billboards even though I did not license OOH (Out of Home, i.e., billboards, etc.) for those images.

Indeed, even as recent as January 2012, my images from 2006, 2007 and 2008 were still being used by Skechers, well beyond the license period. I have personally analyzed these images to determine whether any have been modified, altered or enhanced by Skechers. Based on my review and analysis, I have determined that very few images were modified, altered or enhanced. Skechers' license for the use of my photographs from the November 2006 shoot expired in July 2007; yet, many of those photographs were still being used by Skechers as recently as June or July 2010. Skechers' license for the use of my photographs from the September 2007 shoot expired no later than June 2008; yet, Skechers continued to use those photos as recently as June or July 2010. Similarly, Skechers' licenses for the 2008 photo shoots only permitted the use of those photographs for six months; yet, as recently as June or July 2010, Skechers had used those images without a license. Finally, with respect to the photographs from the 2009 shoot, Skechers' license expired in April 2010, but Skechers used the photographs without authorization after that date. These facts are set forth in further detail in Paragraphs 4, 17, 19–22, 24–25 and 27–31 of the Complaint, which I confirm are true and correct statements.

46.   For those models whom I photographed during the above-mentioned photo shoots, I understand from the majority of models themselves that I have permission to use their image and likeness on my website and portfolio.

47.   When I learned that Skechers had used my images beyond the terms of the license period, I instructed my agent, Bobby Heller to contact Skechers about the issue. At first, Skechers denied that my images were being used outside of North America. I was told that if my images were being used outside of North America, then such use was unauthorized and they—Fred Machuca and Jason Greenberg—did not know about it. I was also told that there should not be any expired images being used, and if they were being used, then it was a mistake. It was repeated to me that there should be nothing used outside North America. If there was any use of my images outside North America, it was an unauthorized mistake. Moreover, during the

1 | course of my investigation and even during this litigation, Skechers has not shown
2 | me all the ads and marketing materials that it used around the world which contain
3 | my images. Even after Bobby Heller asked Skechers to disclose this information to
4 | us more than two years ago, Skechers stonewalled us. Since filing this lawsuit, we
5 | have found over 100 more of my images that we had no idea were being used by
6 | Skechers and other companies around the world. I could not reasonably know which
7 | images were being used in other countries without being there. For example, during
8 | discovery we found many of my images that I had no idea were being used at the time
9 | I registered the images. The only images I registered with the Copyright Office as
10 | published were the ones I understood to be published based on what I had discovered
11 | and could through inspection and high level examination (without any input from
12 | Skechers to provide accurate information about usage) determine were the images
13 | used by Skechers. Yet, Skechers clearly took the position and still do that only
14 | whatever I caught them doing personally is what they had done. This position of
15 | them saying "show us what you have" is what prompted me to start an investigation.
16 | Finally, we have found examples of stock graphics and stock imagery used in the
17 | Skechers marketing materials available online for license on iStock Photo and other
18 | sources that Skechers never produced for us in discovery. In fact, I understand that
19 | Robert Welsh claimed that Skechers had never used stock graphics, which is contrary
20 | to Fred Machuca's admission that his graphic artists routinely used stock graphics in
21 | marketing images. (Stock graphics are graphics created by someone other than
22 | Skechers and which are available to anyone to purchase.)
23 |        I declare under penalty of perjury that the foregoing is true and correct.
24 | Executed this 18th day of June, 2012, at Los Angeles, California.

*/s/ Richard Reinsdorf*
RICHARD REINSDORF