WILLIAM J. BRIGGS II (BAR NO. 144717)
HENRY L. SELF III (BAR NO. 223153)
LAVELY & SINGER
PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
Email: wbriggs@lavelysinger.com
       hself@lavelysinger.com

Attorneys for Plaintiff
RICHARD REINSDORF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD REINSDORF, an individual,<br><br>    Plaintiff,<br><br>    v.<br><br>SKECHERS U.S.A., INC., a Delaware corporation; SKECHERS U.S.A., INC. II, a Delaware corporation; and DOES 1–10, inclusive,<br><br>    Defendants. | CASE NO. CV 10-7181-DDP (SSx)<br><br>**DECLARATION OF ROBERT HELLER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Hon. Dean D. Pregerson, Room 3]<br><br>Discovery Cut-Off: May 15, 2012<br>Pretrial Conference: August 27, 2012<br>Trial Date: September 11, 2012 |

I, ROBERT ("BOBBY") HELLER, declare:

1. I am the owner of Opus Reps, a photographer's agency, which represents the Plaintiff in this action, Richard Reinsdorf. I personally and through Opus Reps have represented Richard Reinsdorf for the past five years as a professional photographer. I have personal and firsthand knowledge of the matters set forth in this declaration, and, if called and sworn as a witness, I could and would testify competently thereto under oath.

2. I started Opus Reps more than five years ago, and Richard Reinsdorf was one of my first clients. Opus Reps is proud to represent some of the leading image creators from around the world. Our roster of clients include some of the most eclectic and fashion-forward creative minds in the industry. Our boutique roster is comprised of art directors, creative directors and other leading brand makers who have made photography and image creation their line of work. We receive literally thousands of submissions each year for desired representation and have only accepted a small handful of effective and talented image creators into our family of photographers. Our clients span the globe, including UK, Germany, Russia, China, Italy, Japan, the United States and all other leading markets around the world. Our photographers are sought after to engage with a client and to assist them in identifying and elevating their brand. Opus Reps represents photographers who have a wide and varied range of styles, most of whom have been called upon to work internationally for advertising, editorials, magazines, and album packaging in print and multi-media formats.

3. I have been a photographers' representative for approximately ten years. Before I started Opus Reps, I worked at a company called Legend Photo. I consider myself extremely familiar with and have a deep understanding of the customs and practices and basic terms and terminology commonly used in the advertising, marketing and photographic industries. My knowledge and understanding of the industry jargon and customs and practices stems from my

experience in representing art directors, creative directors, and photographers and procuring jobs for them and negotiating their contracts on a daily basis for the past eight years.

4. Based on my experience, I understand that companies such as Skechers typically engage photographers through representatives such as myself and my company, rather than negotiate directly with the photographer. In my experience, it is rare for a company to directly approach a commercial photographer, particularly when that photographer is professionally represented. Rather, representatives such as myself are used to negotiate engagements for photographers, as well as to screen potential jobs for them. As a representative of photographers, I understand that one of my roles is to have an understanding of the value of my client's services. My understanding of the market value for a photographer's services and product stems from my experience and on-the-job learning about and appreciation for my client's underlying rights in the images he or she creates, *i.e.*, photographs.

5. It is my understanding that a photographer is generally considered the copyright owner of the image he captures, particularly since it is the photographer who typically controls almost all of the artistic elements of the photograph and the photographer translates and captures generalized ideas on film. I also understand that it is the photographer who conveys his artistic elements of originality in the image he captures. In addition, I understand that the photographer is considered the author of a photograph because the photographer generally formulates the look and feel of the image that has been captured on film. Thus, I understand that the photographer is considered the copyright owner of the image he captures unless the photographer signs a work-made-for-hire agreement and/or negotiates to assign the copyright through a "buyout."

