DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
ROBERT C. WELSH (S.B. #130782)
rwelsh@omm.com
DREW E. BREUDER (S.B. #198466)
dbreuder@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Defendants
Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD REINSDORF,<br><br>  Plaintiff,<br><br>  v.<br><br>SKECHERS U.SA., INC.;<br>SKECHERS U.S.A., INC. II; and<br>DOES 1-10,<br><br>  Defendants. | Case No. CV10-7181-DDP (SSx)<br>Hon. Dean D. Pregerson<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANTS SKECHERS U.S.A., INC. AND SKECHERS U.S.A., INC. II'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM FRANK LUNTZ**<br><br>Courtroom: 3 (2nd Floor)<br>Hearing Date: July 23, 2012<br>Time: 10:00 a.m.<br><br>Pretrial Conference: August 27, 2012<br>Trial Date: September 11, 2012<br><br>[REPLY DECLARATION OF PROFESSOR CAROL A. SCOTT, Ph.D., AND SUPPLEMENTAL DECLARATION OF JEFFREY A. BARKER FILED CONCURRENTLY HEREWITH] |

## TABLE OF CONTENTS

**Page**

I. DR. LUNTZ'S "CREDENTIALS" DO NOT EXCUSE HIS FAILURE TO FOLLOW SCIENTIFICALLY RELIABLE SURVEY METHODS....... 1

II. THE LUNTZ SURVEY SHOULD BE EXCLUDED FOR FAILING TO MEET BASIC STANDARDS FOR LITIGATION SURVEYS.............. 3

III. PLAINTIFF'S BELATED PRODUCTION OF THE "RAW" DATA DOES NOT CURE THE LUNTZ SURVEY'S DEFECTS............................ 9

IV. CONCLUSION ................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) ................................................................ 2, 8, 9

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ........................................................................ 3, 4

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993) ...................................................................................... *passim*

*DeKoven v. Plaza Assocs.*,
   599 F.3d 578 (7th Cir. 2010) ................................................................................ 8

*Hodgdon Powder Co. v. Alliant Techsys., Inc.*,
   512 F. Supp. 2d 1178 (D. Kan. 2007) .................................................................. 8

*IGT v. Alliance Gaming Corp.*,
   2008 WL 7084606 (D. Nev. Oct. 21, 2008) ........................................................ 3

*Innovation Ventures, LLC v. N2G Distributing, Inc.*,
   2011 WL 6010206 (E.D. Mich. Nov. 30, 2011) .................................................. 5

*Lanphere Enters. v. Jiffy Lube Int'l*,
   2003 U.S. Dist. LEXIS 16205 (D. Or. July 9, 2003) ...................................... 8, 9

*Lust By and Through Lust v. Merrell Dow Pharms, Inc.*,
   89 F.3d 594 (9th Cir. 1996) ................................................................................. 3

*M2 Software, Inc. v. Madacy Entm't*,
   421 F.3d 1073 (9th Cir. 2005) ............................................................................. 4

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................. 2

*Marlo v. UPS*,
   251 F.R.D. 476 (C.D. Cal. 2008) ..................................................................... 8, 9

*Native American Arts, Inc. v. Bud K World Wide, Inc.*,
   2012 WL 1833877 (M.D. Ga. May 18, 2012) .................................................. 5, 9

*Spraying Systems Co. v. Delavan, Inc.*,
   975 F.2d 387 (7th Cir.1992) ................................................................................ 3

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
   2008 WL 4755611 (C.D. Cal. Jan. 7, 2008) ..................................................... 4, 8

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010) ........................................................ 7, 8, 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Vigil v. Michelin N. Am., Inc.*,
　2007 WL 2778233 (W.D. Tex. Aug. 23, 2007) .......................................... 11, 12

*Watec Co. Ltd. v. Liu*,
　2002 WL 34373489 (C.D. Cal. May 21, 2002) ............................................*passim*

**OTHER AUTHORITIES**

Shari S. Diamond, *Reference Guide on Survey Research*, in REFERENCE
　MANUAL ON SCIENTIFIC EVIDENCE 359-418 (Fed. J. Ctr. 3d ed. 2011) ......*passim*

**RULES**

Fed. R. Civ. P. 37(b)(2)(A)(ii) ................................................................................. 10

Fed. R. Evid. 702 .............................................................................................*passim*

According to Plaintiff, as long as a survey is conducted by a "qualified" expert, the survey must be admitted despite the requirements of Rule 702 and *Daubert*. This contention, of course, is incorrect. Even the most exceptional expert qualifications cannot justify admission of a survey that employs unreliable principles and methods. Junk science is junk science, regardless of its proponent.

