O

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   RICHARD REINSDORF, an       )   Case No. CV 10-07181 DDP (SSx)
     individual,                 )
12                               )
                Plaintiff,       )   **ORDER DENYING DEFENDANT'S MOTION**
13                               )   **FOR SUMMARY JUDGMENT AND GRANTING**
          v.                     )   **DEFENDANT'S MOTIONS IN LIMINE**
14                               )
     SKECHERS U.S.A, a Delaware  )
15   corporation; SKECHERS       )
     U.S.A.., INC., II, a        )
16   Delaware corporation,       )   [Dkt. Nos. 124, 125, 127, 139,
                                 )   185]
17              Defendants.      )
     _____ )
18

19        Presently before the court is Defendant Skechers U.S.A.

20   ("Skechers")' Motion for Summary Judgment.  Having considered the

21   submissions of the parties and heard oral argument, the court

22   grants the motion in part, denies the motion in part, and adopts

23   the following order.

24   **I.   Background**

25        As explained in this court's earlier order denying Defendant's

26   Motion to dismiss, Skechers is a shoe company.  (Declaration of

27   Robert Welsh in support of Motion ("Welsh Dec.") Ex.19.)  Beginning

28   in 2005, Skechers hired Plaintiff Richard Reinsdorf ("Reinsdorf"),

a photographer, to conduct several photo shoots.  (Undisputed Fact ¶ 6).  Between 2006 and 2009, Skechers engaged Reinsdorf to conduct five photo shoots at issue here, in connection with Skechers's marketing efforts.  (Complaint ¶¶ 14-15, 18-19, 22-23, 25, 29-30.)  Prior to each photo shoot, Skechers explained to Reinsdorf the type of images Skechers hoped to capture.  (Welsh Dec., Ex. 44 ¶¶ 10,12.)  These explanations included storyboards and photographic examples, as well as drawings depicting particular poses for Skechers' selected models.  (Id. ¶¶ 12, 14.)  During the shoots, Reinsdorf posed models, arranged lighting and props, and otherwise directed the photography sessions.  (Compl. ¶ 23.)  Reinsdorf delivered raw photographs ("the photographs") to Skechers at the conclusion of each photo shoot.  (UF ¶ 22.)

Upon receiving the photographs from Reinsdorf, Skechers proceeded to modify the images for use in Skechers advertisements.  (Welsh Dec., Ex. 44 ¶ 17.)  The alterations varied with each image, and ranged from slight modifications in models' skin tone to the substitution of models' body parts and the addition of substantial graphic effects. (Id. ¶¶ 17, 21.)  These enhanced images were then used in Skechers advertisements ("the advertisements").  (Id. ¶ 16.)  No raw, unaltered photograph was ever incorporated into a finished advertisement.  (Id.)

Reinsdorf submitted invoices to Skechers for his services, and contends that he granted Skechers a limited license to use the photographs.  (Compl. ¶¶ 442; Statement of Genuine Issues ¶¶ 16-20, 22).  Reinsdorf brought suit in this court alleging copyright infringement, as well as state law causes of action for breach of contract and unfair competition, alleging that Skechers utilized

2

1  his copyrighted images as part of Skechers' marketing efforts in

2  violation of the temporal and geographic limits of the use

3  licenses.  (Compl. ¶ 6.)  Skechers now moves for summary judgment.

4  **II.  Legal Standard**

5  Summary judgment is appropriate where the pleadings,

6  depositions, answers to interrogatories, and admissions on file,

7  together with the affidavits, if any, show "that there is no

8  genuine dispute as to any material fact and the movant is entitled

9  to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

10  seeking summary judgment bears the initial burden of informing the

11  court of the basis for its motion and of identifying those portions

12  of the pleadings and discovery responses that demonstrate the

13  absence of a genuine issue of material fact.  See Celotex Corp. v.

14  Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

15  the evidence must be drawn in favor of the nonmoving party.  See

16  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).

17  If the moving party does not bear the burden of proof at trial, it

18  is entitled to summary judgment if it can demonstrate that "there

19  is an absence of evidence to support the nonmoving party's case."

20  Celotex, 477 U.S. at 323.

21  Once the moving party meets its burden, the burden shifts to

22  the nonmoving party opposing the motion, who must "set forth

23  specific facts showing that there is a genuine issue for trial."

