1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4                     - - -

5    HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7    RICHARD REINSDORF,            )
                                   )
8         Plaintiffs,              )
                                   )
9                                  )
                                   )
10        vs.                      ) No. CV 10-07181-DDP
                                   )
11                                 )
                                   )
12   SKECHERS U.S.A., INC., ET AL.,  )
                                   )
13        Defendants.              )
     ──────────────────────────────)

14

15

16             REPORTER'S TRANSCRIPT OF PROCEEDINGS

                        *MOTION HEARING*

17                 LOS ANGELES, CALIFORNIA

18                MONDAY, JULY 23, 2012

19

20   ────────────────────────────────────────────────────

21                  MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
22                    C.S.R. 12254
                UNITED STATES COURTHOUSE
23              312 NORTH SPRING STREET
                       ROOM 404
24           LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
25

```
 1                    A P P E A R A N C E S

 2

 3

 4      ON BEHALF OF THE PLAINTIFFS,
        RICHARD REINSDORF:              LAVELY & SINGER, APC
 5                                      BY:  WILLIAM JOSEPH BRIGGS,
                                        II, ESQ.
 6                                      2049 CENTURY PARK EAST
                                        SUITE 2400
 7                                      LOS ANGELES, CALIFORNIA 90067
                                        (310) 556-3501
 8

 9                                      LAVELY & SINGER, APC
                                        BY:  HENRY L. SELF, III,
10                                      ESQ.
                                        2049 CENTURY PARK EAST
11                                      SUITE 2400
                                        LOS ANGELES, CALIFORNIA 90067
12                                      (310) 556-3501

13

14      ON BEHALF OF THE DEFENDANTS,
        SKECHERS U.S.A., INC.:          O'MELVENY & MEYERS, LLP
15                                      BY:  ROBERT C. WELSH, ESQ.
                                             DANIEL M. PETROCELLI,
16                                      ESQ.
                                        400 SOUTH HOPE STREET
17                                      LOS ANGELES, CALIFORNIA 90071
                                        (213) 430-6000
18

19                                      O'MELVENY & MEYERS, LLP
                                        BY:  DREW E. BREUDER, ESQ.
20                                      1999 AVENUE OF THE STARS
                                        SUITE 700
21                                      LOS ANGELES, CALIFORNIA 90067-603
                                        (310) 246-6713
22

23

24

25
```

1                          **I N D E X**

2

3                                                                  PAGE

4      MOTION HEARING:                                              4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, JULY 23, 2012 |
| 2 | -o0o- |
| 3 | (COURT IN SESSION AT 11:15 A.M.) |
| 4 | THE CLERK:  Calling item four, CV 10-07181-DDP: |
| 5 | *Richard Reinsdorf vs. Skechers USA.* |
| 6 | Counsel, may we have appearances please. |
| 7 | MR. BRIGGS:  Good morning, Your Honor. |
| 8 | William Briggs of Lavely & Singer on behalf of the plaintiff |
| 9 | Richard Reinsdorf. |
| 10 | THE COURT:  Good morning. |
| 11 | MR. WELSH:  Good morning, Your Honor. |
| 12 | Robert Welsh.  Also with me is Daniel Petrocelli, who's the |
| 13 | lead trial counsel in this matter and Drew Breuder on behalf |
| 14 | of the defendants. |
| 15 | THE COURT:  Good morning. |
| 16 | MR. SELF:  And Henry Self also of Lavely & Singer |
| 17 | for the plaintiff. |
| 18 | THE COURT:  Okay.  Mr. Briggs, I'll start with you. |
| 19 | MR. BRIGGS:  Yes, Your Honor. |
| 20 | Your Honor, I'll be brief because we have a |
| 21 | division of labor between myself and Mr. Self. |
| 22 | THE COURT:  Okay.  What is Mr. Self going to be |
| 23 | talking about? |
| 24 | MR. BRIGGS:  He's going to be talking about the |
| 25 | joint authorship issue, Your Honor.  And -- |

UNITED STATES DISTRICT COURT

**EXHIBIT 1**

**5**

```
1                    THE COURT:  And what are you going to be talking
2        about?
3                    MR. BRIGGS:  I was going to be addressing the in
4        limine motions, if that was a concern of the Court.  I can
5        also address the indirect profit issue.
6                    THE COURT:  Why don't you talk about the -- well,
7        why don't I start with Mr. Self, and then we'll get back to
8        indirect profits.
9                    MR. BRIGGS:  Yes, Your Honor.
10                   THE COURT:  Okay.  Go ahead, Mr. Self.
11                   MR. SELF:  Thank you, Your Honor.
12                   THE COURT:  What is the work that we're fighting
13       about here?
14                   MR. SELF:  The -- I believe -- and I may be
15       corrected by opposing counsel, but my understanding from
16       their moving papers is the focus is on the -- what they call
17       "marketing images;" that is the finished advertising images
18       that contain both the plaintiff's photographs and the
19       defendant's additions, that is logos and text and --
20                   THE COURT:  So we'll be talking about the final
21       marketing work?
22                   MR. SELF:  Correct.  That is my understanding.
23                   THE COURT:  Okay.  Okay.  Well, that's -- that's --
24       do you think we're talking about some other work?
25                   MR. SELF:  No.
```

**EXHIBIT 1**

**6**

```
1              THE COURT:  Okay.  So then why are these final
2    marketing works not joint works?
3              MR. SELF:  The key reason that they are not joint
4    works is, the second part of the Ala Mohammed test set forth
5    by the Ninth Circuit Court of Appeals, that is the quote,
6    punitive coauthors make objective manifestations of a big
7    shared intent to be coauthors, and this is I think the fatal
8    flaw in this case --
9              THE COURT:  Don't I look at the -- shouldn't I look
10   at the totality of the circumstances as well?
11             MR. SELF:  Absolutely, yes.
12             THE COURT:  Okay.  So what were the totality of the
13   circumstances here?
14             MR. SELF:  The totality --
15             THE COURT:  What was this all about?  Why did these
16   parties get together?
17             MR. SELF:  This is all about a client paying a
18   photographer to be able to use photographs that he took.
19   That is not a coauthorship situation.
20             THE COURT:  So these raw photos -- we can refer to
21   the unretouched photos as the raw photos.  Those are the
22   things that came out of the camera without any digital
23   enhancements or work done at all by Skechers.  -- that's the
24   raw photos; we'll call them that, okay?
25             MR. SELF:  Well, we'll call them that.  Although,
```

1    for various technical reasons, that would -- that would be

2    slightly inaccurate, but for shorthand, that's --

3            THE COURT:  Okay.  Well, why would it be

4    inaccurate?