6. In those extremely rare instances when a buyout of my client's, *i.e.*, the photographer's, rights occurs, it is typically when one of my photographers does

a photo shoot for the music industry. For a variety of reasons, many of the music companies with whom I have dealt have all insisted on owning the copyright to the images captured by the photographer. Those companies ask that the agreements between the photographers and the company, which I negotiate, include "work-made-for-hire" provisions and an assignment of the copyright in order to clearly indicate that the music company will own the copyright to the images. However, even this copyright agreement has limitations in that the music company/label is only allowed to use the images specifically for the sale and public relations of the artist and album packaging that has been created during this creative session. And, even though there is a specific buy-out or work-for-hire provision in the agreement, there are additional stipulations which limit the music label. One example would be merchandising usage for that artist, *i.e.*, posters, t-shirts and other merchandising paraphernalia are not allowed. The music company must negotiate a separate fee if it wants these rights. Additionally, the music company may not use the images of the artist in any manner that represents third party advertising.

7. One other example, although extremely rare, is a well-known retailer with stores worldwide who sells apparel: Guess, Guess Jeans and Guess by Marciano. Guess is one of the largest media buyers in the world, and it puts the photographer's name as a page credit on the advertising. Yet, Guess insists that it be given full ownership of the images, and an assignment of the copyright is contained in each agreement it enters into for photographers whom I have represented and who have rendered services for Guess. Moreover, even though Guess "buys-out" the photographers' rights to the images, Guess never uses the images more than the allotted period of time contained in the agreements.

8. Guess is atypical of apparel clients. Skechers would be considered the norm insofar as it has never requested that the contracts by which it engages photographers contain a "work-made-for-hire" provision or a "buy-out" provision denoting that Skechers owns the copyright to the photographs. Rather, Skechers

and most apparel companies with whom I have dealt for more than five years have all simply licensed the images captured by a photographer for a limited time and a limited geographic scope. The estimates and invoices between Opus Reps and Skechers for all of Reinsdorf's services and photographs provide for only a limited license of usage of Reinsdorf's photographs, not a buy-out of his rights. (Attached as Exhibit "11" are true and correct copies of some of the estimates and invoices I negotiated on behalf of Reinsdorf with Skechers.) Based on the terms of the limited license granted to Skechers to use Reinsdorf's photographs, and the fact that Skechers did not request that Reinsdorf be engaged as a "work-for-hire" or that Skechers "buy-out" Reinsdorf's rights, I understand that Reinsdorf is the copyright owner of all the photographs he took during photo shoots for Skechers. Further, each estimate and invoice provides that "client's usage rights transferred on payment of invoice." Each of these estimates and invoices involved in this matter was to Skechers U.S.A., the sole contracting party, not any of its foreign partners, subsidiaries or other divisions. Also, each estimate and invoice indicates the season for usage of the photographs, e.g., either Spring/Summer or Fall/Winter, which indicates when six months would start and stop. Further, Skechers never acquired a license to use Reinsdorf's photographs on packaging. Its usage was limited to Web, Lookbook, OOH, and In-Store POS.

9. In the attached estimates and invoices between Skechers and Opus Reps, the term "usage" denotes the license granted to Skechers, *i.e.*, the length of time it could use Reinsdorf's photographs and the geographic area for such use. It is my opinion that the term "usage" is clearly understood by Skechers to allow it only a limited license to use Reinsdorf's photographs and not some sort of co-ownership in any of the images created by Richard Reinsdorf. The fact that Skechers clearly understood the term "usage" to mean a limited license for use of Reinsdorf's photographs is evidenced by the negotiations between Skechers and me for Reinsdorf's services. Moreover, at no time during my negotiation of any of the