As demonstrated in Skechers' opening brief, Dr. Luntz's survey is plagued by a litany of fatal defects. Plaintiff's opposition does not address the vast majority of these defects, and the few that it does address are mischaracterized as "mere technicalities." As explained, these defects go to core scientific principles and render the Luntz survey an unreliable measure of consumer opinion.[1] Nor can the survey's flaws be rectified by Plaintiff's belated, after-the-fact production of raw data that still fails to disclose key details about population selection and sampling procedure, two necessary pieces of information for assessing the integrity and reliability of the survey's results. Given Dr. Luntz's failure to adhere to generally accepted standards for reliable litigation surveys, both his survey and any opinions relating to it should be excluded.

## I. DR. LUNTZ'S "CREDENTIALS" DO NOT EXCUSE HIS FAILURE TO FOLLOW SCIENTIFICALLY RELIABLE SURVEY METHODS

Plaintiff's central contention is that, because Dr. Luntz allegedly "possesses comprehensive knowledge of survey methodology," his survey cannot be excluded and any "technical" failings go to weight, not admissibility. (*See* Plaintiff's Opposition to Motion *In Limine* to Exclude Expert Testimony from Frank Luntz, Dkt. No. 148 ("Opp.") at 3, 5-8.) Plaintiff fails to mention, however, that Dr. Luntz has never been qualified by a court as an expert witness and his only "survey" experience in litigation comes from doing mock jury studies, not large-scale consumer surveys like the one at issue here. (*See* Supplemental Declaration of

---

[1] Tellingly, Dr. Luntz has not submitted a declaration to defend his survey and to respond to the points made by Skechers' expert, Prof. Carol A. Scott, Ph.D.

1  Jeffrey A. Barker in Support of Skechers' Motions in Limine ("Supp. Barker
2  Decl.") ¶ 2, Ex. 8 (5/12/12 Deposition of Frank Luntz ("Luntz Depo.")) at 12:11-
3  13:3, 65:19-67:19.)

Regardless of whether Dr. Luntz's experience qualifies him as an expert, however, no amount of credentials can save a sloppily conducted survey. Even studies designed by distinguished and experienced litigation survey experts are excluded when they have been conducted in a scientifically unreliable manner.

For example, in addressing a survey submitted by renowned social science expert Dr. Jacob Jacoby, one court noted his considerable professional stature and his "numerous, highly significant publications in the area of consumer behavior." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 600 n.75 (S.D.N.Y. 2007). Although the court allowed that "Dr. Jacoby's stellar qualifications" provided some "circumstantial evidence of the reliability of his methods," *id.*, after examining his trademark surveys in that case, the court excluded them under Rule 702 due to "numerous, fundamental deficiencies," including an improper survey universe, lack of a fit between survey questions and the relevant law, and improper coding of survey responses. *Id.* at 569-70. As the court explained, "the fundamental flaws in [his] methodology and execution … more than counter[ed] any circumstantial evidence provided by his qualifications." *Id.* at 600 n.75.

Likewise, another district court found researcher Dr. Michael Rappeport qualified to provide testimony "in the field of designing, conducting, and analyzing surveys." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 445-46 (D.N.J. 2009). In so doing, the court relied on Dr. Rappeport's 200 prior instances of expert testimony and 35 years of marketing and survey research expertise. *Id.* The court then went on to exclude Dr. Rappeport's survey for, *inter alia*, failing to identify the correct survey population and failing to use a control mechanism. *Id.* at 446-48.

In short, Plaintiff cannot pave over the serious flaws in Dr. Luntz's survey

simply by citing to his alleged expertise. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993).  Indeed, as noted, Dr. Luntz has made no effort to support his survey with a declaration attempting to defend the flaws in his methodology.  This is a critical failure, as it is plaintiff's burden to demonstrate that the Luntz survey was conducted with the necessary scientific rigor to ensure its accuracy and reliability under Rule 702 and *Daubert*.  *See IGT v. Alliance Gaming Corp.*, 2008 WL 7084606, at *3 (D. Nev. Oct. 21, 2008); *see also Lust By and Through Lust v. Merrell Dow Pharms, Inc.,* 89 F.3d 594, 598 (9th Cir. 1996) (stating that proponent of expert testimony bears the "burden of proving admissibility").