24  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

25  party "fails to make a showing sufficient to establish the

26  existence of an element essential to that party's case, and on

27  which that party will bear the burden of proof at trial."  Celotex,

28  477 U.S. at 322.  A genuine issue exists if "the evidence is such

1   that a reasonable jury could return a verdict for the nonmoving

2   party," and material facts are those "that might affect the outcome

3   of the suit under the governing law." Anderson, 477 U.S. at 248.

4   There is no genuine issue of fact "[w]here the record taken as a

5   whole could not lead a rational trier of fact to find for the non-

6   moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

7   475 U.S. 574, 587 (1986).

8        It is not the court's task "to scour the record in search of a

9   genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,

10  1278 (9th Cir. 1996). Counsel has an obligation to lay out their

11  support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d

12  1026, 1031 (9th Cir. 2001).  The court "need not examine the entire

13  file for evidence establishing a genuine issue of fact, where the

14  evidence is not set forth in the opposition papers with adequate

15  references so that it could conveniently be found." Id.

16  **III. Discussion**

17       A.   Procedural History

18       Skechers previously brought a Motion to Dismiss for lack of

19  jurisdiction, arguing that the advertisements at issue in this case

20  are joint works created by both Reinsdorf and Skechers.

21  Because the jurisdictional issues were inextricably entwined with

22  the merits of the case, this court applied the more rigorous

23  standard applicable to motions for summary judgment under Federal

24  Rule of Civil Procedure 56.  (See March 9, 2012 Order Denying

25  Defendant's Motion to Dismiss ("Order"), Dkt. No. 28.)

26       As explained in the court's earlier Order, a joint work is a

27  copyrightable work prepared by (1) two or more authors who (2) make

28  independently copyrightable contributions and (3) intend that those

contributions be "merged into inseparable or interdependent parts of a unitary whole." Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 969 (9th Cir. 2008).  Co-authors in a joint work cannot be held liable to one another for infringement of the copyright in the joint work.  Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984); Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998).

This court found that the first two factors, authorship and independently copyrightable contributions, were not at issue.  With respect to authorship, the court expressly declined to determine whether Reinsdorf was the sole author of the raw photographs because, even if that were the case, the finished advertisements at issue here would nevertheless be the product of contributions from two authors, Reinsdorf (raw photographs) and Skechers (graphical additions and modifications).  (Order at 5 n.3.)

The court focused, therefore, on the third factor necessary to establish the existence of a joint work: the intent of the parties to merge independent contributions into a unitary whole.  After concluding that the record did not establish that Reinsdorf intended his raw photographs to be merged into a finished advertisement, the court denied Skechers' motion.  (Id. at 7.) Reinsdorf did not move for reconsideration or otherwise challenge the court's conclusions.

Now, after the conclusion of discovery, Skechers seeks summary judgment on the joint work issue.  Skechers argues that the fully-developed record now demonstrates that Reinsdorf did indeed intend for his raw photographs to be merged with Skechers' graphical enhancements into a finalized marketing image.

1    Reinsdorf's opposition to the motion does not dispute
2  Skechers' contentions regarding his intent with respect to the
3  synthesis of the parties' independent contributions.  Instead,
4  Reinsdorf now challenges the second, authorship element of the
5  joint work test, arguing that the marketing images at issue here
6  are not the creations of two or more authors.  (Opp. at 8-16.)

7    B.  Joint Authorship

8    This case presents an unusual set of circumstances.  In most
9  cases, a plaintiff seeks to establish that he is the sole author of
10 a work, <u>see</u>, <u>e.g.</u>, <u>Morrill</u>, 157 F. Supp. 2d at 1122, or at least a
11 co-author of a work, <u>see</u>, <u>e.g.</u>, <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227,
12 1230 (9th Cir. 2000), so as to enjoy the benefits of copyright
13 ownership (or co-ownership).  Here, in contrast, Plaintiff
14 Reinsdorf seeks to disavow any authorship role in the finished
15 marketing works.