5            MR. SELF:  Because there was actually there on the

6    set as the plaintiff was taking photographs already some

7    minor digital retouching occurring before the photos were

8    delivered to Skechers but -- and that's why they're not

9    actually raw photos.

10           THE COURT:  Okay.

11           MR. SELF:  They're not the exact data were captured

12   by the -- the lens --

13           THE COURT:  Okay.  They're essentially raw photos.

14           MR. SELF:  They're essentially, yes.

15           THE COURT:  Okay.

16           MR. SELF:  I mean for purposes of this -- this

17   legal analysis, we can call them that.

18           THE COURT:  Okay.  So what was your client hired to

19   take pictures, and then these pictures were going to be sold

20   somewhere?  Well, what was -- why was he taking these

21   pictures?

22           MR. SELF:  He's taking these pictures because he

23   was hired by Skechers.

24           THE COURT:  And what did he think was going to

25   happen with those pictures?

**EXHIBIT 1**

**8**

1           MR. SELF:  That there, I think is the key flaw in

2    Skechers' analysis.  Skechers is focusing on the statutory

3    language of an intent that the contributions being merged

4    into --

5           THE COURT:  Right.  It's an objective intent.  We

6    all know that; right?

7           MR. SELF:  These are two very distinct

8    requirements, all right.  This is where Skechers I think

9    makes their fatal mistake.  They are attempting to conflate

10   on one hand the statutory language which concerns an intent

11   that contributions be merged into inseparable or

12   interdependent parts of unitary whole.  That is the language

13   of the statute.

14          What Ala Mohammed teaches us -- and what the

15   subsequent cases in this jurisdiction show -- *Richland*, for

16   example -- or even the *Smashing Pumpkins* case, is that

17   separate and apart from the statutory language, there are

18   three additional factors that must be considered.  And the

19   key one here is not intent to join contributions into an

20   interdependent or inseparable whole.  That is not the issue.

21   The issue is intent to be a coauthor.

22          THE COURT:  All right.  Well, it's an -- it's still

23   objective intent; right?

24          MR. SELF:  It is.

25          THE COURT:  Okay.  So I'll go back.

**EXHIBIT 1**

**9**

1          What did your client believe was going to happen to

2     the raw photographs once he took them?

3          MR. SELF:  That they would be used in Skechers

4     marketing materials.

5          THE COURT:  Okay.  And was he familiar before he

6     took the photos of the type of campaign that Skechers was

7     interested in using his photos for in their marketing works?

8          MR. SELF:  I believe so, yes.

9          THE COURT:  Okay.  And what was that campaign?

10         MR. SELF:  The evidence shows that the parties

11    contemplated use of his photographs primarily in what are

12    called "lookbooks," as well as in-store advertising and a

13    point-of-sale materials.

14         THE COURT:  Okay.  So these photographs, for lack

15    of a better term, were sort of -- well, I don't want to use

16    that phrase.  Okay.  Go on.  I'm listening.

17  Q    Okay.  So the -- what the entire joint authorship

18    analysis here really comes down to at the end of the day, is

19    as you say, the totality of the parties' conduct.  Did they

20    behave like licensor and licensee -- like parties operating

21    at arms' length with the business transaction or did they

22    conduct themselves as collaborators -- as joint authors, as

23    leer assistant musician; getting together and making art

24    together --

25         THE COURT:  You said your client adhered to any

**EXHIBIT 1**

**10**

1    formalities when it came to working with Skechers as a

2    licensee?

3              MR. SELF:  Yes.

4              THE COURT:  Okay.

5              MR. SELF:  The plaintiff referred -- well, that may

6    not be quite accurate.  The defendants corresponded with the

7    plaintiff's professional represent -- representatives and

8    negotiated the terms of the arrangement.

9              THE COURT:  And then your -- your client sent

10   something entitled "invoice"; right?

11             MR. SELF:  His representative did; yes.

12             THE COURT:  Okay.

13             MR. SELF:  And our point is --

14             THE COURT:  Well, when you say his

15   "representatives," he adopts what they did; right?

16             MR. SELF:  That is right.

17             THE COURT:  Okay.

18             MR. SELF:  But his -- objectively, not reasonable

19   to think that two collaborators -- two authors wanting to get

20   together and make art -- make creative works together, would

21   be invoicing each other.  That's inconsistent with a notion

22   of joint authorship.  I challenge Skechers to show us one

23   reported decision where any two collaborators --

24             THE COURT:  Do you think Skechers was going to

25   trust its advertising campaign and its business to just some

1    raw photographs?

2            MR. SELF:  I'm not sure I understand the question;

3    I'm sorry.

4            THE COURT:  Did your client believe that Skechers

5    was trusting its business, its advertising campaign, its

6    future success on raw photos?

7            MR. SELF:  I -- no.

8            THE COURT:  Okay.  Okay.  Would you say that it

9    would be a fair assumption to state that Skechers believed

10   that the marketing works were very important to the image

11   that Skechers wished to convey to the public?

12           MR. SELF:  Yes.

13           THE COURT:  Okay.  Go on.  I'm listening to your

14   next point then.