1 agreements for Reinsdorf's services with Skechers did either Jill Simonian or Karey
2 Teng tell me that Skechers intended to be a coauthor with Reinsdorf or that the
3 photographs or finished marketing images containing his pictures would be joint
4 works. Indeed, that notion of Reinsdorf jointly authoring a photograph or finished
5 marketing image with any client is completely contrary to how the industry operates.
6 Reinsdorf was engaged to provide Skechers commercially ready photographs that
7 Skechers could use for a limited duration. And, it is important to note, the
8 agreements under which Skechers used Reinsdorf's photographs contains no
9 exclusivity terms. In other words, Reinsdorf was and is now free to allow others
10 to use any of the photos he took during the five photo shoots for Skechers.
11 Moreover, when the six-month usage term expired, Skechers was not authorized to
12 use the photographs unless it negotiated for and obtained an extended term of usage.
13     10. In the fall of 2006, I was contacted by Fred Machuca, Skechers'
14 creative director, who asked about engaging Reinsdorf for a photo shoot for
15 Skechers. Fred told me that he would have a young lady by the name of Jill
16 Simonian contact me to negotiate the deal for Reinsdorf's services. Jill Simonian
17 subsequently called me. During our telephone negotiations, Jill never told me that
18 Skechers wanted to own the copyright to the images, or buy-out Reinsdorf's rights
19 to the images, or have Reinsdorf considered a "work-for-hire" photographer in
20 which case Skechers would be considered the owner of any image captured by
21 Richard Reinsdorf during the photo shoot. In fact, it was to the contrary. Jill
22 Simonian told me that Skechers wanted to use Richard's images for a limited period
23 of time — six months — and for only for stores in the continental U.S. I understood
24 that Jill spoke on behalf of Jason Greenberg when she told me Skechers wanted only
25 a limited license for Reinsdorf's photographs because she repeatedly told me during
26 our phone calls that she had to run everything by Mr. Greenberg. My belief that Jill
27 spoke on behalf of Jason Greenberg was confirmed when I received Estimate No.
28 E00133, dated October 30, 2006, back from Skechers containing Mr. Greenberg's

signature approving it and the terms. (Attached as Exhibit "12" is a true and correct copy of Opus Estimate No. E00133, dated October 30, 2006 which I understand contains the signature of Jason Greenberg.)

11. Additionally, my confidence that Skechers completely understood what the term "usage" meant in the estimates and invoices I sent to it was buttressed by my subsequent negotiations with Skechers for Reinsdorf's services. In approximately September 2007, I was contacted by Karey Teng, who I was told would replace Jill Simonian as my direct contact for all negotiations with Skechers. Karey and I had a very amicable working relationship and Karey also reconfirmed the US (only) usages. After a couple of photo shoots, Karey Teng called me and explained that Skechers was launching its first "satellite" and "small" stores in Canada. Karey specifically asked me if Reinsdorf would include North America in the Usage terminology to make sure the Canadian territory was covered. I discussed the request with Richard, and we agreed that we were malleable to the additional region in the Usage purchase. I then called Karey Teng and told her that Richard was agreeing to North America and that we would include this on the Invoices and Estimates so Skechers would not have a concern about this region. If Skechers did not understand the vernacular surrounding the terms of "usage," then why would Ms. Teng call and ask express permission to include a new territory in their usage reguest?

12. At no time did Fred Machuca ever tell me that Skechers wanted to be a joint author or co-owner of any photo taken by Richard Reinsdorf; similarly, Jason Greenberg never contacted me to tell me that he considered Skechers to be a co-author or joint author of any of Richard Reinsdorf's images. No one from Skechers ever expressed an intent to be considered a co-owner or co-author of any photograph taken by Richard Reinsdorf during his photo shoots for Skechers or of any marketing images containing those photos.

13. At no time during the past eight years as a photographers'

representative have I been asked by anyone to ensure that the agreement between the photographer and the company contain a provision that the company is to be considered a joint author or a co-owner of the copyright of any photo taken by any of my photographers or marketing images embodying them. And, at no time did anyone from Skechers ever say that they considered Skechers to be a joint author of any photo taken by Richard Reinsdorf or any finished marketing image that included one or more of them. It simply is not something that I understand to be done by any of the industries that employ commercial photographers, other than the rare examples I gave where I explained about Guess and the music industry.