## II. THE LUNTZ SURVEY SHOULD BE EXCLUDED FOR FAILING TO MEET BASIC STANDARDS FOR LITIGATION SURVEYS

The crux of Plaintiff's secondary argument is that flaws in a survey's construction can never provide a basis for the survey's exclusion at summary judgment.  (*See* Opp. at 5-6.)  In addition to drastically understating the gravity of the defects in Dr. Luntz's survey, it also misstates the law.  The Ninth Circuit has rejected the notion that all surveys should be accepted at summary judgment.  *See Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263-64 (9th Cir. 2001) (stating that "we [are not] suggesting that the presence of a survey will always preclude summary judgment"); *accord, Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir.1992) (affirming summary judgment after finding consumer survey too flawed to create genuine issue of material fact).

Rather, surveys are evaluated through a two-step process.  The first step (relevant to summary judgment) asks whether the survey is admissible—that is, "is there a proper foundation for admissibility, and ***is it relevant and conducted according to accepted principles?***"  *Clicks*, 251 F.3d at 1263 (emphasis added); *see also* Skechers' Motion *In Limine* to Exclude Expert Testimony from Frank Luntz, Dkt. No. 127 ("Mot.") at 2-4 (discussing the standards courts apply to litigation surveys).  If the survey is admitted, the second step is to address the weight of the

survey based on "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like." *Clicks*, 251 F.3d at 1263.

A survey's admissibility is a "threshold question" that must be resolved by a court. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005). Where a survey "was not created or conducted in a manner that complied with appropriate standards," it should be excluded. *Id*. (district court properly rejected a survey that was not created by a qualified expert and that was not conducted "in accordance with generally accepted survey principles"); *see also Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, 2008 WL 4755611, at **3-4 (C.D. Cal. Jan. 7, 2008) ("Respondents' failure to demonstrate that the [proffered survey] was conducted in accordance with generally accepted survey principles warrants exclusion of the survey.").

Dr. Luntz's survey fails in numerous respects to comply with the generally accepted standards that courts apply to survey research. It is deficient not simply because it contains a few survey procedures that could have been better designed; rather, the Luntz survey violates virtually every precept of a properly conducted litigation survey and contains none of the methodological "safeguards" that ensure a survey's accuracy and reliability, including proper stimuli, survey questions, or control mechanisms.[2] Thus, the survey's flaws are not limited to peripheral issues. They go to the fundamental methods underlying the survey, which, as Dr. Scott

---

[2] As set forth in the moving papers, these safeguards include the following:

(1) a proper universe and a representative sample;
(2) "the persons conducting the surveys must be experts";
(3) "the data must be properly gathered and accurately reported";
(4) "the sample design, the questionnaires and the manner of interviewing [must] meet the standards of objective surveying and statistical techniques"; and
(5) if a survey design is seeking to establish a causal link, an appropriate control to properly determine the effect of the test stimulus.

(Mot. at 3.)

observes, are too scientifically unreliable to permit any reliance on the survey's results. (Reply Declaration of Professor Carol A. Scott, Ph.D. in Support of Skechers' Motion in Limine ("Scott Reply Decl.") ¶ 20.)

Knowing that his expert's methodology does not comply with the scientific principles set forth in the Federal Judicial Center's *Reference Guide on Survey Research*, Plaintiff characterizes those rules as mere "suggestions," presumably to be followed or not followed when the mood strikes. Plaintiff also tries to discount Prof. Scott's thorough, 19-page critique of the Luntz survey as mere "nitpick[ing]." (Opp. at 1-2.) Plaintiff is mistaken on both counts.

Far from simply offering "take-them-or-leave-them" thoughts on how a survey might be conducted, the *Reference Guide* exists for the stated purpose of "assist[ing] judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information." Shari S. Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 362 (Fed. J. Ctr. 3d ed. 2011) [hereinafter "Diamond, Fed. J. Ctr. Ref. Guide"]. The *Reference Guide* sets forth rigorous scientific standards that a survey must meet in order to be deemed reliable, including the selection of a proper universe and representative sample, the use of objective surveying and statistical techniques, and the use of an adequate control to properly determine the existence of a causal link. *See generally* Diamond, Fed. J. Ctr. Ref. Guide at 359-418.