16   Reinsdorf's position is understandable in light of the fact
17 that, as explained above, a co-author in a joint work cannot be
18 liable to another co-owner for infringement of the copyright in
19 that work.  <u>Oddo</u>, 743 F.2d at 632-33 (9th Cir. 1984).  Furthermore,
20 and perhaps more importantly, "[i]n a joint work, . . . each author
21 obtains an undivided ownership in the whole of the joint work,
22 including any portion thereof.  Consequently, one joint author
23 thereby obtains the right to use or license that portion of the
24 joint work that was the sole creation of the other joint author."
25 1 Nimmer on Copyright § 6.06[A].  Thus, to bring a successful
26 infringement claim against Skechers, Reinsdorf must establish that
27 his role in the creation of the final marketing images did not rise
28 to the level of authorship.

1    The criteria for joint authorship include whether 1) an

2    alleged author exercises control over a work, serves as "the

3    inventive or master mind," or creates or gives effect to an idea;

4    2) there exists an "objective manifestation of a shared intent to

5    be coauthors; and 3) "the audience appeal turns on both

6    contributions and the share of each in its success cannot be

7    appraised." Aalmuhammed, 202 F.3d at 1233-35 (internal quotations

8    and citations omitted). Due to the variety of creative

9    relationships to which these factors apply, however, the factors

10   "cannot be reduced to a rigid formula." Id. at 1235.

11       1.  Control

12   Courts in this district have found the joint control criterion

13   satisfied where "both parties had creative control over separate

14   and indispensable elements of the completed product." Morrill v.

15   Smashing Pumpkins, 157 F. Supp. 2d 1120, 1124 (C.D. Cal. 2001); see

16   also Eagle Rock Entm't. Inc. v. Coming Home Prods., Inc., No. CV 3-

17   571 FMC; 2004 WL 5642002 *13 (C.D. Cal. Sept. 1, 2004). Here, the

18   parties appear to agree on their respective degrees of control over

19   the constituent parts of the marketing images. Reinsdorf's

20   opposition argues that "[a]lthough . . . Skechers controlled the

21   latter half of the creative process here, namely the graphic design

22   of its marketing images, it exercised little to no control over

23   Reinsdorf's authorship of his underlying photographs. . . ." (Opp.

24   at 9.) Similarly, Reinsdorf asserts that "[j]ust as Skechers had

25   minimal involvement in Reinsdorf's authorship of his photographs,

26   [Reinsdorf] likewise did not exercise any supervisory powers over

27   the design of Skechers' marketing images . . . ." (Opp. at 11

28   (internal quotation omitted).) Skechers does not dispute these

1  characterizations.  (Reply pp. 7-10.)  Thus, as in <u>Morrill</u> and

2  <u>Eagle Rock Entertainment</u>, each party had exclusive, or near-

3  exclusive, power over the distinct constituent parts of the unitary

4  whole.  The "supervisory" or "control" factor thus weighs in favor

5  of joint authorship.

6          2.  Audience Appeal

7          While acknowledging that the audience appeal of the marketing

8  images could be attributed to both parties' contributions,

9  Reinsdorf argues that the bulk of the images' appeal can be

10  attributed to Reinsdorf's photos, and quantified.  Reinsdorf

11  contends that the relative appeal of the parties' separate

12  contributions can be appraised by a casual comparison of the raw

13  photographs with the finished images.  (Opp. at 17.)  "From that

14  basis," Reinsdorf claims, "one can fairly easily parse how much of

15  the audience appeal of the work originates" from the various

16  elements.  (<u>Id.</u>)  This conclusory assertion notwithstanding, the

17  only evidence Reinsdorf cites is a survey study by Dr. Frank Lunz.

18  (Opp. at 17.)  Putting aside for the moment Skechers' general

19  objections to Dr. Lunz's opinions, it does not appear that Dr. Lunz

20  ever compared Reinsdorf's raw photographs to the finished Skechers

21  advertisements.[1]  Dr. Luntz' survey was designed to test brand

22  recognition, not to appraise the relative audience appeal of the

23  various elements in the finished advertisements.  It appears that

24  Dr. Luntz did not present either Skechers' complete advertisements

25  _____

26          [1] It appears that Dr. Luntz did not present either Skechers'
   complete advertisements or Reinsdorf's raw photographs to survey

27  participants.  (Declaration of Dr. Carol Scott in Support of Motion
   to Exclude Luntz Report ¶ 46.)  Dr. Luntz' survey was designed to

28  test brand recognition, not to appraise the relative audience
   appeal of the various elements in the finished advertisements.

1   or Reinsdorf's raw photographs to survey participants.