15           MR. SELF:  So the next point is that Skechers

16   really fails to address this three-part Ala Mohammed test at

17   all.  Instead they suggest that all three Ala Mohammed

18   factors are somehow subsumed into the statutory language

19   itself; in particular, the requirement that there be two or

20   more authors.  That is not what Ala Mohammed said; that is

21   not what the subsequent cases, such as the *Smashing Pumpkins*

22   decision, such as the others cited in our papers; That's not

23   what the cases say, and it doesn't stand to reason.  You --

24   just because there are two authors, it does not necessarily

25   follow that -- that those two authors must have intended to

EXHIBIT 1

12

1   be coauthors of a joint work.

2          THE COURT:  I mean, that's true, sure.  We all

3   agree with that.  You could have a situation where you have a

4   person -- an actor that adds a line to a script, for example.

5   And the script goes on for a hundred pages; the actor says,

6   Well, you know, I'd like to change this.  I want to say this,

7   instead of that.  And maybe that independently qualifies

8   as -- as copyrightable, and you don't have a joint authorship

9   under that circumstance.  We all agree with that; right?

10         MR. SELF:  Sure.

11         THE COURT:  Okay.  But we're dealing with a very

12  different situation here, aren't we?

13         MR. SELF:  We're dealing with a situation where a

14  customer came to a photographer, and for a -- an agreed-upon

15  price, bought permission to use the plaintiff's intellectual

16  property.  That is not joint authorship.  Objectively

17  evaluated, that is not to two creative parties collaborating

18  on body-shared work.

19         THE COURT:  Was what Skechers did, significant?

20         MR. SELF:  Yes.

21         THE COURT:  Okay.  Was it independently

22  copyrightable?

23         MR. SELF:  As a derivative work, yes.

24         THE COURT:  Okay.  But we don't get to the issue of

25  whether something is a derivative work until we first answer

**EXHIBIT 1**

**13**

```
 1    the question about whether they are joint authors; right?
 2              MR. SELF:  Agreed.
 3              THE COURT:  Okay.  So let's focus on the high
 4    points then of your argument that they are not joint authors.
 5              MR. SELF:  Yes.
 6              THE COURT:  Go ahead.
 7              MR. SELF:  The first and most important is, as I've
 8    already stated, the parties negotiated the terms of a deal,
 9    whereby the plaintiff rendered services and authorized
10    certain uses.  That right there -- that is not joint
11    authorship.  That is a licensing arrangement.  That is a
12    permission to use property situation.  Furthermore --
13              THE COURT:  Well, then that sounds like a
14    conclusion to me.  And we're looking at, again, the totality
15    of the circumstances on this issue --
16              MR. SELF:  Agreed.
17              THE COURT:  -- so why don't you -- I just want to
18    make sure that I'm really clear in my mind about what your
19    sort-of-key arguments are in the joint authorship issue.
20              MR. SELF:  The most important points are number
21    one, the invoices, as in the estimates; -- the business
22    arrangement.
23              Number two, the fact that objectively, the
24    plaintiff never expressed to Skechers or anyone, an
25    understanding or an intent that he would be a joint author.
```

```
 1              Number three, no one from Skechers at any point in
 2    time before this litigation ever expressed outwardly,
 3    objectively any such intent either.
 4              THE COURT:  And your client never expressly
 5    indicated there was going to be a licensing arrangement
 6    either.
 7              MR. SELF:  Again, totality of the circumstances --
 8              THE COURT:  Right.  So you've got to look at this
 9    amalgam of what occurred.  And we look -- we start with the
10    big picture --
11              MR. SELF:  Yes.
12              THE COURT:  -- I think; right?
13              And we start looking at what was contemplated.
14    Your client had a good reputation as being an excellent
15    photographer, and they'd liked his work in the past.
16              Skechers has a very substantial company where
17    marketing works are very important to it and Skecher
18    maintained -- Skechers maintained control of the final
19    approval of whatever the marketing works was.  Your client
20    didn't have any input into any of those issues, did he?
21              MR. SELF:  That's correct.
22              THE COURT:  Okay.  In fact, your client didn't ever
23    restrict how the photographs could be digitally manipulated,
24    did he?
25              MR. SELF:  That -- that is correct.
```

```
 1                  THE COURT:  Okay.  All right.

 2                  Anything further?

 3                  MR. SELF:  Again, it's the totality of the

 4       circumstances.  And looking objectively, at all of the facts

 5       here, it doesn't just add up to joint authorship.

 6                  THE COURT:  Okay.  Thank you very much.

 7                  MR. SELF:  Thank you.

 8                  THE COURT:  Should we just deal with this issue,

 9       Mr. Welsh.  Why don't we go ahead.

10                  MR. WELSH:  I won't spend a lot of the Court's time

11       on this, because I think Your Honor has highlighted what from

12       our point of view are the major issues.

13                  Number one, we have the definition and the

14       Copyright Act of what is a joint work.  Your Honor went

15       through that when we were here before with regard to the

16       motion to dismiss.  As Your Honor has indicated, we were down

17       to the final issue:  Whether or not there was undisputed

18       evidence to show that the plaintiff intended that his

19       photographs be merged into the Skechers marketing images.  We

20       have proffered undisputed evidence showing that.  We have

21       from the plaintiffs mouth himself with regard to his

22       deposition; we have it from writings from both the plaintiff

23       and his agent in which prior to the first photo shoot at

24       issue here, they wrote to Skechers, acknowledging that

25       Skechers was going to be digitally playing with the
```

**EXHIBIT 1**

**16**

1  photographs and making suggestions.

2  THE COURT:  I think we have to look here again at

3  sort of the big picture.  And I agree with what you've said.

4  This wasn't a photograph to be put in a news magazine.  This

5  was something that's going to be part of a very important,

6  large campaign by a very large company.  And that was the

7  context that everybody understood this project involved.