14.     At no time did Fred Machuca, Karey Teng, or Jill Simonian or anyone from Skechers ever tell me that they did not understand the term "usage" that is contained in every Estimate or Invoice I sent them on behalf of Richard Reinsdorf. It is my understanding that the term "usage" is a term of art in our industry that is interchangeable with the term "license." I understand the term "usage" is commonly understood in the industry to mean a limited license for use of a photographer's images unless there has been a "buy-out." That is my experience and understanding after having negotiated hundreds, if not thousands, of agreements for commercial photographers during the past eight years.

15.     It bears repeating that on each one of my telephone negotiations with Skechers, the first item I discussed with either Jill or Karey was the license of usage. I wanted to know how long Skechers wanted to use the photos, and they wanted to tell me the scope of usage in order to negotiate Mr. Reinsdorf's rate of pay. There is a negotiated rate for a limited license versus a "buy-out," which is commonly understood to mean in the industry that the customer, such as Skechers, is buying all rights from the photographer. At no time during any of the negotiations for Skechers did Skechers ever ask to "buy-out" Mr. Reinsdorf's rights in the photographs. Neither did Fred Machuca, Jill Simonian, Karey Teng or Jason Greenberg ever say to me that they did not have a clear understanding of the term

Case 2:10-cv-07181-DDP -SS   Document 152   Filed 06/18/12   Page 9 of 12   Page ID
 #:5009

1  "usage" that was present in each Estimate and Invoice that they signed and
2  approved. I understood that the folks at Skechers, Jill Simonian, Karey Teng, Fred
3  Machuca and Jason Greenberg were all seasoned retailers who understood terms that
4  are commonly used in this industry. It would shock me if Fred Machuca, Jill
5  Simonian, Karey Teng or Jason Greenberg claimed not to have an understanding of
6  terms that are commonly and daily used in the apparel industry.
7       16.   It is my understanding that, when I dealt with Fred Machuca, Jill
8  Simonian and Karey Teng, each one of them fully understood the term "usage" in
9  the contract and that the term meant a limited license for use of Richard Reinsdorf's
10 photographs. There is nothing any of them said to me that indicated that they had
11 a different understanding of that term. To the contrary, every conversation that I had
12 with them indicated their full and complete understanding that what they were
13 acquiring from Mr. Reinsdorf was a license to use his images and that the license
14 was of a limited nature.
15      17.   Further, from my years of experience in this industry it has been
16 standard that the client contacts us directly if and when they desire to utilize images
17 shot by the photographers for additional usage that is not stated in the original
18 agreement. This is largely based on an honor system with the understanding of the
19 ramifications that the cost of post-negotiating a usage can be far more expensive
20 than the cost of pre-negotiating the usage. This is a well known custom and practice
21 in the industry. If we are in the position of negotiating for the models, for instance,
22 I always urge the client to pre-negotiate possible usages they might in the future
23 desire before the conclusion of the shoot as it will be cost prohibitive after the shoot
24 is done. Every client that has ever wished to further their negotiated usages has
25 contacted the agency appropriately and literally months before the usage is up, the
26 client gets the ball rolling on the negotiation of the intended additional usage
27 request. It is at this point they are deciding whether it is more effective to buy the
28 imagery or to reshoot a new campaign. Never once in my entire experience in this

industry have I had a client other than Skechers go past their usage period and not appropriately contact the agency to respectfully negotiate the extended usage. In fact, on the rare occasion someone has inappropriately utilized one of the photographer's images, it is usually some Mom & Pop organization or a college kid who grabbed an image off of the Internet for a club promo not being cognizant of the ramification of utilizing someone's intellectual property without permission. I am more than confident that Skechers was fully aware and familiar with the terminology that is widely accepted and used in our business for the use of images created by my photographers or any photographer for that matter.