The *Reference Guide* is undeniably authoritative. Dozens of district courts have cited and relied on its methodological principles in assessing whether proffered surveys meet the requirements of Rule 702 and *Daubert*—and have excluded surveys that do not pass muster. *See, e.g.*, *Native American Arts, Inc. v. Bud K World Wide, Inc.*, 2012 WL 1833877, at **5-8 (M.D. Ga. May 18, 2012); *Innovation Ventures, LLC v. N2G Distributing, Inc.*, 2011 WL 6010206, at **4-5 (E.D. Mich. Nov. 30, 2011); *Watec Co. Ltd. v. Liu*, 2002 WL 34373489, at **1-2

(C.D. Cal. May 21, 2002).

Applying the same principles and her extensive experience in conducting and analyzing litigation surveys, Dr. Scott has exhaustively detailed the "multiple fatal flaws" that render the Luntz survey inherently unreliable as a measure of the purported role that the photographs taken by Mr. Reinsdorf played in Skechers' marketing efforts. (*See* 5/21/12 Declaration of Professor Carol A. Scott, Ph.D. in Support of Skechers' Motion in Limine, Dkt. No. 127-1 ("5/21/12 Scott Decl.") ¶¶ 6, 52 & Ex. B.)  Neither Plaintiff nor Dr. Luntz has attempted to justify—thereby effectively conceding—the vast majority of the survey's critical methodological flaws. In particular, the opposition has no answer for the Luntz survey's:

- Use of overtly biased stimuli, including Skechers ads that emphasized fashion and style, in contrast to the ads of other companies, which were athletically oriented (5/21/12 Scott Decl. ¶¶ 32-37; Mot. at 7-9);
- Use of improper and biased questions purposely designed to increase the number of "Skechers" responses, including questions that coached respondents to focus on Skechers' style- and fashion-based ads (5/21/12 Scott Decl. ¶¶ 42-44; Mot. at 9-11);
- Failure to include an "I don't know" option or open-ended questions (despite Dr. Luntz's prior advocacy for including open-ended questions in surveys), thus forcing respondents to "guess" a fashion-oriented company based on the visuals presented (5/21/12 Scott Decl. ¶¶ 32-35; Mot. at 9);[3]
- Failure to use a control to rule out rival explanations for "Skechers" responses and to separate the supposed effects of Mr. Reinsdorf's photographs versus the effects due to the products or models being shown, or other elements added by Skechers to the ads at issue (5/21/12 Scott

---

[3] At his deposition, Dr. Luntz admitted that, had he used an "I don't know" option, his identification rates undeniably would drop because he would "lose[] people who have an impression, a perception, an expectation, but they're not actually sure." (Luntz Depo. at 142:8-15.)

Decl. ¶ 39, 46; Mot. at 11-12);

- Failure to consider other aspects of Skechers' marketing communications mix, including media placement, frequency of exposure, pricing strategy, and product design, that may have caused respondents to associate the images with Skechers (5/21/12 Scott Decl. ¶¶ 37-41, Mot. at 12);
- Reliance on Plaintiff's attorneys to provide images that were purportedly representative of the ads at issue without conducting any independent research to verify that they were representative (Mot. at 12);
- Erroneously equating interest in purchasing a brand with a decision to actually buy the product (5/21/12 Scott Decl. ¶ 22, Mot. at 12); and
- Failure to support Dr. Luntz's ultimate conclusion that the ad images tested positively influenced consumers' attitudes toward Skechers or conclusively increased the level of interest in Skechers' products, since the ad images received ratings from respondents that were only slightly above the "completely neutral" point on the scale (5/21/12 Scott Decl. ¶¶ 49-51, Mot. at 12).[4]

Plaintiff never once addresses any of these breaches of the generally accepted rules for litigation surveys.

The lack of a control, in particular, is a critical defect because Dr. Luntz purports to opine on the "causal proposition" that consumers allegedly associate the photographic images taken by Mr. Reinsdorf with Skechers. In cases involving trademark surveys, which also seek to measure consumers' associations with brands, "[w]ithout a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240-41

---

[4] The defects in Dr. Luntz's survey population and sample selection, which Plaintiff briefly, but unsuccessfully, addresses in its opposition, are discussed in Section III, *infra*.