2   (Declaration of Dr. Carol Scott in Support of Motion to Exclude

3   Luntz Report ¶ 46.)  Without such a comparison, Skechers cannot

4   credibly argue that the relative audience appeal of the joint

5   authors' contributions has been ascertained, and has failed to

6   demonstrate that the share of appeal attributable to each element

7   can be appraised.  The audience appeal factor therefore weighs in

8   favor of joint authorship.

9           3.  Objective Manifestations of Intent

10      With respect to manifestations of intent, in the absence of a

11  contract, the inquiry here must focus on the facts.  <u>Aalmuhammed</u>,

12  202 F.3d at 1235.  Here, Skechers has presented facts that it

13  suggests evince the parties' intent to be joint authors.  Reinsdorf

14  testified, for example, that his goal was to do a "great job,"

15  defined as "capturing great moments" that "Skechers could use in

16  its advertising and marketing materials."  (Reinsdorf Deposition,

17  Welsh Dec., Ex. 50 at 323:3-6.)  Reinsdorf did not expect anything

18  in particular about the finished images, as "[Skechers] could do

19  whatever," and never did anything creatively with the pictures that

20  it was not allowed to do.  (Reinsdorf Depo. at 314:18-19; 330: 2-

21  6.)  Indeed, Reinsdorf had created similar images, which Skechers

22  subsequently modified for use in advertising materials not at issue

23  in this case, for Skechers at an earlier photo shoot, the "Michelle

24  K" photo shoot.  (<u>Id.</u> at 393.)  As with the earlier Michelle K

25  shoot, Reinsdorf understood that he would be taking photos for

26  Skechers to use in its catalogs and other marketing materials.

27  (<u>Id.</u> at 396:10-20.)  Reinsdorf's representative, Robert Heller

28  ("Heller"), acknowledged in an e-mail to Skechers personnel that

Skechers' intended to "digitally play" with or otherwise "decorate" Reinsdorf's raw images.  (Ex. 53 to Welsh Dec. at 128.)

Heller also testified that, as Reinsdorf's representative, he affirmatively wanted Skechers to do something with the images, "to make beautiful ads for their company." (Id. at 130.)  Indeed, Reinsdorf facilitated Skechers' manipulation of the images by suggesting that Skechers use a gray or white background so as to facilitate digital alteration of Reinsdorf's photos.  (Id. at 125:5-7.)  When Reinsdorf received samples of the finished advertisements, his representative did not express shock or confusion, but rather stated, "These came out great!  Love the art direction in the graphics!!"  (Ex. 24 to Welsh Dec.)  Even after the commencement of this suit, Reinsdorf displayed the finished marketing images on his personal website.[2]  (Dec. of William Briggs in Opposition to Motion, Ex. 46.)

While these actions and communications provide an indication of Reinsdorf's intent that the parties' separate contributions be merged into a unified whole, that is not the question here. Rather, the issue is whether the parties manifested an intent to be co-authors.  The difference is important.  While intent to merge separate contributions is a necessary element of a joint work, it is not equivalent to an intent to be joint authors.

---

[2] The exhibit in question is not an image of Reinsdorf's website, but rather a cease and desist letter sent to Reinsdorf by Skechers, referencing the use of the advertisements.  In its reply, Skechers asserts that it sought to prevent Reinsdorf from displaying Skechers trademarks and logos, but not the marketing images.  (Reply at 10.)  It is unclear whether the website displayed Skechers logos or trademarks separate and apart from the advertising images themselves.

1    _Aalmuhammed_ itself provides a useful illustration of the

2    distinction.   There, the plaintiff wrote certain passages and

3    scenes that appeared in a movie.   _Aalmuhammed_ 202 F.3d at 1231-32.

4    The court found that the parties all intended for the plaintiff's

5    contributions to be merged into independent parts of the movie as a

6    whole.   _Id._ at 1332.   That intent, however, had no bearing on

7    whether the parties intended the contributing plaintiff to be an

8    "author" of the film.   _Id._ at 1232-35.   Applying the control,

9    audience appeal, and intent factors described above, the

10   _Aalmuhammed_ court ultimately determined that, despite the parties'

11   intent to merge their independent contributions, the parties did

12   not intend for the plaintiff to be a co-author of the movie and the

13   plaintiff was not an author of the film.   _Id._ at 1235.