8  MR. WELSH:  And, Your Honor, there was, as -- as we

9  talked about -- as the Court talked about in the *Morrill*

10  case:  Active collaboration between the parties from

11  beginning to end.  It may be disputed whether or not Skechers

12  is or is not a joint author of the photograph.  But as Your

13  Honor has already realized, that issue doesn't bear on

14  whether or not summary judgment should be granted here.  The

15  point which is not disputed is that from the very outset, the

16  parties met in advance of the photo shoot to discuss ideas;

17  to share concepts about what they were going to try to

18  achieve at the photo shoot.  They then talked about what

19  props would be appropriate and worked with the plaintiff in

20  order to come up with the right props and get those

21  delivered.  There was discussion about what the right model

22  should be, what the imagery should be.  Skechers personnel

23  attended each and every photo shoot.  There were tear sheets.

24  There were other kinds of diagrams that were exchanged

25  between the parties, both before the photo shoot and during

1    the photo shoot.  This is exactly the kind of collaboration

2    that Ala Mohammed says is what is -- what is necessary to

3    establish the objective evidence of an intent to be a

4    coauthor:  Is when you collaborate with another.  And here,

5    the evidence is undisputed that there was active

6    collaboration.

7           We also have the -- the fact that plaintiff

8    participated in the Michelle K. Photo shoot in 2005 -- a year

9    before the photo shoot, in question, in this lawsuit even

10   began.  There once again, he took photos.  He saw that his

11   photos were materially altered and modified by Skechers and

12   then put into these marketing images.

13          And we have e-mails from the plaintiff and -- and

14   his agent, in which they were not so thrilled with what

15   Skechers had done, apparently.  But at no time, did

16   plaintiff -- and he admits it in his deposition, did

17   plaintiff ever complain to Skechers about the changes they

18   had made; never once suggested that Skechers could not make

19   such changes.  We have all the ingredients that we need for

20   there to be a joint work.  We have satisfied the statutory

21   requirements.  Mr. Self's suggestion that Ala Mohammed, in

22   fact, somehow changes the copyright statute is absolutely

23   wrong.  Ala Mohammed's -- the teaching of Ala Mohammed are

24   completely consistent with the requirements of the -- of the

25   joint work definition.  What Ala Mohammed is talking about in

**EXHIBIT 1**

**18**

```
1    the requirements is with regard to satisfying the joint -- to
2    establishing the control issue for whether or not you have
3    two or more authors.  It's the author aspect which
4    Ala Mohammed says implies some control.
5            We have the Morrill case vs. Smashing Pumpkins; it
6    is directly on point.  I'm surprised they even cited it
7    because it -- the fact situation is exactly ours.  The
8    plaintiff in Morrill, like the plaintiff here, came to court
9    and said, I -- I created this work, and even though I used
10   the work of the band with Smashing Pumpkins in my video, they
11   did not exercise sufficient control over my finished product
12   to be considered a joint author.  That is exactly the
13   argument they have made to Your Honor here.  And the Morrill
14   Court said, No, you're wrong; the Smashing Pumpkins band had
15   the control over their own musical performances and that
16   control over their musical performance is that wasn't
17   incorporated into the video with sufficient to satisfy the
18   control element under Ala Mohammed for the test of
19   authorship.
20           Likewise here, plaintiffs insist, I had full and
21   complete control over the taking of the photographs.  He's
22   adamant about it.  He -- he puts himself exactly into the
23   factual scenario in the Morrill case.  And the decision in
24   Morrill on joint authorship is likewise -- is equally
25   applicable here.  The parties intended that each of their
```

1   contributions would be merged in -- into a unified whole.

2   That unified whole here is the joint work of the marketing

3   images.  And as an author of those joint works, Skechers

4   simply can't be sued for copyright infringement.

5           THE COURT:  Thank you, Mr. Welsh.

6           MR. WELSH:  Thank you.

7           MR. BRIGGS:  Your Honor, may I briefly address --

8           THE COURT:  Go ahead.  And then we'll take up the

9   indirect profits issue, please.

10           MR. BRIGGS:  Thank you, Your Honor.

11           Your Honor, I want to briefly address some of the

12   concerns raised by the Court.  The Court highlighted the

13   issue that there must be an objective manifestation of intent

14   to be joint authors.  That is one of the key factors in the

15   Ala Mohammed area.  And the Court pressed questions on

16   Mr. Self designed to elicit information as to whether or not

17   there was, indeed, an objective manifestation of intent.

18   There was not.  Here, Your Honor, the most inconsistent

19   objective manifestation of a lack of intent to be coauthors

20   was the very fact that Skechers had to pay for a six-month

21   usage period of these photos; both, geographically and within

22   time.  And after that, they had no further right to those

23   photos.  That is not something that is consistent with an

24   intent to be a coauthor, because if it were, Skechers would

25   be able to use it -- the photos endlessly, but they cannot,

1   even in their marketing images.  So that factor alone

2   suggests that there was no -- objective manifestation of

3   intent.

4           Another factor, Your Honor, we cited it in our

5   papers, Skechers sent Mr. Reinsdorf a notice to cease and

6   desist from use of these images on his own Web site.  If

7   Mr. --

8           THE COURT:  I understand that.  That came up later.

9   And they may not have been thinking through all of the joint

10  authorship arguments at that point.  So I don't know really

11  what to make of that.  You know, their trademarks were up on

12  the Web site.  They may have felt that there's an independent

13  basis in trademark law dealing with dilution, disparagement,

14  not policing their marks.  I can think of a whole bunch of

15  issues that are outside the scope of copyright.

16          MR. BRIGGS:  And let me put this in the

17  chronological context for the Court, that cease and desist

18  letter...

19          It came after the motion to dismiss.  That motion

20  to dismiss was based on joint authorship, Your Honor.  So

21  there was no mistake as to whether or not there was joint

22  authorship issues present, because counsel had already

23  thought through that issue.

24          THE COURT:  But aren't we here because the parties

25  weren't really in a -- in a -- in -- in a written sense,

1   perfectly clear about exactly everything here?  So now we

2   look at everything.  We look at the totality; we look at what

3   was anticipated.  We look at the big picture, and we try to

4   unravel and unsort this whole cross of dealings and what

5   occurred and try to make some sense of it.