18. As a photographers' representative, it is not common that I go to photo shoots, but I do try to make it to as many photo shoots as possible. For Richard Reinsdorf's very first project with Skechers, I was present on the set for the last couple of hours of the shoot, prior to wrap. This Skechers photo shoot took place on November 16, 2006. During my time at the November 16 photo shoot, it was clear to me that Richard was absolutely running the show and had the entire studio whipped into an excited frenzy of energy. That is his style. As with all of Richard's photo shoots, he is the key creative mind in the development of his imagery.

19. I was also present at the Skechers October 2, 2008 photo shoot. At this photo shoot, I had an unobstructed view of the entire photo shoot. It is best described as Richard Reinsdorf being the captain of the ship. Richard was at his best and in the height of his game, which is creating a hyper energetic playground state for the large number of models. It was Richard Reinsdorf who gave the suggestions, posed the models, gave the creative ideas, directed the lighting, came up with the angles for the camera and the shoot, decided when to click the shutter, directed the placement of the props, directed the angle of a model's hair, suggested and directed the expression the models gave to the camera. Richard Reinsdorf ran the entire show. At no time during this photo shoot did I witness Fred Machuca or

1  Jason Greenberg ever give Richard Reinsdorf any suggestions. And, I was in a
2  position to observe Richard for the several hours I was there on set during the height
3  of the shooting mid day to the end of the shoot. In fact, Jason Greenberg was rarely
4  on the set during this time period. Instead, I observed Mr. Greenberg spend the
5  bulk of the time in the models' area. Fred Machuca in my observation was a very
6  quiet man who simply allowed Richard to run everything. And because I had full
7  run of the entire studio where the photo shoots occurred, I certainly would have
8  observed had either Fred or Jason or anyone else from Skechers given Richard
9  suggestions as to how to run the photo shoot or suggestions for how the models
10 should pose. That simply did not happen.

11     20.    I have no recollection of seeing "storyboards" brought on set by
12 Skechers. Commonly, these "inspirations" are prominently displayed near or
13 around the shooting area where in the creative team would reference these images
14 in discussion of the direction of the shoot. I did not see this happening. In fact, the
15 fury of energy that Richard Reinsdorf created did not allow for a break and
16 discussion of reference materials. This is a "go go go" sort of shoot and the
17 ultimate goal is to keep the energy alive and moving at which Richard is a master.
18 What I do recall clearly, and is also apparent in our Invoices and Estimates, is that
19 we provided for a full scale printing shop where Richard's images were constantly
20 being pumped out of printers and applied to foam core to show the inspiration and
21 direction of the shoot. This helps to build the energy and to make sure everyone is
22 in agreement and satisfaction with the direction, energy, tone and mood that the
23 photographer is capturing and creating for the client.

24     21.    I never saw or witnessed anyone from Skechers come up with any
25 preconceived ideas as to what Richard should capture on film. This is unlike other
26 photo shoots for other customers where I have seen extensive storyboards. In other
27 words, unlike other customer's photo shoots, I never saw anyone from Skechers
28 approach Richard to analyze pictures to create a pose and then get a shot. Rather,

1  I witnessed Skechers' representatives leave the photo shoots entirely to Richard,
2  who ran the photo shoots as very high energy. Examples of the high energy are that
3  Richard would employ trampolines on which the models could jump; he would have
4  the models run in order to get certain expressions of activity; he would orchestrate
5  a big funfest in order to elicit enthusiastic responses from the models. None of these
6  suggestions came from Skechers folks. All of these suggestions came solely from
7  Richard Reinsdorf.

8  22.   In fact, this is exactly the reason Skechers would hire an artist like
9  Richard Reinsdorf and leave the shoot in his hands. Richard is able to bring to the
10 table a culmination of stamina, good spirit, technical savvy and an aspirational
11 brand-elevating eye that is the core desire of the Skechers client and a creative
12 product that Richard Reinsdorf repeatedly delivered to them shoot after shoot. I
13 believe he singlehandedly elevated the brand to a new position in the market.

14 I declare under penalty of perjury that the foregoing is true and correct.
15 Executed this 15TH day of June, 2012, at Los Angeles, California.

ROBERT HELLER