(S.D.N.Y. 2010) (excluding survey for failing to use an adequate control and replicate marketplace conditions).[5] Here, there are numerous alternative explanations for why a respondent might associate one of the tested advertising images with Skechers—including preexisting beliefs, outright guessing, or recognition of the composition style and graphic elements of the advertising images that were added by Skechers.[6] *See* Diamond, Fed. J. Ctr. Ref. Guide at 397-401; 5/21/12 Scott Decl. ¶¶ 38-39. Absent a proper control, Dr. Luntz has no basis for concluding that any association a respondent may draw between the images at issue and Skechers was in any way caused by Mr. Reinsdorf's specific contributions. (*See* 5/21/12 Scott Decl. ¶ 39.)

Where, as here, a survey's flaws "are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence." *Hodgdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007); *Sugar Ass'n*, 2008 WL 4755611, at **3-4; *Marlo v. UPS*, 251 F.R.D. 476, 485-86 (C.D. Cal. 2008) (Pregerson, J.) (rejecting survey evidence in class action because it was unreliable and "ha[d] essentially no probative value"); *Watec*, 2002 WL 34373489, at **1-2 (excluding a study that was the product of "sloppy" survey methodology); *Lanphere Enters. v. Jiffy Lube Int'l*, 2003 U.S. Dist. LEXIS 16205, at **35-36 (D. Or. July 9, 2003) (striking survey from summary judgment record where results were irrelevant to facts at issue and were based on "imprecise, confusing, and vague questions").

Plaintiff's attempt to distinguish irrelevant characteristics of the *Marlo* and *Watec* cases misses the point. It matters not that the specific deficiencies in the surveys at issue there are not an exact match with the flaws in Dr. Luntz's survey.

---

[5] Other courts likewise have excluded surveys that fail to include a proper control. *See, e.g.*, *Bracco Diagnostics*, 627 F. Supp. 2d at 445-46; *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010).
[6] For example, Dr. Luntz acknowledged at deposition that the presence of particular styles of shoes used in the ad images could have impacted respondents' expectations of which brand was being advertised. (Luntz Depo. at 158:2-6.)

Rather, *Marlo* and *Watec* demonstrate, as do the other cases cited by Skechers, that surveys will be found inadmissible if they are not "the product of reliable principles and methods." *Marlo*, 251 F.R.D. at 485 (citing *Daubert*, 509 U.S. at 579.)

That said, numerous courts *have* excluded surveys for containing flaws nearly identical to those found in the Luntz survey, including improper survey populations, misleading questions, and inadequate controls. *See, e.g.*, *Native American Arts*, 2012 WL 1833877 at **6-8 (improper stimuli and "leading and slanted" questions"); *Bracco Diagnostics*, 627 F. Supp. 2d at 445-46 (failure to identify proper survey population and to use a control); *Lanphere Enters.*, 2003 U.S. Dist. LEXIS 16205 at **35-36 ("imprecise, confusing, and vague questions" and results irrelevant to facts at issue); *THOIP*, 690 F. Supp. 2d at 240-41 (failure to use an adequate control and to replicate marketplace conditions). The fatal defects present in the Luntz survey are clear and irremediable and, like in those other cases, warrant exclusion.

### III. PLAINTIFF'S BELATED PRODUCTION OF THE "RAW" DATA DOES NOT CURE THE LUNTZ SURVEY'S DEFECTS

On May 22, 2012, Plaintiff finally produced certain raw data related to Dr. Luntz's survey. This production of data came only *after* Plaintiff's initial refusal to produce the data in response to Skechers' subpoena, *after* Skechers' motion to compel the data's production, *after* Magistrate Judge Segal's order to produce the data by May 9, *after* Plaintiff's failure to produce the data on the Court-ordered date, *after* Skechers' took the court-ordered deposition of Dr. Luntz, *after* the close of discovery, and *after* Skechers filed its summary judgment papers and motion *in limine* on May 21. (*See* Mot. at 14-15.) Incredibly, Plaintiff claims that Skechers "has suffered no harm" despite his and Dr. Luntz's blatant violations of the rules of discovery and the Court's orders. The facts show otherwise.