14       Skechers' evidence that the parties here intended Reinsdorf's

15   photos to be merged with Skecher's digital alterations and

16   additions therefore does not resolve the authorship issue.   Indeed,

17   the parties behaved in ways uncharacteristic of joint authors.

18   Perhaps most importantly, Reinsdorf charged Skechers thousands of

19   dollars for his work.   Not only did Reinsdorf charge for his time

20   and effort, but also for "usage" of the photographs.   (Declaration

21   of Robert Heller in Opposition to Motion, Ex. 11.)   Reinsdorf also

22   attempted to limit Skechers' use of its ads by including temporally

23   and geographically restricting language in his invoices to

24   Skechers.   Skechers, for its part, also sought to prevent Reinsdorf

25   from making use of the finished images on his personal website,

26   even during the pendency of this suit.   (Briggs Dec., Ex. 46.)

27       A party intending to jointly produce a finished work generally

28   would not require payment from a co-author or, conversely, would

11

1  not agree to pay for a purported co-author's contribution.   More

2  importantly, a co-author would not attempt to constrain an intended

3  co-author's use of a collaborative work.   Other courts have come to

4  similar conclusions under similar circumstances.   In <u>Tang v.</u>

5  <u>Putruss</u>, 521 F. Supp. 2d 600 (E.D. Mich. 2007), for example, a

6  contract between a photographer and a purported co-author required

7  that the second party pay the photographer money before using the

8  photographer's photos.   <u>Id.</u> at 607.   The court found such a

9  provision inconsistent with an intent to be joint authors.   <u>Id.</u>

10      The court in <u>Robinson v.Buy-Rite Jewelery, Inc.</u>, No. 03 CIV

11  3619(DC), 2004 WL 1878781 (S.D.N.Y. Aug. 23, 2004), addressed

12  circumstances similar to, but critically different from, those

13  here.   In <u>Robinson</u>, as here, a photographer was hired for a fashion

14  shoot, and yielded all subsequent decision-making authority as to

15  how the photos would be used.   <u>Id.</u> at *3.   Unlike here, however,

16  the photographer agreed that the other contracting party could use

17  the photographs without limitation.   <u>Id.</u>   Relying on this

18  "critical" fact, the court concluded that the parties did intend to

19  be joint authors.   <u>Id.</u>

20      This court's analysis of the three <u>Aalmuhammed</u> authorship

21  factors indicates that Skechers' finished advertisements are not

22  the products of multiple authors.   While the control and audience

23  appeal factors suggest plural authorship, the parties' behavior

24  toward one another clearly indicates a lack of intent to be joint

25  authors of the finished works.

26      C.  Motions in Limine

27      Skechers seeks to exclude the testimony of Plaintiff's experts

28  Frank Luntz and Jamie Turner.   Under Federal Rule of Evidence 702,

1    an expert witness may offer opinion testimony if 1) that
2    specialized knowledge will aid the trier of fact, 2) the testimony
3    is based on sufficient information, 3) the testimony is the product
4    of reliable methods, and 4) the expert has properly applied those
5    methods to the facts of the particular case.  Fed. R. Evid. 702.

6         1.  Frank Luntz

7         Plaintiff's expert Dr. Frank Luntz ("Luntz") conducted a
8    survey designed to test 1) whether Reinsdorf's photographs were
9    directly linked to the Skechers brand and 2) whether Reinsdorf's
10   photos influenced consumers' decision to purchase a product.  (Opp.
11   at 5.)  Skechers contends that this survey was fatally flawed, in
12   that it was directed at an unrepresentative population, employed
13   improper stimuli that produced biased responses, and failed to use
14   adequate controls.  (Mot. at 1).

15        Dr. Luntz surveyed an even number of men and women aged
16   sixteen to twenty-four, even though he knew that Skechers'
17   customers are disproportionately female.  (Decl. of Carol Scott ¶
18   9; Luntz Depo. at 119).  Luntz selected that age range because,
19   according to his research, that demographic is the "meat of the
20   athletic wear purchaser." (Declaration of Jeffrey A. Barker ¶ 5.)[3]
21   Skechers, however, has submitted evidence that it is not an
22   "athletic wear" company, but rather a "fashionable footwear"
23   company that sells products ranging from "active" apparel to
24   "dress[wear]".  Luntz surveyed participants from five geographical
25   regions, but did not compare the distribution of participants to
26   the distribution of Skechers' advertising and sales, nor determine

27   _____

28        [3]  Luntz did not keep any records of this research.  (<u>Id.</u>)

whether the ads used in the survey had actually been displayed in those regions.  ((Luntz Deposition at 113-15.)