6          And I understand the arguments that you've made,

7   and they -- they certainly are pertinent to part of the

8   analysis; I agree.

9          MR. BRIGGS:  May I address what the Court just

10  said, Your Honor?

11         THE COURT:  Yes.

12         MR. BRIGGS:  The Court hits upon the notion that it

13  was not clear.  What the Court, I guess, is getting at, is

14  that in the estimates and invoices, the term "license" was

15  not used.  That's conceded.  That term analogy was not used

16  and neither the estimates or the invoices, but what was

17  used -- what is one of the terms that is used as a custom and

18  practice in the industry -- and we have an expert report from

19  Jack Reznicke (phonetic), who opined on this -- they used the

20  terminology "usage," which a multibillion dollar corporation,

21  such as Skechers in all of its campaigns for every single

22  photographer that it hired both prior to Mr. Reinsdorf and

23  subsequent to Mr. Reinsdorf, uses the same terminology.  And

24  as Mr. Reznicke pointed out in his own expert report, that

25  term is synonymous with license when a company --

EXHIBIT 1

22

1          THE COURT:  Well, let's assume you're right for

2     purposes of discussion -- let's assume you're right it was a

3     license.

4          What were the terms of the license?

5          MR. BRIGGS:  The terms of the license, Your Honor,

6     were simple.  Skechers had a right to use the photos and its

7     marketing materials.  And I beg to defer slightly with Mr.

8     Self -- it was a bit broader than simply look books or

9     Internet.  It was also billboards.  It was also --

10          THE COURT:  Okay.  So Skechers violated the -- the

11     licensing agreement.

12          MR. BRIGGS:  Yes, Your Honor.

13          THE COURT:  Okay.  And that gives rise to a

14     contract claim?

15          MR. BRIGGS:  That gives rise to a copyright

16     infringement case on claim under the operative law when a

17     party exceeds the term of a copyright license of the

18     plaintiff; has the option of deciding whether to pursue a

19     breach of contract claim or an infringement claim.

20     Mr. Reinsdorf has decided to pursue both, breach of contract,

21     as well as infringement, Your Honor.

22          THE COURT:  There's a breach of contract claim in

23     the complaint?

24          MR. BRIGGS:  Yes, Your Honor.

25          THE COURT:  Okay.  I didn't recall.

1          Okay.  Thank you.

2          Let's talk about indirect damages.  Do you want to

3     talk about that since you're there?

4          MR. BRIGGS:  Yes, Your Honor.  I'll briefly address

5     the issue of indirect damages.

6          Do you mind if I grab some water real quick?

7          THE COURT:  Go ahead.

8          MR. BRIGGS:  Thank you.

9          Our indirect damage analysis -- I don't think

10    there's any dispute on the operative law here.

11    the *Polar Bear* decision sets out the operative law that there

12    must be a reasonable relationship between the revenue and the

13    infringing activity.

14          What we have in this case that distinguishes it

15    from others in the Ninth Circuit, but clearly brings it

16    within what the Second Circuit has dealt with.  We have a

17    company that has engaged in serial abuses of discovery.  The

18    gamesmanship has prevented --

19          THE COURT:  I don't know if that's true or not --

20    and I'm sorry to interrupt you; but if you felt that they had

21    done something improper, your remedy is a motion to compel.

22    So I am dealing with the record that I have before me today,

23    and I'm not revisiting whether a motion to compel would have

24    produced something or whether it would have been well taken.

25    So I don't really care about that argument.  I want to know

**EXHIBIT 1**

**24**

```
1    what is before me today.
2              MR. BRIGGS:  What is before you today, Your Honor,
3    is the causal link between Mr. -- the use of Mr. Reinsdorf's
4    images --
5              THE COURT:  Right.
6              MR. BRIGGS:  -- and then the profits.
7              THE COURT:  Sure.  Everybody talks about the nexus.
8    Let's talk about the nexus.
9              MR. BRIGGS:  Okay.  And the profits earned by
10   Skechers.  Dr. Lunz's (phonetic) survey went out and tested
11   the public.  And according to his deposition testimony, the
12   recognition and the -- the -- the -- the consumer awareness
13   of these ads was so high that it was compelling -- it would
14   compel people to purchase the Skechers product.  He said --
15             THE COURT:  What does that mean?
16             MR. BRIGGS:  Well, here's what it means, Your
17   Honor, in the context of this particular case:  If the Court
18   looked at the Andreas vs. Volkswagen case, there --
19             THE COURT:  Well, but tell me about the survey
20   again.  What did he show people?
21             MR. BRIGGS:  I'm sorry?
22             THE COURT:  What were the -- what were the people
23   that were surveyed, what were they shown?
24             MR. BRIGGS:  The people were shown various ads from
25   both Skechers, Nike, Reebok, Converse and one other company.
```

```
1    In the ads they were asked to determine, Is this a -- and all

2    the logos had been removed from the ads.  They were asked, Do

3    you know what is being advertised here?  Number one, for

4    consumer awareness -- this is similar to what the Court did

5    in the Andreas decision.

6            THE COURT:  Doesn't that make the joined authorship

7    argument for the defendant?

8            The logos were removed.  They looked at the look of

9    the ads.  And they said, Oh, this looks like the Skechers ad

10   or its consistent with what I understand the Skechers

11   campaign to historically be.

12           MR. BRIGGS:  Your Honor used an analogy a moment

13   ago about an actor adding a line to a movie.  And that actor,

14   not being a joint author with either the writer or even if

15   the director had an interest in intellectual property,

16   interest in the overall finished product, there is no

17   difference here, Your Honor.  Mr. Reinsdorf provided a

18   copyright protective photograph that was used by Skechers.

19   Dr. Lunz testified -- and we pointed it out, that it is the

20   photo -- it's the photo that the consumer is drawn to -- not

21   all of the graphics that the Court pointed to -- and we have

22   it in our papers, as some of these graphics were, in fact,

23   stock graphics.  So they weren't even original graphics, that

24   Skechers itself created.  So it was the photo that

25   Mr. Reinsdorf took.  And this is what Dr. Lunz' survey
```

1    showed, that that resonated with the consumer.  And in

2    particular --

3              THE COURT:  Were people shown the same marketing

4    image with different photos or without photos?