Not only was Skechers deprived of the ability to question Dr. Luntz at his deposition about the belatedly produced data, but Plaintiff's production is still

woefully incomplete. At his deposition, Dr. Luntz identified two other categories of materials that he considered or relied upon in formulating his opinions: (1) 20 to 24 finished marketing images provided by Plaintiff's counsel that Dr. Luntz considered in making his final determination of which images to include in the survey (Luntz Depo. at 18:2-16); and (2) another set of visuals shown to Dr. Luntz by Plaintiff's attorneys on another occasion that were also considered in formulating his opinions (*id*. at 33:6-20). To date, none of these materials has been produced. Since Plaintiff still has not produced all documents that Dr. Luntz considered or relied upon in formulating his opinions, Dr. Luntz's survey and any opinions based thereon can and should be barred on that basis alone. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii).

Moreover, the raw data that Plaintiff produced lacks sufficient detail to allow a meaningful analysis of the reliability and integrity of Dr. Luntz's survey results. (*See* Scott Reply Decl. ¶¶ 6-12.) As discussed in Skechers' opening brief, a properly constructed survey report should provide detailed information about the target population, how respondents were selected, as well as incomplete or terminated questionnaires. (Mot. at 13-14.) Additionally, a carefully defined survey universe and a representative sample are key requirements of a properly conducted survey. (*Id*. at 4.) The belatedly produced data provide no information about how survey participants were recruited, screened, and qualified, and the procedures used to validate participants' qualifications. (Scott Reply Decl. ¶ 8.)

This information is especially important here because of the inherently uncertain nature of surveys, like Dr. Luntz's, that are conducted over the Internet. (*Id*. ¶ 10.) Internet surveys can be plagued by numerous biases, such as self-selection based on their particular interest in the topic of the survey. (5/21/12 Scott Decl. ¶ 29.) All that can be discerned from the "raw" data is that 817 respondents participated in Dr. Luntz's survey between the ages of 16 and 24. (*See* Scott Reply Decl. ¶ 7.) Other crucial information for testing the integrity of Dr. Luntz's survey

data is unknown, including what list of Internet users was used to select potential survey participants, the response rate of users invited to take the survey, and the demographic information of users who declined to participate. (*See id.* ¶ 11; 5/21/12 Scott Decl. ¶ 29.)

The raw data also shed no light on the other flaws in the population that Dr. Luntz selected for his survey. As noted in Skechers' opening brief, the Luntz survey should have been directed at a survey population that had the same demographic characteristics as Skechers' customer base and actual or prospective purchasers. (Mot. at 5-6.) Dr. Luntz's survey failed on both grounds. Dr. Luntz targeted "athletic wear purchaser[s]" even though Skechers is a fashion-footwear company, not an athletic wear company. (*Id.* at 4-5.) Additionally, Dr. Luntz never asked participants about their actual purchasing behavior at the outset of the survey (Luntz Depo. at 216:10-15), but instead asked only about the degree to which the images participants were shown increased or decreased their level of interest in purchasing the promoted shoes (Mot. at 6). This question, of course, goes only to whether survey participants' interest in the products potentially was increased, which "is not at all the same as increasing one's *purchase* of a product." (5/21/12 Scott Decl. ¶ 22.) Dr. Luntz failed to ask the right questions at the right point of his survey for purposes of identifying which respondents are actual or potential customers of Skechers' products.

Finally, Plaintiff's late-produced data has no bearing on the numerous other defects in the Luntz survey (*see* Section II, *supra*), which warrant the survey's exclusion.

## IV. CONCLUSION

The touchstone for a survey's admissibility is whether it is based on reliable scientific principles. Given the numerous fundamental methodological flaws of the Luntz survey that stand unrebutted in the record, the survey demonstrates "such gross indifference to the scientific method as to call into question the validity of *any*

testimony that [Dr. Luntz] would offer." *Vigil v. Michelin N. Am., Inc.*, 2007 WL 2778233, at *11 (W.D. Tex. Aug. 23, 2007). Accordingly, Dr. Luntz's survey and any proposed expert testimony relating to it are inadmissible and should be excluded by the Court.

Dated: July 2, 2012　　　　　　　　O'MELVENY & MYERS LLP

By: /s/ Robert C. Welsh
　　　Robert C. Welsh
Attorneys for Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II