Luntz attempted to evaluate the link between Reinsdorf's photos and Skechers' brand by showing survey participants an image, then asking which company the image was promoting.  (Luntz Depo., Ex. 511.)  Respondents had to choose between Skechers, Adidas, Converse, Nike, and Reebok.  (Id.)  There was no "I don't know" option.  (Id.)  As Luntz later acknowledged, all options other than Skechers are principally athletic apparel companies.  (Luntz Depo. at 172-73.)  As described above, Skechers sells a broad range of products, including dress apparel.  Skechers argues, therefore, that the survey format produced biased, unreliable results. (Barker Dec. ¶ 6.)

For example, at question 10, participants were shown an image of a woman in heavy makeup, tight, shiny, purple leather pants, a revealing top, and raised-heel, strapped, polka dot shoes.  (Luntz Depo., Ex. 511).  Survey respondents were then asked whether the image promoted Adidas, Converse, Nike, Reebok, or Skechers.  (Luntz Depo., Ex. 511).  Question 11, in contrast, poses the same brand-identification inquiry with respect to an image of a baseball player on a baseball field, in uniform and batting helmet, lifting a weighted baseball bat.  (Id.)  The survey is replete with other examples of Skechers ads featuring models in leather jackets and jewelry staring straight into the camera, as well as non-Skechers ads featuring action and sports scenes.  (Id.)  Later in the survey, respondents were presented with the same ads, from all five companies, side-by-side, then specifically asked to identify which of the five ads ("disco girl" with sunglasses, baseball player,

14

gymnast, etc) was a Skechers ad.  (Id.)  Skechers argues that the obvious differences between Skechers "fashionable" ads and the other companies' athletic-themed ads skewed identifications' toward Skechers, and render the Luntz fundamentally flawed.

Lastly, Skechers contends that the Luntz survey failed to use adequate controls.  (Mot. at 11-12.)  Survey participants were not shown any ads that did not contain any Reinsdorf images, nor were they shown any unaltered Reinsdorf images.  Instead, respondents were only shown images containing both Reinsdorf's photographs and alterations and enhancements made by Skechers.  Participants were never asked why they associated a particular ad with Skechers. Absent any controls, such as ads containing photos other than Reinsdorf's or Reinsdorf's unaltered photos, Skechers argues, the survey provides no basis upon which to conclude that Reinsdorf's photos are the motivating force behind consumers' association of the ads in question with Skechers' brand.

Reinsdorf makes virtually no attempt to defend Luntz's methods.  Instead, Reindsorf contends that Skechers has merely "nitpicked" the Luntz survey, and that any questions regarding the survey's technical reliability is a question of weight to be determined at trial.  (Opp. at 1, 5); see E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992).  The first step in the court's analysis of any survey, however, is to determine whether the survey is admissible, relevant, and conducted according to accepted principles.  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001).  The court must, therefore, determine whether a preponderance of the evidence establishes that the reasoning or methodology underlying expert

1  testimony is scientifically valid.   Daubert v. Merrell Dow Pharms.,

2  Inc., 509 U.S. 579, 593 (1993).   Unless survey evidence is

3  conducted according to accepted principles, it is not admissible in

4  the first instance.   Fortune Dynamic, Inc. v. Victoria's Secret

5  Stores Brand Mgm't, Inc., 618 F.3d 1025, 1036 (9th Cir. 2010).

6      Here, the preponderance of the evidence indicates that the

7  Luntz survey was not conducted according to accepted scientific

8  principles.   Luntz did not identify any basis, save for his own

9  undocumented research, for selecting the survey population that he

10  used.   There is no indication that the survey population had any

11  relationship to the relevant population of Skechers consumers.

12  Skechers fashion-focused ads were presented alongside obviously

13  distinctive sportswear ads in closed-ended brand identification

14  questions.   Furthermore, though the survey purported to examine the

15  role that Reinsdorf's photos played in consumers' association of

16  certain ads with Skechers' brand, the survey did not include any

17  controls or basis for comparison.