5              Was that done?

6              MR. BRIGGS:  No, Your Honor, that wasn't done; but

7    this is similar to the survey that was conducted in *Andreas*

8    where the Court found that that survey was sufficient to

9    provide circumstantial evidence of causal link that the

10   advertisement there helped with the profits.  In that

11   particular case, I believe it was *Odi*.

12             THE COURT:  Okay.  So let's just follow your train

13   of logic here.  And let's assume that -- that the -- for

14   purposes of this discussion, that the -- that the survey

15   responses were positive as you say they were, Okay.

16             How do you get to the damages calculation?

17             MR. BRIGGS:  We get to the damage calculation,

18   Your Honor, two ways:  Both, Jamie Turner and David Connelly,

19   gave opinions.  Mr. Connelly is the economist attorney who

20   crunched the numbers -- who looked at the material that was

21   provided to us by Skechers and extrapolated from that

22   material that was provided by Skechers, that the profits that

23   were generated from these marketing ads was $33 million.  He

24   took all of the information from the 2007, 2008, 2009, 2010

25   reports, in addition to the general ledgers that were finally

1    provided to us after or at 5:00 o'clock on discovery cutoff

2    date after Mr. Connelly had been deposed and had issued his

3    initial report.  Mr. Connelly went through this material that

4    we had and was able to discern that Skechers profited from

5    their use of these images to at least the turn of $33

6    million.

7            THE COURT:  How much of the profits were

8    attributable to the design of the shoes?

9            MR. BRIGGS:  We don't have that figure, Your Honor.

10           THE COURT:  How much was attributable to the

11   goodwill in the name Skechers?

12           MR. BRIGGS:  Well, Your Honor, that Mr. -- both,

13   Mr. Connelly and Jamie Turner took into account, in coming up

14   with their analysis the goodwill factor -- and I don't have

15   that figure at my fingertips, but it's in Mr. Connelly's,

16   report, Your Honor.  He absolutely took that into

17   consideration and discounted from the overall net profits for

18   Skechers that amount.

19           THE COURT:  How much was attributable to just

20   general marketing that had been done by Skechers for these

21   particular shoes?

22           MR. BRIGGS:  Your Honor, during the operative

23   period 2007, 2008 2009 that we're talking about here -- and

24   2011, Mr. Connelly opined based on all the information that

25   he had as well -- that the defendants provided us, 70 --

1    close to 70 percent of Skechers advertisements consisted of

2    using Mr. Reinsdorf's images during that period of time.  He

3    went -- Mr. Connelly and his report -- and it's in a

4    supplemental report, Your Honor -- went through the

5    television advertising budget.  He went through, entered that

6    as well -- he went through magazines -- he parsed all of this

7    information out, and, Your Honor, for that operative time

8    period, 70 percent of the ads consisted of Mr. Reinsdorf's

9    images.

10           THE COURT:  What -- what is the total amount of

11   damages for indirect damages that your client is asserting?

12   What's the -- what's the number?

13           MR. BRIGGS:  Your Honor, we're saying that we're

14   entitled to a percent of that 33 million.  When we first

15   analyzed the case, I know that the Court was concerned that

16   we had a very high figure, which was in excess of

17   $200 million.

18           THE COURT:  I wasn't concerned.  I was incredulous.

19           MR. BRIGGS:  And we have since had an economist go

20   through; look at all of these key periods of time for this

21   company who's net revenues during this 3- to 4-year period

22   exceeded a billion dollars.  And the figure that Mr. Connelly

23   has come up with is approximately 33 million.

24           THE COURT:  Okay.  Thank you.

25           MR. BRIGGS:  Thank you, Your Honor.

1          MR. WELSH:  Your Honor, it's -- it's just

2    abundantly clear that plaintiff cannot satisfy the causal

3    nexus requirement, mandated by the Ninth Circuit, and has not

4    done so here.

5          First of all, we know from the operative case law

6    that with regard to causation, Court's are to consider tort

7    concepts, of course, causation; but for causation.  The point

8    that plaintiffs are supposed to be able to establish here is

9    that but for not Skechers use of Mr. Reinsdorf's photographs,

10   because they concede, we had the right to use them, but only

11   our infringing use of the Reinsdorf photographs produced,

12   caused profits to Skechers that would not otherwise

13   have occurred -- accrued to the company but for the

14   infringing use of his photograph.  They have shown no

15   evidence that establishes that.  We have -- we have provided

16   you the --

17         THE COURT:  By that -- just so I'm clear, are you

18   saying that assuming their argument that the license really

19   was a license and that the usage was limited to, for example,

20   six months, that there was a non-infringing use for six

21   months?  And then later there was allegedly an infringing use

22   and there's no attempt to -- to separate those two concepts?

23         MR. WELSH:  Exactly right, Your Honor.  By their

24   own accusations -- and that becomes even more difficult when

25   you realize that during this entire period of time, Skechers

1    was legitimately using certain of the plaintiff's

2    photographs.  You said at the beginning, What really happened

3    here?  What really happened here was this:

4            We hired Mr. Reinsdorf to produce these -- to take

5    photographs for marketing images to advertise seasonal

6    products.  They're either the -- they were either in the

7    spring summer season, the fall/winter season.  Footwear, like

8    other apparel items, is seasonal.  The images go up for one

9    particular season.  That's why they had six-month limitations

10   with regard to payment terms, because Skechers only thought

11   it was -- it needed to pay him for six months because that

12   was the seasonal usage that they had bargained for.  And now

13   all that happens is a new set of seasonal images goes up in

14   the next season.  And what happens, some images from the

15   old image -- from the old run, don't come down.  They're left

16   up in outlet stores.  That's what we're talking about --

17   still advertising the old seasonal product.  This is not the

18   case where Skechers created a set of images and then over the

19   course of years, took his photographs and created new ones

20   and new ones and new ones out of same old photographs it had

21   used from prior photo shoots.  No.  It took the photo shoots

22   from one photo shoot; it created whatever images were going

23   to be, and those were the only images that it used from those

24   photo shoots.  And that's how it progressed each way through.