18      These inadequacies speak not merely to the weight that should

19  be accorded to the survey, but rather to the fundamental

20  reliability of Luntz's approach.   Reinsdorf does not identify any

21  scientific principles underlying the Luntz survey, which appears to

22  violate numerous accepted practices in the field of survey

23  research.   (Scott Dec. ¶¶ 24-25, 31; Shari S. Diamond, Reference

24  Guide on Survey Research, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE

25  373-408 (Fed. Judicial Center 3d ed. 2011).   Accordingly, Skechers'

26  Motion to Exclude Luntz's testimony and report is GRANTED.[4]

27

28      [4] The court further notes that Reinsdorf did not comply with
                                                      (continued...)

2.   Jamie Turner

A copyright owner is entitled to recover "any profits of [an] infringer that are attributable to the infringement." 17 U.S.C. § 504(b). Recoverable profits include an infringer's "indirect profits," which generally arise when an infringer uses "a copyrighted work to sell another product." Garcia v. Coleman, No. C-07-2279 EMC, 2009 WL 799393 at *2-3 (N.D. Cal. Mar. 24, 2009) (citing Polar Bear Prods. v. Timex Corp., 384 F.3d 700 (9th Cir. 2004)). Because only those profits "attributable to the infringement" are recoverable under the Copyright Act, "a causal link between the infringement and the monetary remedy sought is a predicate to recovery" of any kind. Polar Bear, 384 F.3d at 708.

It is the plaintiff's burden to establish a non-speculative causal connection between an infringement and the infringer's profits. Id. at 708, 711; Mackie v. Rieser, 296 F.3d 909, 914-16 (9th Cir. 2002). A plaintiff cannot merely present an infringer's gross revenue, but rather must identify a particular revenue stream that bears a "legally sufficient relationship" to the infringement. Polar Bear, 383 F.3d at 711.

Reinsdorf seeks to introduce the testimony of Jamie Turner to establish the amount of Skechers' profits attributable to Skechers' use of Reinsdorf's photographs. Turner summarized his analysis as follows:

---

[4](...continued)
the Magistrate Judge's order regarding the production of raw data from the Luntz survey. Though Reinsdorf eventually produced the data, it did so after the expiration of the deadline set by the Magistrate Judge and after the filing of the instant motion. Nevertheless, Skechers does not appear to have been unduly prejudiced by the late production.

1.      [W]e can broadly conclude that more than 0% but less than 100% of the net profits generated by Skechers during this period can be attributable to Mr. Reinsdorf's brand imagery.

2.      We know there was already some value to Skechers [sic] brand . . . so it is safe to assume that Mr. Reinsdorf's images are worth less than 100% of the net profits . . . .

3.      [W]e know that Mr. Reinsdorf's brand imagery was used around the globe . . . .

4.      We also know that this brand imagery was a foundational element of the marketing program . . . .

5.      [W]e know that the residual value of the brand imagery will continue for approximately five years . . . .

6.      Therefore, based on the above facts and based on my experiences working with brands such as The Coca Cola Company, AT&T and CNN . . ., it is reasonable to conclude that the value that Mr. Reinsdorf's copyrighted brand images contributed to the net profits for the corporation fall somewhere between 50% and 75% of the net profits . . . .

(Turner Report at 14-15.)

Turner's entire contribution to this dispute essentially amounts to, "I have a lot of experience with brands and marketing, therefore I can divine that 50-75% of this large, successful, company's profits come from Reinsdorf's photographs."  This "analysis" identifies no causal link, let alone a non-speculative connection, between Skechers' alleged infringement and any particular revenue stream.  Turner somehow settles upon an indirect profits figure between $161 million and $241.1 million without any specific data or discernible methodology, and in reliance on such "facts" as "it is safe to assume that Mr. Reinsdorf's images are worth less than 100% of the net profits."[5]  Turner's opinion is not

_____

[5] The court does not consider Turner's newly proffered opinion, submitted as an opposition to Skechers' Motion in Limine. See Fed. R. Civ. P. 37(c)(1).  Even if the court were to consider Turner's declaration, the result here would not change.  The

(continued...)