25           Now, the law is quite clear about a causal nexus.

1    And they have not been able to isolate the variables that

2    they would need to, to create such a causal nexus.

3            Our expert Professor Hanson from UCLA talks about

4    how you do it, because he routinely does it.  He's an

5    econometrician.  He teaches in the business school.  He does

6    this for a living.  What he says is, You gotta go out and

7    collect data about all the other advertising and marketing

8    activities that Skechers engaged in during the same period.

9    And then you have to be able to hold all of that constant so

10   that you can simply measure whatever effect, if any, may be

11   caused by Skechers use of the marketing images that

12   incorporated Mr. Reinsdorf's photographs.  They made no such

13   attempt to do that.  They didn't even bother to identify

14   what's the footwear that's being advertised in the marketing

15   images.  They don't know.  They never asked that question.

16   They don't know what the sales were of lines of footwear or

17   styles of footwear.  Why?  Because they never bothered to

18   ask.  They don't know the extent to which Skechers was

19   emphasizing its advertising for television and other forms

20   which were much more expensive -- where most of its

21   advertising dollars went, not to these wall posters and

22   in-store displays, that -- that Mr. Reinsdorf's photographs

23   were used for.  You've got to be able to show that -- for

24   them to be able to have profits, they've got to show that

25   they're not taking profits from those other advertisements

1  that Mr. Reinsdorf has no interest in, but only from the

2  infringing use of his.  And they haven't done it.  They

3  haven't broken it out.  They haven't -- they haven't even

4  obtained the data necessary to even conduct the econometric

5  analysis that would be required.

6         So we haven't even gotten to the first step.  As

7  for their contention that Mr. Turner is now their -- their --

8  is providing the missing evidence, I just noticed Mr. Briggs

9  wouldn't even tell the -- Your Honor what the amount was that

10  Mr. Turner came up with, with his analysis, 321,000,000

11  compared to Mr. Connelly at 30-some odds.  There's a

12  $300 million gap between these two experts in terms of what

13  they are computing.  That shows you how inherently unreliable

14  their activities are.

15         THE COURT:  Well, Mr. Reinsdorf valued the usage

16  when he sent this non-negotiated bill of $200,000 at

17  $200,000.

18         MR. WELSH:  Exactly right, Your Honor.  And we

19  think that that not only shows what the value is.  It also

20  tells you that these invoices only set forth payment terms,

21  not copyright restrictions.  If these were payment terms as

22  they were, then it only stands to reason that what would be

23  the first thing Mr. Reinsdorf would do when he came to learn

24  that Skechers had used it beyond what was the -- the period

25  set forth in the invoice.  He sent a buyout invoice, saying,

1   Here, your uses are such.  You need to buy out my services;

2   here's how much it's going to cost, $200,000.  It was a

3   payment term.  He didn't come and say, Oh, no, you've

4   infringed my copyright; not in the slightest --

5           THE COURT:  The part -- the part that's odd to me

6   is that that payment term was never negotiated beforehand.

7           MR. WELSH:  It was -- it was not.

8           THE COURT:  Here's a bill for $200,000.

9           MR. WELSH:  That's right.  And what we were doing

10  in the time it came, as you can see from correspondence,

11  Skechers tried to say, Okay.  We got the bill.

12  Phil Paccione, the general counsel of Skechers, writes back

13  as soon as he gets it and says, We're looking into this, but

14  regardless if we owe you additional money, we'll pay it,

15  because we all understood those were the terms.  If we had

16  additional uses, we were obligated to make some additional

17  payments.  And we were just simply looking in to try to

18  understand what was the extent of our uses; did it justify

19  this additional payment when they pulled out of the

20  negotiations.  And then next thing we see is they file a case

21  for copyright infringement, seeking $250,000,000.

22          THE COURT:  Okay.  Thank you.

23          MR. WELSH:  Thank you.

24          MR. BRIGGS:  May I briefly, Your Honor?

25          THE COURT:  Yes.

1          MR. BRIGGS:  Your Honor, you raise the question

2     with counsel for Skechers whether or not Mr. Reinsdorf

3     through his experts has pulled out of his damage analysis,

4     the period -- the authorized period in which Skechers was

5     allowed to use the images.  Yes.  The answer -- the short

6     answer to that question is yes.  Mr. Connelly in his report,

7     both his original report on -- that defense counsel has, as

8     well as his supplemental reports, pulls out that number from

9     the damage calculations.  So it's present, Your Honor.  We're

10    not trying to double dip with respect to that figure.

11          With respect to --

12          THE COURT:  Where does he get the number from?

13          MR. BRIGGS:  Which number, Your Honor?

14          THE COURT:  The 30 plus -- whatever it is.

15          MR. BRIGGS:  The 33 million?

16          THE COURT:  Yeah.  Where does that come from?

17          MR. BRIGGS:  Excuse me, Your Honor.

18          Here's where it comes from, Your Honor:

19    Mr. Connelly determined that Skechers' net sales revenue

20    totalled 1.2 billion in 2007; 1.2 billion in 2008;

21    1.2 billion in 2009.  From those, Mr. Connelly did a but for

22    analysis for those periods of time in -- through 2007 through

23    2009.  He determined that the percentage of sales

24    attributable to the photos on the basis of Skechers

25    advertising expenses for print, outdoor, and Internet media

1    that principally utilized Mr. Reinsdorf's photos, he

2    concluded -- Mr. Connelly concluded that Skechers' net sales

3    attributable to its infringement of Mr. Reinsdorf's photos

4    totaled $78,817,648 for the years 2007 through 2009 and that

5    the gross profits --

6              THE COURT:  Per year?

7              MR. BRIGGS:  No, that's total, Your Honor.  That's

8    total for that time period.