1   based upon sufficient facts and is not the product of reliable

2   methods.  Because Turner's opinion fails to illustrate a

3   relationship of any kind between infringing conduct and specific

4   income, it cannot serve as a basis for granting Reinsdorf Skechers'

5   indirect profits.  Skechers motion to exclude Turner's testimony is

6   GRANTED.[6] [7]

7       D.  Remaining Issues

8       Skechers also argues that it is entitled to summary judgment

9   because the invoices Reinsdorf sent to Skechers are not copyright

10  licenses as a matter of law.  Skechers correctly points out that

11  Reinsdorf's declaration with respect to this issue contradicts his

12  earlier admissions.  The complaint alleges that "Reinsdorf entered

13  into a series of written license agreements with Skechers for its

14  exclusive use of his photos . . . ."  (Compl. ¶ 55.)  In February

15  2012, Reinsdorf confirmed that the facts asserted in his complaint

16

17  _____

18      [5](...continued)
    declaration is internally inconsistent, referring at one point to

19  financial reports from 2007 through 2009 and elsewhere to reports
    spanning from 2008 to 2010, and purports to rely on other late-

20  filed declarations that conflict with Turner's statements and
    conclusions.

21
        [6] While the court has sustained Skechers' objection to

22  Turner's newly-filed expert opinion, Skechers presented that
    objection in combination with a purported motion to strike the

23  supplemental report of David Connelly.  (Dkt. No. 185).  Reinsdorf
    did not oppose the motion, and the issue was not raised at oral

24  argument.  Though the docket indicates that that motion was taken
    under submission, the Motion to Strike was untimely filed.  C.D.

25  Cal. L.R. 6-1.  Insofar as it regards David Connelly, the Motion is
    VACATED.  Skechers remains free to file a Motion in Limine

26  regarding the supplemental Connelly report.

27      [7] Having concluded that Turner's opinion is inadmissible for
    failure to apply reliable methods and rely upon sufficient

28  information, the court does not address Skecher's contention that
    Turner is not qualified to present expert testimony.

1   were accurate to the best of his knowledge.  (Reinsdorf Depo. at

2   16:14-16.)

3       Three months later, however, over two months after the

4   deadline to make changes to the deposition transcript, Reinsdorf

5   purported to completely change his answer to "Skechers did not

6   actually get exclusive use of the pictures."  (Supplemental Dec. of

7   Robert Welsh, Ex. 6.)  Reinsdorf has not provided any explanation

8   for the untimely reversal.  Reinsdorf also now states in opposition

9   to the instant motion for summary judgment that he "never granted

10  Skechers an exclusive right to use my photographs."  (Reinsdorf

11  Dec. at 17.)  A party may not, however, create an issue of fact by

12  contradicting prior deposition testimony.  <u>Van Asdale v. Int'l Game</u>

13  <u>Tech.</u>, 577 F.3d 989, 998 (9th Cir. 2009).  The court finds that

14  there is a clear inconsistency between Reinsdorf's initial

15  testimony, in which he confirmed the complaint's allegation that he

16  granted Skechers an exclusive license, and his later untimely

17  correction and declaration that he did <u>not</u> grant Skechers an

18  exclusive license.  Reinsdorf's subsequent affidavit is a sham, and

19  is thereby stricken.  <u>Id.</u>

20      Beyond holding Reinsdorf to his initial assertion, however,

21  the court expresses no opinion regarding the existence of a

22  copyright license.  Having determined that the finished

23  advertisements are not joint works, it is unclear to the court

24  whether Skechers' license argument remains relevant.[8]  With respect

25

26

_____

27      [8] Though Skechers suggests that it is entitled to summary
28  judgment if there was no license, the basis for this contention is
    unclear.

1  to the license issue, Skechers' Motion for Summary Judgment is

2  therefore DENIED without prejudice.

3  **IV.   Conclusion**

4      Skechers has not demonstrated that the parties intended to be

5  co-authors of the finished marketing images, which are, therefore,

6  not joint works.  In light of that determination, it is unclear

7  whether Skechers' license argument remains relvant.  Accordingly,

8  Skechers' Motion for Summary Judgment is DENIED.

9      The expert opinions of Frank Luntz and Jamie Turner do not

10 satisfy the requirements of Federal Rule of Evidence 702.

11 Accordingly, Skechers' Motions in Limine to exclude those opinions

12 are GRANTED.

13

14

15 IT IS SO ORDERED.

16

17

18 Dated:October 9, 2012

19                                DEAN D. PREGERSON
                                 United States District Judge

20

21

22

23

24

25

26

27

28