9              THE COURT:  Yeah, okay.

10             MR. BRIGGS:  And that gross profits attributable to

11   the infringement were 33, 6 -- $33,662,074.

12             THE COURT:  Is that the one where he says "based

13   upon my experience the number is 33 million"?

14             MR. BRIGGS:  No, Your Honor.  No, Your Honor.

15             THE COURT:  What's the -- where does he get that

16   number from?

17             MR. BRIGGS:  Mr. Connelly gets this number,

18   Your Honor, from a comprehensive analysis of Skechers' data

19   that it produced to us.  That data being finally the general

20   ledgers which came after the discovery deadline.  And from

21   Skechers' own general ledgers, we were able to determine,

22   contrary to statements here, certain information on the

23   profitability of some of the product lines for which

24   Mr. Reinsdorf's photos support it.  We have all that listed

25   in all our papers, Your Honor.  So I don't want to reiterate

1    that here.  But Mr. Connelly took all of that data, and it is

2    in his report.  And that's how he derived that particular

3    figure.

4            THE COURT:  Okay.

5            MR. BRIGGS:  Your Honor, you asked one final

6    question on the buyout.  The Court indicated that it did not

7    see in the papers where that number came from.  Mr. Heller in

8    his declaration testified -- and we don't think that this is

9    admissible because we think it was settlement discussions,

10   but for purposes of argument, Mr. Heller testified that what

11   Mr. Reinsdorf did when he determined that Skechers had

12   exceeded its license, he went to Skechers; he picked up the

13   phone, Hey -- sent an e-mail as well -- hey, we noticed that

14   you guys have exceeded the use of the license.  We'd like to

15   talk to you about it.  Silence... for the longest time from

16   Skechers.  Mr. Heller had to continue to attempt to knock on

17   the door of Skechers to get their attention.  Finally, he

18   sent a letter to the general counsel because he was directed

19   to approach the general counsel of Skechers with this.  He

20   did.  You guys have been using Mr. Reinsdorf's photos, in

21   excess of the license -- but not only in excess of the

22   license for the six-month period but geographically, because

23   we have determined that you have used these photos not only

24   in the United States -- not only in North America, but we

25   determined that you used the photos in Europe, on

```
1    billboards -- you weren't allowed to do that.  On bus stops
2    you weren't allowed to do that.  In the subway tunnels you
3    weren't allowed to do that.  In magazines you weren't allowed
4    to do that.  We also discovered that you did the same thing
5    in Asia.  You -- not only Asia but Dubai; not only in the
6    European continent; not only in the Asian continent but also
7    in the South American continent.  So when Mr. Heller
8    approached the general counsel of Skechers to notify him of
9    this and said, You guys pretty much know how you've used
10   this.  You know, we want to come to some resolution, and
11   you're not moving on this.  So Mr. Heller made a proposal;
12   that proposal was $200,000, which we contend, if anything, it
13   only constitutes at that time what Mr. Reinsdorf understood
14   were actual damages --
15            THE COURT:  Okay.  Thank you.
16            MR. BRIGGS:  Thank you, Your Honor.
17            MR. WELSH:  Your Honor, I really don't want to take
18   up the Court's time with additional argument, if it's
19   unnecessary.  I would simply point out with regard to
20   Mr.Connelly.  You asked if -- you asked the right question,
21   How did he come up with this 33 million?  The answer is he
22   assumed it.  What he did is he said, I need to create a but
23   for world, because that's what Professor Hanson said I need
24   to do.  How will I do that?  Well, let's imagine a world that
25   doesn't have the Reinsdorf photographs.  How much did
```

EXHIBIT 1
38

```
 1    Skechers sell on that but for will?  Oh, I'm going to assume
 2    that Skechers sold the average of what Skechers competitors
 3    sold during the equivalent period of time, which because I've
 4    done math, I know is lower than what Skechers was selling.
 5    So having assumed that if I didn't have the Reinsdorf
 6    photographs, I would only have sales here; not showing it,
 7    but just assuming it, and then I look at what Skechers sales
 8    were.  Actually, in the real world, the difference is what is
 9    33 million is.  He has simply assumed the facts to create it.
10    He hasn't done the analysis to show it.  And that's the
11    fundamental difference.  All Mr. Briggs can do -- all the
12    plaintiffs can do is just assert conclusions.  They can't
13    show you the ethological -- a sound ethological analysis that
14    allows any trier of facts to reach those conclusions
15    themselves.  Thank you.
16              THE COURT:  Okay.  Thank you for your argument.
17    Thank you.
18              Submitted.
19              MR. WELSH:  Your Honor, one housekeeping matter...
20              THE COURT:  Go ahead.
21              MR. WELSH:  We have trial scheduled now for the
22    11th of September.  And as a result of that, there are a
23    variety of pretrial filings that are quickly coming due, some
24    of which within a week.
25              THE COURT:  Okay.  Why don't I just -- I don't want
```

1    you to have to do all that while I sort this out.  So maybe I

2    ought to just continue all the dates 30 days.  And I'll have

3    a decision out sometime within the next two weeks, maybe

4    sooner.

5              MR. WELSH:  Very well.

6              THE COURT:  Is that Okay?  I'll just have my clerk

7    do that on a minute order.  He'll continue all the dates.

8              MR. PETROCELLI:  Your Honor, does that include the

9    trial date?

10             THE COURT:  If that dates conflicts, then you

11   can -- then work it out together with counsel.

12                  (Whereupon proceedings adjourned.)

13                           - - -

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 1**
**40**

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5

 6

 7    RICHARD REINSDORF                    :

 8              vs.                         :   No. CV 10-07181-DDP

 9    SKECHERS U.S.A., INC.                 :

10

11

12    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

13    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

14    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

15    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

16    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

17    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

18    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

19    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

20    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

21    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

22    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

23

24    /S/_____          07/30/2012

25    MARIA R. BUSTILLOS                      DATE
      OFFICIAL REPORTER
```