1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  DREW E. BREUDER (S.B. #198466)
   dbreuder@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
4  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
5  Facsimile:   (310) 246-6779

6  ROBERT C. WELSH (S.B. #130782)
   rwelsh@bakerlaw.com
7  BAKER & HOSTETLER LLP
   12100 Wilshire Boulevard, 15th Floor
8  Los Angeles, CA 90025-7120
   Telephone:  (310) 442-8852
9  Facsimile:   (310) 820-8859

10 Attorneys for Defendants
   Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14 RICHARD REINSDORF,                    Case No. CV10-7181-DDP (SSx)

15              Plaintiff,               Hon. Dean D. Pregerson

16       v.                             **DEFENDANTS SKECHERS U.S.A.,
                                         INC. AND SKECHERS U.S.A., INC. II'S
17 SKECHERS U.S.A., INC.;                MEMORANDUM OF POINTS AND
   SKECHERS U.S.A., INC. II; and         AUTHORITIES IN OPPOSITION TO
18 DOES 1-10,                            PLAINTIFF'S MOTION *IN LIMINE* RE
                                         PROOF RELATING TO INDIRECT
19              Defendants.              PROFITS; AND DECLARATIONS OF
                                         JENNIFER CLAY, JOHN DAVID
20                                       MOODY, AND ROBERT C. WELSH IN
                                         SUPPORT THEREOF**
21

22                                       Courtroom:    3 (2nd Floor)
                                         Hearing Date:  February 25, 2013
23                                       Time:          10:00 a.m.

24                                       Pretrial Conference:  May 6, 2013
                                         Trial Date:           May 14, 2013
25

26

27

28

                                              SKECHERS' OPP. TO
                                            PLF'S MOTION *IN LIMINE*
                                            CV10-7181-DDP (SSX)

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    THE COURT SHOULD DEFER RULING ON THE MOTION UNTIL SKECHERS' MOTION FOR CLARIFICATION IS DECIDED.............................................................................................3

III.   SKECHERS HAS ACCURATELY REPRESENTED THE ABSENCE OF ANY FORMAL MARKETING PLANS OR DOCUMENTS ANALYZING THE EFFECTIVENESS OF ITS MARKETING EFFORTS. ..................................................................4

    A.     Skechers Produced All Documents Responsive to Plaintiff's Document Requests.................................................................4

        1.     Financial and Sales Information ...............................6

        2.     Marketing Plans ........................................................9

    B.     The Court Has Already Rejected Plaintiff's Complaints About the Adequacy of Skechers' Document Production. ..........................11

IV.    PLAINTIFF, NOT SKECHERS, IS THE PARTY WHO HAS MADE MISREPRESENTATIONS TO THE COURT. ...........................................14

    A.     The 2011 PowerPoint. ...........................................................14

    B.     Skechers' Distribution Agreement. .......................................17

V.     THERE IS NO LEGAL BASIS TO EXCUSE PLAINTIFF FROM HAVING TO DEMONSTRATE A "CAUSAL NEXUS" IN ORDER TO RECOVER INDIRECT PROFITS. ......................................................18

VI.    PLAINTIFF'S CONTENTION THAT HE IS NOT REQUIRED TO ESTABLISH A "CAUSAL NEXUS" IS MERITLESS. ............................20

VII.   CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. Federal Bureau of Investigation,*
    194 F.R.D. 305 (D. D.C. 2000) .................................................................2

*Andreas v. Volkswagen of America, Inc.,*
    336 F.3d 789 (8th Cir. 2003) ..........................................................23, 24

*Arnold Productions, Inc. v. Favorite Films Corp.,*
    176 F. Supp. 862 (S.D.N.Y. 1959) ...............................................20

*Cartier v. Somo's Sons, Inc.,*
    No. 04-Civ.2268(RMB)(DFE), 2007 WL 1040245 (S.D.N.Y. Apr. 4,
    2007) ...........................................................................19, 20

*Deering, Milliken & Co. v. Gilbert,*
    269 F.2d 191 (2d Cir. 1959) ...........................................12, 19, 20

*Fournier v. McCann Erikson and MicroSoft,*
    242 F. Supp. 2d 318 (S.D.N.Y. 2003) ....................12, 13, 18, 19

*Gaste v. Kaiserman,*
    683 F. Supp. 63 (S.D.N.Y. 1988) ...............................................19

*In re Malget,*
    165 B.R. 933 (Bankr. S.D. Cal. 1994) .......................................19

*In re Record Club of Am., Inc.,*
    30 B.R. 418 (M.D. Pa. 1983) ........................................................19

*Mackie v. Rieser,*
    296 F.3d 909 (9th Cir. 2002) ........................................................2

*Maredia v. Philip Morris USA, Inc.,*
    No. 1:05-cv-00393-OWW-SMS, 2007 WL 2462093 (E.D. Cal. 2007).......19, 20

*Polar Bear Prods. v. Timex Corp.,*
    348 F.3d 700 (9th Cir. 2004) ...............................................passim

*Project Strategies Corp. v. Nat'l Commc'ns Corp.,*
    948 F. Supp. 218 (E.D.N.Y. 1996) ...............................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Shanghai Automation Instrument Co., Ltd. v. Kuei*,
194 F. Supp. 2d 995 (N.D. Cal. 2001).................................................................19

*Shapiro, Bernstein & Co, Inc. v. Remington Records, Inc.*,
265 F.2d 263 (2d Cir. 1959) ...........................................................................19, 20

*Taylor v. Meirick*,
712 F.2d 1112 (7th Cir. 1983) ........................................................................21, 24

*Wolf v. Superior Court*,
107 Cal. App. 4th 25 (2003) ...............................................................................19

**STATUTES**

17 U.S.C. § 504(b) ...................................................................................................20

**RULES**

Fed. R. Civ. P. 26....................................................................................................3

Fed. R. Civ. P. 34....................................................................................................2

Fed. R. Civ. P. 37(b)(2(A)(i)-(v) ...........................................................................3

Fed. R. Civ. P. 37(c) ...............................................................................................3

Fed. R. Civ. P. 56(d) .............................................................................................11

Fed. R. Evid. 402 ....................................................................................................3

Fed. R. Evid. 702 ....................................................................................................3

Local Rule 37............................................................................................................9

SKECHERS' OPP. TO
PLF'S MOTION *IN LIMINE*
CV10-7181-DDP (SSX)

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Richard Reinsdorf ("Plaintiff")'s Motion *In Limine* (the "Motion" or "Mot.") is nothing more than a thinly-disguised attempt to re-present the same failed arguments he has been making for nearly a year—namely, that Skechers allegedly withheld key documents during discovery and misrepresented that such documents do not exist, and therefore Plaintiff should be permitted to try his $33 million indirect profits claim to a jury despite his inability to make the requisite showing of a "causal nexus" between Skechers' allegedly infringing use of Plaintiff's photographs and any increases in Skechers' profits.  The documents Skechers is accused of withholding are formal marketing plans as well as documents analyzing the effectiveness of the company's advertising and marketing campaigns.  Skechers has consistently maintained that it does not have, and never created, such documents.

Plaintiff originally contended that Skechers was withholding its marketing plans in connection with his one and only motion to compel, which was heard by Magistrate Judge Segal in January 2012.  The Court subsequently denied Plaintiff's motion without prejudice and Plaintiff never sought further relief from the Court during discovery.  After the close of discovery, however, Plaintiff reasserted the same argument in opposing Skechers' summary judgment motion and Skechers' pending motion for clarification.  The Court's statements at the hearings on these motions made it clear that Plaintiffs' discovery complaints were unavailing because brought well after the close of discovery.  There is no basis to revisit these arguments yet again, particularly when disposition of Skechers' pending motion for clarification will likely render the Motion moot.

To justify what amounts to a fourth "bite" at the same "apple," Plaintiff disingenuously portrays the Motion as based on recently discovered evidence that he claims was not available to him before.  (*See* Mot. at 11:20-22 (referring to "a

1   recently discovered document entitled "International Advertising & Marketing

2   Systems & Procedures 2011"); *id.* at 14:8-11 (referring to a "recently found"

3   distribution agreement between Skechers and one of its foreign distributors).) This

4   is a gross distortion of the truth, as these documents were known to Plaintiff or

5   produced by Skechers during discovery. Equally troubling, Plaintiff misrepresents

6   the contents of these documents. Far from "pro[ving] that Skechers did not

7   accurately represent the existence of its documents to the court" (*id.* at 3:23-25),

8   these documents are entirely consistent with Skechers' prior representations.

9          Apparently recognizing the weakness of this argument, Plaintiff

10   alternatively contends that Skechers' failure to prepare formal marketing plans in

11   the ordinary course of its business somehow excuses him from having to proffer

12   non-speculative evidence showing a "causal nexus" between any allegedly

13   infringing use of Plaintiff's photographs and increases in Skechers' profits, as is

14   required to proceed with his indirect profits claim.[1] (*Id.* at 15:3-24:23.) This is

15   nonsense. Skechers was under no legal obligation to prepare formal marketing

16   plans or analyses of the effectiveness of its advertising and marketing plans, either

17   in the normal course of business or for the first time in response to Plaintiff's

18   document requests. *See, e.g., Alexander v. Federal Bureau of Investigation*, 194

19   F.R.D. 305, 310 (D. D.C. 2000) (Rule 34 only requires production of documents

20   already in existence; there is no duty to create documents that do not exist). Thus,

21   as a matter of law, Skechers' inability to produce documents that never existed,

22   and that it had no duty to create, cannot excuse Plaintiff from having to satisfy the

23   "causal nexus" requirements imposed by Ninth Circuit law. Tellingly, none of the

24   cases cited by Plaintiff say otherwise.

25          There is one point on which Plaintiff and Skechers apparently agree: the

26   expert reports submitted by David Connelly, which is the only remaining evidence

27   _____

28   [1] *See, e.g., Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004); *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

1   supporting Plaintiff's $33 million indirect profits claim, woefully fail to satisfy the

2   "causal nexus" requirement.  Though Plaintiff has vainly sought to blame Skechers

3   for his failure of proof, the underlying record in this case shows that Plaintiff's

4   failures are entirely of his own making.  Plaintiff's motion should be denied.

5   **II.     THE COURT SHOULD DEFER RULING ON THE MOTION UNTIL**

6   **SKECHERS' MOTION FOR CLARIFICATION IS DECIDED.**

7       The Court should decline to entertain Plaintiff's Motion as it seeks rulings

8   on matters that are currently pending before the Court.  Skechers' motion for

9   summary judgment (Dkt. No. 125) and its motion for clarification (Dkt. No. 199)

10  both request an order that Plaintiff's indirect profits claim fails as a matter of law

11  because he has not carried his burden of proffering sufficient, non-speculative

12  evidence showing the causal link required under *Polar Bear* and other Ninth

13  Circuit authority.  As the Court no doubt recalls, it has already heard extensive

14  argument on this issue—including Plaintiff's argument that he is excused from

15  satisfying *Polar Bear* because of alleged discovery misconduct by Skechers—and

16  has received multiple rounds of briefing from the parties.  Moreover, following the

17  hearing on Skechers' motion for clarification, the Court denied Plaintiff's request

18  for leave to file additional briefing.  (Dkt. No. 215 (12/7/12 Order).)  The instant

19  Motion, which is unsupported by the Federal Rules Plaintiff cites,[2] is nothing more

20  than an eleventh-hour attempt to circumvent this ruling and submit the very

21  briefing the Court indicated it did not want.

22

23

---

24  [2] The rules cited by Plaintiff do not authorize the relief he seeks.  (*See* Notice of
    Mot. at 2:19-20.)  For instance, Federal Rule of Civil Procedure 37(c) states that if

25  a party fails to produce evidence as required by Rule 26 or a court order, that party
    cannot use the withheld evidence at trial.  Although the Court can also impose

26  "other appropriate sanctions," including orders listed in Rule 37(b)(2(A)(i)-(v),
    none of those orders apply here.  Likewise, Plaintiff's citation to Federal Rule of

27  Evidence ("FRE") 402 and 702 is inapposite.  FRE 402 simply calls for the
    admission of "relevant evidence" unless barred by the constitution, federal statute

28  or other law.  And FRE 702 details the basic requirements for expert testimony.

1    In any event, if summary judgment on indirect profits is granted in

2    Skechers' favor, Plaintiff's Motion will likely be moot.  As such, and until

3    Skechers' motions are decided, there is simply no reason to endure yet another

4    round of briefing and argument on the precise issues already before the Court.

5    **III.   SKECHERS HAS ACCURATELY REPRESENTED THE ABSENCE
     OF ANY FORMAL MARKETING PLANS OR DOCUMENTS
6    ANALYZING THE EFFECTIVENESS OF ITS MARKETING
     EFFORTS.[3]**

7

8    **A.     Skechers Produced All Documents Responsive to Plaintiff's
              Document Requests.**

9

10   Plaintiff's Motion is predicated on the fallacy that "[f]rom the outset of this

11   case, [Plaintiff] sought the discovery and information from Skechers that would

12   allow him to build his case for profits." (Mot. at 3:16-17.)  What the underlying

13   record really shows is that Plaintiff made a calculated choice to focus his discovery

14   efforts on obtaining what he hoped would be analyses conducted by Skechers on

15   the effectiveness of its advertising and marketing activities, and thereby avoid

16   incurring the cost and expense of having his own expert conduct such analyses.

17   Even after Skechers repeatedly advised Plaintiff that it did not have the types of

18   documents he was seeking, Plaintiff simply asserted (as he does now) that such

19   documents must exist.[4]

20   The one thing Plaintiff did not do was propound appropriate discovery

21   requests seeking the basic, underlying facts and information necessary for his own

22

23   [3] Plaintiff's "Statement of Facts" contains a litany of misstatements and
     exaggerations on a variety of topics including (i) why Skechers hired Plaintiff to
24   take photographs; (ii) the nature and extent of Skechers' use of Plaintiff's
     photographs; and (iii) the usage terms contained on the parties' invoices. (Mot. at
25   1:20-3:14.)  Skechers disputes Plaintiff's characterization of these issues but,
     declines to address them here because they are not material to the Motion.

26   [4] *See, e.g.*, Mot. at 11:6-10 (contending that "basic business acumen suggests that a
     company as large as Skechers...would be expected to maintain some records to
27   track effectiveness of, or the interest or sales generated by, its various marketing
     initiatives and advertising").  Tellingly, however, Plaintiff now acknowledges that
28   such "expectations are not enough to support a motion to compel." *Id.* at 11:13-14.

1    expert to conduct an indirect profits analysis.  For example, Plaintiff never

2    requested that Skechers identify the specific shoe styles and product lines featured

3    in the marketing images.  Similarly, Plaintiff never requested yearly sales data for

4    any specific product lines identified by Skechers, even though his expert, David

5    Connelly, identified such documents as necessary for his analysis.[5]  Even Plaintiff

6    now acknowledges that "potential missteps [] may have occurred" during

7    discovery, and that Plaintiff never filed "whatever motion to compel [that was]

8    needed to be filed…[to] gather the information that needs to be gathered…."

9    (Welsh Declaration ("Welsh Decl."), Ex. I (12/3/12 Tr.) at 60:4-61:21.)

10         Though lacking formal marketing plans, Skechers did produce *thousands* of

11   pages of documents from its files showing Skechers' actual usage of the marketing

12   images containing Plaintiff's photographs.  Skechers also produced documents

13   from its files showing how, when and where its foreign distributors used marketing

14   images containing Plaintiff's photographs.  (*Id.* ¶ 10.)  Incredibly, Plaintiff never

15   shared *any* of these documents with Mr. Connelly.  (Dkt. No. 180 (Errata Supp.

16   Connelly Rep.) at Ex. F) (identifying the documents on which Connelly relied).)

17   Plaintiff's discovery shortcomings were confirmed by Connelly's deposition

18   testimony, which was taken one day before the May 15, 2012 discovery cutoff.

19   Specifically, Connelly admitted that he had yet to receive any of the data necessary

20   for conducting an indirect profits analysis:

21             Q:  Let me rephrase my question.  You have not seen
              sufficient data for you to make a determination of any
22            indirect profits attributable specifically to the use of
              [Plaintiff's] images, correct?
23
              A:  As of today.
24
              Q:  As of today, yes.
25
              A:  Correct.
26

27

28   _____
     [5] *See* Dkt. No. 180 (Errata Supp. Connelly Rep.) at 2 n.2.

(Welsh Decl., Ex. K (5/14/12 Connelly Dep.) at 92:22-93:3.)  In short, Plaintiff's lack of diligence during discovery—not Skechers' purported withholding of documents—explains why he lacks the information he claims to need to satisfy the "causal nexus" requirement.

### 1.    Financial and Sales Information

In his Motion, Plaintiff claims that Skechers refused to provide various "financial and sales" documents and testimony supposedly needed to prove his indirect profits claim.  (Mot. at 4:4-5:2.)  However, for each of the discovery requests Plaintiff identified, Skechers either produced responsive documents, indicated that it had no responsive documents, or made witnesses available to testify.  Plaintiff accepted the written responses, documents and testimony provided by Skechers, and never sought relief from the Court concerning *any* of these particular discovery requests.

For example, Request No. 158 sought documents "sufficient to evidence YOUR revenues and profits from 2006 until the present."  Skechers responded by indicating that it had already produced its annual reports, which reflect the company's overall revenues and profits during the years in question.  Plaintiff never raised any further issues with Skechers' response, and never moved to compel on this request.  (Welsh Decl. ¶ 12, Ex. L (1/6/12 letter to H. Self) at 4.)

In addition, Plaintiff sought documents (Request No. 171) and testimony (Topic No. 14) concerning Skechers' "deductible expenses and/or elements of profit…that YOU contend are attributable to factors other than YOUR alleged infringements of photographs taken by [Plaintiff]."  (*Id.*, Ex. O (4/30/12 Objections) & Ex. N (3/21/12 Objections).)  As it explained in its written objections and to the Court, Skechers believed that "all of [its] 'elements of profit' and expenses are attributable to factors other than" its alleged infringement:

[Request No. 171 and Topic No. 14] basically say "Produce all evidence of any profit or any costs that are not attributable to these ads." Your Honor, it's tantamount to requiring the company to produce its entire general ledger because, as [Skechers' C.O.O. and C.F.O.] Mr. Weinberg would testify, Skechers doesn't attribute any particular sales to any particular advertising campaign. It wouldn't know how to do that. It doesn't track data in such a way that would allow it to do it. It looks at its advertising as a whole. It --this is a company that sells 3,000 different styles of shoes every year. They have multiple different lines and brands.

(*Id.*, Ex. G (5/8/12 Tr.) at 19:10-20:4.) Ultimately, however, Skechers produced a version of its general ledger that recorded sales and expense data for the relevant period.[6] Skechers also made its apex witness, chief operating officer and chief financial officer David Weinberg, available for deposition concerning these subject matters, even though Skechers' motion for protective order was pending before the Court.[7] Incredibly, Plaintiff spent less than *one hour* deposing Mr. Weinberg and asked only three questions bearing on indirect profits:

Q: Do you believe it's possible to analyze which of Skechers' marketing campaigns or efforts result in any particular sales or at least--at least quantities of revenue?

A: On a quantitative basis, no.

*****

Q: Do you believe that [it] would or would not be possible to somehow measure the impact that Skechers' marketing efforts have had on the sales of particular product lines...?

---

[6] Plaintiff claims that Skechers produced "an incomplete copy of its general ledger" on "May 25, 2012...four days after it filed its motion for summary judgment...." (Mot. at 5 n.2.) Plaintiff misses the point, as he never requested production of Skechers' general ledger. Moreover, Skechers produced a version of its general ledger that contained the information responsive to Plaintiff's request on May 15, 2012 (Welsh Decl. ¶ 11), six days *before* it filed its summary judgment papers. (Dkt. No. 125.)

[7] The Court did not grant Skechers' protective order until May 11, 2012—three days *after* Plaintiff deposed Mr. Weinberg. (*See* Dkt. No. 109 at 9:21-24 (Court grants protective order because "no witness could competently testify on" Topic Nos. 13 and 14).) Plaintiff thus had free reign to ask Mr. Weinberg whatever questions he wanted concerning these subject matters, but chose not to do so.

SKECHERS' OPP. TO
PLF'S MOTION *IN LIMINE*
CV10-7181-DDP (SSX)

A:  I'm not sure.  I think it depends on the premises you start with and what you think you're looking for.

Q:  So my question is…whether Skechers internally could or does measure the impact that those…particular campaigns have on their…respective product lines?

A:  That's no.

(Welsh Decl., Ex. J (5/8/12 D. Weinberg Dep.) at 30:5-10, 33:24-35:1.)  Plaintiff never asked any follow-up questions, never showed Mr. Weinberg any documents or other materials that were inconsistent with his testimony, and never moved to compel on Topic No. 14 or Request No. 171.

As noted above, Plaintiff also served discovery asking Skechers to produce documents and provide testimony concerning the existence of a causal link between its use of the marketing images and shoe sales.  Specifically,

- In Request No. 179, Plaintiff demanded that Skechers produce documents evidencing "sales of products…*that are attributable to* YOUR marketing efforts that used [Plaintiff's] images."

- In Request No. 180 and Nos. 182-189, Plaintiff asked Skechers to produce documents evidencing "*the impact* YOUR marketing efforts that used [Plaintiff's] images had on the sale of products," including sales of the Cali, Men's USA, Women's USA, Men's Active, Women's Active, Men's Sport, Women's Sport, and Shape Ups product lines.

- In Topic No. 13, Plaintiff asked Skechers to provide testimony concerning the company's revenues and profits "*attributable to Skechers' marketing campaigns* in 2006, 2007, 2008, 2009 and 2010."

Skechers timely submitted written objections objecting to this discovery. Skechers explained that it had not conducted any analysis of whether its sales are "attributable to" use of marketing images containing Plaintiff photographs.  As a result, it has no documents analyzing the impact, if any, of marketing images

1  incorporating Plaintiff's photographs on the sales of its various product lines. (*Id.,*

2  Ex. P (5/4/12 Objections).)  Once again, Plaintiff never met and conferred with

3  Skechers, and never moved to compel further responses to these requests.  Nor did

4  Plaintiff quarrel with Skechers' objections to Topic No. 13. (*Id.,* Ex. N (3/21/12

5  Objections).)  In fact, Skechers, not Plaintiff, was the only party to ever seek

6  judicial relief concerning this discovery, having successfully moved for a

7  protective order concerning Topic Nos. 13 and 14.  (Dkt. Nos. 87, 109.)

8          2.      **Marketing Plans**

9          Plaintiff also claims that Skechers withheld or misrepresented the existence

10  of various "marketing" documents required for his indirect profits claim.  (Mot. at

11  8:1-10, 12:13-15.)  During discovery, Plaintiff sought:

12          •  "All DOCUMENTS that constitute, evidence, reflect, describe, relate

13             or refer to YOUR Marketing Plan for 2006, 2007, 2008, 2009 and

14             2010."  (Request No. 145); and

15          •  Copies of agreements between Skechers and its domestic and foreign

16             retailers and distributors "that relate or refer to Skechers' marketing

17             plans and/or advertisements."  (Request Nos. 149-152.)

18          Skechers objected to these Requests on various grounds, including that they

19  were overbroad and unduly burdensome, and offered to meet and confer.  (Welsh

20  Decl., Ex. M (9/12/11 Objections).)  Unable to resolve their differences during the

21  parties' meet and confer, Plaintiff moved to compel on these and other requests.

22  (Dkt. No. 44.)  At the hearing, Magistrate Judge Segal repeatedly questioned why

23  Plaintiff needed "such broad discovery" (Request No. 145) and agreed that

24  Skechers' offer to produce "documents relating to Skechers' marketing efforts that

25  pertain to any of the images...at issue in th[e] lawsuit" was "sufficient."  (Welsh

26  Decl., Ex. D (1/26/12 Tr.) at 4:23-5:2, 6:15-7:15.)  Magistrate Segal also expressed

27  doubts about the relevance and scope of Request Nos. 149-152.  (*Id.* at 13:5-14

28  (Court: "Yes, I guess I don't see the relevance of [Request Nos. 149-152],

1   either….I mean, it's just too broad.").)  The Court later denied Plaintiff's motion

2   for failure to comply with Local Rule 37, and ordered the parties to meet and

3   confer in-person.  (Dkt. No. 51.)  Notably, Plaintiff never again moved to compel

4   on these or any of the other nearly 200 document demands he propounded on

5   Skechers in this case.  (Welsh Decl. ¶ 14.)

6         On January 31, 2012, the parties met and conferred in-person concerning

7   their outstanding discovery disputes.  At the meeting, Plaintiff continued to

8   demand that Skechers produce all documents responsive to Request Nos. 145 and

9   149-152 as written, and refused to narrow the scope of the requests.  Skechers

10  again advised that it did not have "formal marketing plans," but that it would be

11  producing "the documents that will show the Skechers…marketing activities[]

12  with regard to any and all photographs…that were shot by" Plaintiff.  (*Id.*, Ex. E

13  (1/31/12 Tr.) at 8:21-10:4, 14:18-15:11.)  Skechers also made clear that Plaintiff

14  would have to seek further relief from the Court if he continued to seek broader

15  categories of documents:

16              I think there's a fundamental disconnect here, which is
              that what we have agreed to produce, pending entry of
17            the protective order, are documents showing how the
              images at issue were marketed.  Okay?  This [Request
18            No. 145], as I read it -- we have told you we don't have a
              formal marketing plan.  You have since told us today you
19            view "marketing plan" as being broader, anything
              reflecting or relating [to] that marketing plan.  *As I read
20            that, that calls for every single piece of paper in the
              marketing department of Skechers.  Now, if you guys are
21            seeking that level of granularity, then I think it needs to
              be teed up with the Magistrate or the Court in some
22            fashion because we've agreed to produce marketing
              documents relating to the ads.*  You guys seem to want
23            any piece of paper that deals on a broader level with
              Skechers' marketing, which I just don't see the relevance
24            [of].

25  (*Id.*, Ex. E at 19:11-20:4.)[8]  Shortly thereafter, Skechers produced more than 2,400

26  of "usage" documents evidencing how, when, and where the marketing images

27

28  [8] All emphases are added and internal citations omitted, unless otherwise indicated.

1    were utilized by the company.  Plaintiff never complained or sought further relief

2    from the Court with respect to Request No. 145.  (*Id.* ¶ 10.)

3         Plaintiff also declined to further pursue Request Nos. 149-152 until more

4    than a month later, when he re-raised the subject during a March 1, 2012 discovery

5    conference with Magistrate Judge Segal.  During that conference, Magistrate Segal

6    recommended—in order to resolve the parties' impasse—that Skechers provide

7    Plaintiff with a representative exemplar of one of the company's distributor

8    agreements so that he could review the document.  (*Id.*, Ex. F (3/1/12 Tr.) at 16:1-

9    17:10.)  Consistent with this recommendation, Skechers produced a redacted

10   exemplar of one of its foreign distribution agreements on March 27, 2012.  (*Id.* ¶

11   14.)  Plaintiff never raised any further issue with respect to Request Nos. 149-152,

12   and never sought further relief from the Court with respect to this discovery.  (*Id.*)

13        In short, Plaintiff had every opportunity during discovery to obtain the

14   documents, information and testimony he needed.  Plaintiff could have served

15   discovery seeking facts and data, instead of discovery seeking analysis that

16   Skechers never conducted and was under no obligation to create.  Plaintiff never

17   challenged the adequacy of Skechers' document responses, met and conferred with

18   Skechers, or filed additional motions to compel.  Even after the close of discovery

19   and in the face of Skechers' summary judgment motion, Plaintiff never sought

20   additional discovery pursuant to Federal Rule of Civil Procedure 56(d).  Plaintiff

21   has only himself to blame for his failure to pursue any of these courses of action.

22   **B.   The Court Has Already Rejected Plaintiff's Complaints About the
23        Adequacy of Skechers' Document Production.**

24        Even if Plaintiff had asked Skechers to produce the data he now claims is

25   needed for his indirect profits claims (which he did not), and even if Skechers had

26   refused to produce that information (which it did not), Plaintiff still would not be

27   entitled to relief because he failed to ever raise any of these issues with the Court

28

1    or Magistrate Judge Segal prior to the May 15, 2012 close of discovery.[9] If the

2    arguments and legal authorities presented in Plaintiff's Motion seem familiar, this

3    is no coincidence.  The Court has previously entertained the precise issue raised by

4    Plaintiff's Motion on several occasions.

5         Plaintiff first raised this argument in mid-June 2012, in opposition to

6    Skechers' summary judgment motion:

7              [W]here, as here, a defendant in a copyright infringement
              action *fails or refuses during discovery to produce*
8              *evidence of sales or net profits from specific product*
              *lines*, then the court may rely on indirect or
9              circumstantial evidence and the plaintiff need only
              establish a basis for a reasoned conclusion; the court may
10             then extrapolate from the available evidence to determine
              the amount of the recovery. *Fournier v. McCann*
11             *Erikson and MicroSoft*, 242 F. Supp. 2d 318, 328
              (S.D.N.Y. 2003) (citing *Deering, Milliken & Co. v.*
12             *Gilbert*, 269 F.2d 191, 193 (2d Cir. 1959).)

13   (Dkt. No. 149 at 35:1-13; *see also id.* at 35:14-36:16 ("Skechers has actively

14   prevented [him] from obtaining direct proof of the sales of [Skechers'] product

15   lines to frustrate his efforts to establish the relationship between the revenue and

16   the infringement" and therefore Plaintiff "should be permitted to present to the

17   Court reasoned conclusions of Skechers' profits attributable to its infringement").)

18   Of course, these are the identical points and authorities which form the basis of

19   Plaintiff's present Motion.

20        At the July 23, 2012 hearing on Skechers' summary judgment motion,

21   Plaintiff once again argued that Skechers' "has engaged in serial abuses of

22   discovery" and that this "gamesmanship has prevented" him from obtaining the

23   indirect profits evidence he needed under *Polar Bear*.  The Court expressly

24   rejected this argument:

25

26   [9] Plaintiff's failure to seek judicial relief is particularly egregious, given the
     discovery continuances afforded him and his repeated refusal to comply with
27   expert discovery deadlines throughout the course of this case. *See, e.g.*, Dkt. Nos.
     69 (3/15/12 Order granting Plaintiff's application to continue discovery cutoff), 72
28   (Skechers' application to preclude Plaintiff from offering expert testimony).

> I don't know if that's true or not -- and I'm sorry to interrupt you; but if you felt that [Skechers] had done something improper, your remedy is a motion to compel. So I am dealing with the record that I have before me today, and I'm not revisiting whether a motion to compel would have produced something or whether it would have been well-taken. *So I don't really care about that argument.* I want to know what is before me today.

(Welsh Decl., Ex. H (7/23/12 Tr.) at 23:2-24:1.)

Plaintiff then re-raised this same argument at the December 3, 2012 hearing on Skechers' motion for clarification. Specifically, Plaintiff argued that his expert, Mr. Connelly, was not provided with necessary indirect profits data until the "very last day of discovery," and again cited to *Fournier* as support for why Plaintiff should only have to present "reasoned conclusion as to the extent of the injury" rather than the causal link required by *Polar Bear*. (*Id.*, Ex. I (12/3/12 Tr.) at 35:3-39:4.)  Once again, the Court did not accept this argument:

> So what.  The so what means this, with all due respect, and I'm sorry to interrupt you.  And I preach this constantly:  If you feel you haven't gotten the discovery you're entitled to, bring a motion to compel.  *But you cannot later be heard having failed to assert your rights to, in a proceeding after the close of discovery, say, gosh, we were -- we were hampered by not getting certain documents*....I was just telling you that you've got to police your rights.

(*Id.* at 35:3-36:21; *see also id.* at 36:22-38:4 (Court advises Plaintiff that "parties who believe that they are entitled to documents [are required to] go get those documents by any means necessary before the close of discovery").)

During the meet and confer on this Motion, Skechers reminded Plaintiff of the foregoing history and urged him to review the prior pleadings and transcripts. (Welsh Decl. ¶ 20.)  There is simply no legal support for Plaintiff's decision to ignore the Court's prior admonitions on this subject and proceed with his Motion.

**IV.   PLAINTIFF, NOT SKECHERS, IS THE PARTY WHO HAS MADE MISREPRESENTATIONS TO THE COURT.**

Plaintiff acknowledges that the Court "cannot compel the production of things that do not exist." (Mot. at 11:13-18.)  However, Plaintiff maintains he now has newly discovered evidence showing that Skechers does in fact have formal marketing plans and/or documents analyzing the effectiveness of Skechers' various advertising and marketing campaigns.  The entirety of Plaintiff's evidence is (1) a 2011 PowerPoint entitled, "*International Advertising & Marketing Systems & Procedures*" (the "2011 PowerPoint"); and (2) a provision from Skechers' standard agreement with its foreign distributors.  In truth, both these documents were either known to Plaintiff during discovery or produced by Skechers.  Moreover, nothing in these documents calls into question the prior representations made by Skechers during discovery.

**A.   The 2011 PowerPoint.**

As explained in the accompanying Declaration of Jennifer Clay ("Clay Decl."), the 2011 PowerPoint contains various corporate systems and procedures in effect in 2011 that were applicable to Skechers' international subsidiaries. (Clay Decl. ¶ 4.)  Skechers' international subsidiaries are wholesalers; they sell Skechers footwear and related products (collectively "footwear") to foreign wholesale accounts.  These subsidiaries do not sell Skechers footwear directly to consumers. (*Id.* ¶ 8.)  Nonetheless, Skechers' foreign subsidiaries will engage in advertising to promote the sales of Skechers footwear by its wholesale customers.  The 2011 PowerPoint simply sets forth the systems and procedures that Skechers' international subsidiaries were requested to follow regarding their use of Skechers advertisements or marketing materials, as well as other placements that feature Skechers footwear.  (*Id.*)  The document itself does not contain any information specifically relating to Skechers' use of any advertising or marketing materials containing Plaintiff's photographs and therefore is irrelevant to this case.

Plaintiff insists that the information that Skechers requested its international subsidiaries to provide would include data analyzing the effectiveness of Skechers' advertising and marketing campaigns. *This is completely untrue.* As demonstrated by the very pages highlighted by Plaintiff, the information provided by Skechers' international subsidiaries pursuant to these systems and procedures would not allow Skechers (or anyone else) to reach any conclusions about the "effectiveness" of Skechers' advertising in generating specific sales. (*Id.* ¶ 12.)

**Pages 25–26.** These pages discuss some of the steps that international subsidiaries were requested to follow if they wish to make changes to the footwear featured in Skechers print advertisements and marketing materials. Page 25 states that "For all print ad selection with shoe changes, the country contact must submit a request to JD [Moody] in which they provide Requested Shoe Sku Styles and Colors and the pairs *ordered* for each style." Page 26 simply provides an exemplar of how the information referenced on Page 25 should be presented to Skechers as part of the review and approval process. (*Id.* ¶ 11.)

In the context of the international subsidiary's wholesale business, the reference to "pairs ordered for each style" refers to the number of pairs of shoes that the subsidiary *has already sold* to its wholesale customers. (*Id.* ¶ 12.) Skechers requested this information in order to make an assessment whether the volume of the subsidiary's existing wholesale sales warranted modification of Skechers print ads. For example, if a subsidiary wished to change the footwear style in a particular advertisement from a work boot to a sandal, Skechers requested the subsidiary to indicate the number of sandals it has already sold to its wholesale accounts. This information cannot be used to evaluate the effectiveness of any modified advertisements or marketing images, as Plaintiff imagines, since the order information provided by the subsidiary reflects orders that were placed *before* any advertisements have appeared, not after. (*Id.*)

*Pages 31-32.* If possible, the information referenced on these pages is even more irrelevant to Plaintiff's indirect profits claims as it does not even concern the use of Skechers' own advertising or marketing materials. As is clearly indicated, these pages set forth the systems and procedures applicable to a subsidiary's use of so-called "advertorials." To be clear, an advertorial is not a Skechers advertisement. Rather, an advertorial is a separate feature that appears in many fashion magazines in which the magazine agrees to highlight particular products. (*Id.* ¶ 13.) As an example, if the prevailing trend for a particular season featured boots with fur tops, Skechers' international subsidiaries might decide to work with a magazine to develop an advertorial featuring Skechers boots with fur tops. Such advertorials would typically feature pictures of the selected Skechers footwear along with editorial copy provided by the magazine. (*Id.*)

Advertorials are also different from advertisements because the information that would normally appear in Skechers advertisements or marketing images, such as the prominent use of the Skechers logo and placement of Skechers' well-known trademarks, do not typically appear in advertorials. (*Id.* ¶ 14.) As a result, Skechers is concerned that an advertorial may not be as "effective" as an advertisement in clearly identifying the source of the featured footwear. Thus, Skechers requested its international subsidiaries to provide the magazine with contact information so that consumers would be able to contact Skechers about the products featured in the advertorial. (*Id.*) But this contact information has no bearing on the ability to assess the "effectiveness" of the advertorial in boosting sales of the products featured in the advertorial. Indeed, all information relating to the use of advertorials by Skechers' international subsidiaries is irrelevant to this case because it does not appear that Plaintiff's photographs were ever used in advertorials. (*Id.* ¶ 13 ("To my knowledge and belief, such advertorials did not contain any marketing images featuring photographs taken by [Plaintiff].").)

1    In short, far from calling Skechers' representations into question, the 2011

2    PowerPoint only confirms that Skechers made no attempt to gather data from its

3    international subsidiaries that would allow it to undertake the types of analyses

4    called for by Plaintiff's document requests.

5    It is also clear that Plaintiff was acutely aware of the 2011 PowerPoint

6    during discovery.  At the April 30, 2012 deposition of Skechers' International

7    Marketing Manager, John David ("JD") Moody, Plaintiff specifically questioned

8    Mr. Moody about a Skechers website (http://share.skechers.com/media, "the

9    Media Share website") that contained a copy of the 2011 PowerPoint.

10    (Declaration of John David Moody ("Moody Decl.") ¶ 5.)  Mr. Moody, who is the

11    author of the 2011 PowerPoint, posted the document on the Media Share website

12    in or about mid-January 2011.  (*Id.* ¶¶ 3-4.)  Plaintiff marked as an exhibit at Mr.

13    Moody's deposition an index of FTP files located on the Media Share website,

14    which included the 2011 PowerPoint.  (*Id.* ¶ 5.)  Plaintiff admits that he obtained a

15    copy of the 2011 PowerPoint from the Media Share website as late as December

16    2012 (Ruga Decl. ¶ 6)—which means that the document was accessible to Plaintiff

17    for at least four months prior to the close of discovery.[10]  (Moody Decl. ¶ 8.)

18    **B.    Skechers' Distribution Agreement.**

19    Plaintiff also misleads the Court by describing Skechers' distribution

20    agreement as "recently found evidence."  (Mot. at 14:8.)  *This is false and Plaintiff*

21    *knows it is false.*  Skechers produced its distribution agreement on March 27,

22    2012—seven weeks before discovery closed.  (Welsh Decl. ¶ 14.)  Moreover, as

23    detailed above (*see supra* pp. 10-11), the circumstances under which Skechers

24    produced its foreign distribution agreement refute any suggestion that it did not

25    make a full and complete production.

26

27    _____

[10] Though Mr. Moody testified that he believed the materials on the Media Share website were not accessible to the public, he learned shortly after his deposition

28    that the documents could be publicly accessed.  (Moody Decl. ¶ 8.)

1    Equally beyond dispute is the fact that the distribution agreement does not

2    refer to marketing plans by *Skechers*, but rather refers to the preparation of

3    marketing plans *by the foreign distributor*.  (*See* Ruga Decl. ¶ 8, Ex. 7 at p. 8

4    (quoting Article 9 of the agreement).)  Additionally, this provision clearly states

5    that "SKECHERS shall not be responsible for and *shall not prescribe* any

6    business plan for DISTRIBUTOR."  (*Id.*)  In short, the terms of this document

7    simply confirm that they do not "refer or relate to any Skechers' marketing plans"

8    and therefore were not responsive to Plaintiff's document request.

9    Following his receipt of the exemplar distribution agreement, Plaintiff could

10   have propounded additional discovery requesting the marketing plans prepared by

11   Skechers' foreign distributors had he thought it important.  Plaintiff never did so.

12   (Welsh Decl. ¶ 14.)  Nor did Plaintiff ever contend that marketing plans by

13   Skechers' distributors were encompassed by his original request.  Hence, Plaintiff

14   completely misleads the Court when he asserts that marketing plans prepared by

15   Skechers' foreign distributors "are precisely the types of marketing plans that

16   [Plaintiff] requested and that Skechers told the court did not exist."  (Mot. at 15:1-

17   2.)  This is yet another example of Plaintiff's attempt to distort the underlying

18   record and shift the blame for his own discovery shortcomings on to Skechers.

19   **V.   THERE IS NO LEGAL BASIS TO EXCUSE PLAINTIFF FROM**

20   **HAVING TO DEMONSTRATE A "CAUSAL NEXUS" IN ORDER TO RECOVER INDIRECT PROFITS.**

21

22   Plaintiff cites to cases from various jurisdictions as supporting his

23   contention that the Court should absolve him of his causation burden under *Polar*

24   *Bear*.  (Mot. at 20:15-24:23.)  But these authorities say no such thing.

25   First, Plaintiff's cases all concern the type of evidence admissible for

26   calculating the *amount* of damages suffered by the plaintiff; they simply do not

27   address the evidence necessary to establish damages *causation*—which is the issue

28   here.  *Fournier*, for instance, only stands for the proposition that, when proving the

1   *amount*—not existence—of damages, circumstantial evidence may be used if

2   defendant has withheld the underlying data necessary to calculate damages with

3   certainty.  242 F. Supp. 2d at 327-328 (holding that causation requirement still

4   required plaintiff to present evidence from relevant revenue stream, but allowing

5   circumstantial evidence of relevant revenue stream to establish amount of

6   damages).[11]  These cases do not suggest, as Plaintiff would have the Court believe,

7   that plaintiffs are relieved of their initial burden of establishing the fact of

8   damages.  *See, e.g., In re Record Club of Am., Inc.*, 30 B.R. 418, 422 (M.D. Pa.

9   1983) (*Shapiro* "does *not* say that minimal evidence or evidence of questionable

10  probative value will authorize the court to speculate" about the existence or

11  amount of damages).  The burden of establishing a causal nexus is Plaintiff's to

12  carry, and the fact that proof is difficult to obtain does not relieve the party who

13  has the burden of proof from carrying that burden.  *Shanghai*, 194 F. Supp. 2d at

14  1004 (noting that burden does not shift where proof is merely difficult to obtain

15  (citing *In re Malget*, 165 B.R. 933, 936 (Bankr. S.D. Cal. 1994)).

16      In addition, Plaintiff's cases do not create any *per se* rule permitting a

17  negative inference where plaintiff lacks sufficient evidence to prove his case.

18  Litigation is not a game of "heads I win, tails you lose."  And Plaintiff utterly

19

---

20  [11] *See also Cartier v. Somo's Sons, Inc.*, 2007 WL 1040245, at *2 (S.D.N.Y. Apr.
    4, 2007) (citing *Fournier* to support use of circumstantial evidence in "Calculation
21  of Plaintiffs' Damages"); *Project Strategies Corp. v. Nat'l Commc'ns Corp.*, 948
    F. Supp. 218, 222 (E.D.N.Y. 1996) (discussing defendant's failure to prove
22  deductible costs for purposes of calculating damages); *Gaste v. Kaiserman*, 683 F.
    Supp. 63, 65-66 (S.D.N.Y. 1988) (same); *Shapiro, Bernstein & Co, Inc. v.
23  Remington Records, Inc.*, 265 F.2d 263, 268 (2d Cir. 1959) (holding defendants
    purposely frustrated proof of the "basic issue in case, i.e., *the extent* of the royalties
24  due"); *Deering, Milliken & Co., Inc. v. Gilbert*, 269 F.2d 191, 193 (2d Cir. 1959)
    (defendant challenged "method of computation of damages" which used
25  circumstantial evidence); *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 27 (2003)
    (entitlement to compensation previously established by contract); *Maredia v.
26  Philip Morris USA, Inc.*, 2007 WL 2462093, at *5-6 (E.D. Cal. 2007)
    (circumstantial evidence used to calculate damages after default judgment);
27  *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1003-04
    (N.D. Cal. 2001) (burden shifted to defendants to discount amount of damages
28  court intended to award).

SKECHERS' OPP. TO
PLF'S MOTION *IN LIMINE*
CV10-7181-DDP (SSX)

1   ignores the absence of any finding of bad faith conduct by Skechers during

2   discovery, which was present in most of Plaintiff's cases.  For instance, *Shapiro*—

3   in which the court found that defendants had "consciously and deliberately failed"

4   to keep an accounting of their allegedly infringing activity, 265 F.2d at 266—held

5   that, "[a] man who willfully places the property of others in a situation where it

6   cannot be recovered, or its true amount or value ascertained . . . will consequently

7   be compelled to bear all the inconveniences of the uncertainty or confusion which

8   he has produced."  *Id.* at 271-72.  Likewise in *Deering*, the court upheld a damages

9   award based upon circumstantial evidence in response to defendant's bad faith

10  failure to produce sales data.  269 F.2d 191, 193-94.  As observed by the court in

11  *Arnold Productions, Inc. v. Favorite Films Corp.*, 176 F. Supp. 862 (S.D.N.Y.

12  1959), the underlying logic in both *Shapiro* and *Deering* was that "the defendants'

13  tortious conduct, by its very nature, prevented the accurate ascertainment of the

14  respective plaintiff's damages, which were undoubtedly sustained."  *Id.* at 866.[12]

15  Here, by contrast, Plaintiff is the only party who was found to have engaged in bad

16  faith.  (Dkt. No. 51 (1/30/12 Order) at 8:4-10 (Plaintiff failed to "negotiat[e] the

17  protective order in good faith" and "failed to meet and confer in good faith with

18  [Skechers]").)  Where, as here, there can be no finding of bad faith because

19  Skechers was under no obligation to prepare the types of analyses sought by

20  Plaintiff's discovery, Plaintiff has only himself to blame for his failures of proof.

21  **VI.   PLAINTIFF'S CONTENTION THAT HE IS NOT REQUIRED TO**

22          **ESTABLISH A "CAUSAL NEXUS" IS MERITLESS.**

23          Repeating the same failed argument made at the hearing on Skechers'

24  motion for clarification, Plaintiff again claims that Section 504(b) of the Copyright

25  _____

26  [12] *See also Maredia*, 2007 WL 246093, at *8 (court ordered negative damages inference after plaintiff had willfully violated court order compelling discovery, and terms of contract requiring recordkeeping supported inference that evidence of

27  damages existed); *Cartier*, 2007 WL 1040245, at *2 (negative inference drawn after court found that defendants liquidated infringing watches after receiving a

28  cease-and-desist letter and refused to provide any sales data for past sales).

1   Act merely requires him to present evidence of the "total pie" of Skechers' profits

2   and the burden then shifts to Skechers to demonstrate why any portion of the "pie"

3   does not belong in the damages calculation. (Mot. at 16:1-10; *see also* Welsh

4   Decl., Ex. I (12/3/12 Tr.) at 28:3-30:14.)  There are many things wrong with

5   Plaintiff's argument, not the least of which is that he never tells the Court what he

6   claims is included in Skechers' "total pie."

7          That Plaintiff is forced to talk in terms of metaphors about "pies" as opposed

8   to actual financial data undoubtedly results from the fact that Plaintiff only has

9   admissible evidence of Skechers' total revenue and profits from all operations.[13]

10  Included among Plaintiff's many discovery failures was his omission to seek

11  production of Skechers' sales or profits broken down by shoe styles or even basic

12  product lines.  As the Court has made clear, merely showing a defendant's total

13  profits from *all* operations does not come close to satisfying his evidentiary burden

14  of proof.  (*See id.* at 29:17-20 ("You just don't get to say, they sold some stuff,

15  here's our ad; sit back and tell the other side, . . . disprove that we don't get all of

16  your revenue.").)  *See also Polar Bear*, 384 F.3d at 711 (rejecting the proposition

17  that "the plaintiff in a copyright action against a multi-division, multi-product

18  company . . . would need do nothing more than offer an overall gross revenue

19  number . . . and sit back"); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983)

20  ("If General Motors were to steal your copyright and put it in a sales brochure, you

21  could not just put a copy of General Motors' corporate income tax return in the

22  record and rest your case for an award of infringer's profits.").

23          Nor was Connelly able to extract such sales information from the general

24  ledger data Skechers produced.  As he acknowledged in his Supplemental Report,

25  save for a few non-Skechers brands, the general ledger data does not identify sales

26  by shoe styles or product lines.  (Dkt. No. 180 (Errata Supp. Connelly Rep.) at 7.)

27

28  _____

[13] Skechers reported total revenues and profits from all operations in its annual 10k
reports, which it produced to Plaintiff.  (Welsh Decl., Ex. L (1/6/12 letter) at 3.)

1    Unable to even identify Skechers' sales, revenues or profits attributable to the

2    products featured in Plaintiff's photographs (Welsh Decl., Ex. I (12/3/12 Tr.) at

3    63:23-64:19), Plaintiff cannot begin to satisfy his own flawed approach.

4         Plaintiff's proffered approach is also inconsistent with the analysis

5    undertaken by his own expert. Connelly did not simply repeat the financial

6    information set forth in Skechers' 10k submissions and call it a day. Instead he

7    recognized that an integral part of the required *Polar Bear* causal nexus analysis is

8    showing what Skechers' revenues would have been "but for" the claimed

9    infringements. (Dkt. No. 180 (Errata Supp. Connelly Rep.) at 6 (describing his

10   "effort to identify Skechers' sales revenue by separate product lines").) However,

11   the absence of relevant financial information again resulted in Connelly's undoing.

12        Connelly's purported "but for" analysis consists only of the unsupported

13   assertion that absent the claimed infringements, Skechers' annual profits would

14   have equaled the average annual profits and growth rate of some of Skechers'

15   competitors. (*Id.* at 8; Welsh Decl., Ex. I (12/3/12 Tr.) at 66:1-6.) Even here,

16   Connelly cannot avoid "putting his thumb on the scale" in order to favor his client.

17   As Connelly acknowledged, he excluded one of Skechers' main competitors, Nike,

18   from his analysis due to what he calls Nike's "anomalous growth." (Dkt. No. 180

19   at 8 n.12; Welsh Decl., Ex. I (12/3/12 Tr.) at 65:15-19.) Again, Connelly offers no

20   justification for this assertion, but the reason for it can be easily surmised. By

21   excluding Nike's sales data, he is able to widen the claimed gap between Skechers'

22   actual sales and the sales of its competitors' growth—and thereby increase the

23   amount of damages he asserts was attributable to Skechers' claimed infringements.

24   This is nothing more than self-serving speculation that leaves "too many question

25   marks" to establish a causal nexus under *Polar Bear*. 384 F.3d at 715.

26        Unable to rectify the shortcomings of his expert's analysis, Plaintiff is

27   reduced to arguing that the entire *Polar Bear* causation requirement is misguided

28   and that he should only be required to show that "the end consumer[s] [were

1    exposed] to the infringing material." (Mot. at 18:23-25 (citing *Andreas v.*
2    *Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003).)[14] Under his strained
3    reading of these cases, any time a plaintiff can show allegedly infringing material
4    was disseminated to the general public, his causation burden is satisfied regardless
5    of whether he has linked the infringing material with a relevant revenue stream.
6    Plaintiff's position lacks merit and inconsistent with governing Ninth Circuit law.

7        In *Polar Bear*, the court analyzed three categories of indirect profits awards
8    to determine if plaintiff had demonstrated a sufficient causal nexus.  384 F.3d 700.
9    First, the court considered plaintiff's claim of profits due to defendant's use of
10   infringing material at trade shows, which allegedly spurred direct sales at those
11   trade shows.  *Id.* at 712.  The court found that "[the expert]'s testimony established
12   the requisite causal connection between the category of profits sought—revenue
13   from trade booth sales—and the infringement."  *Id.*  The court reached a similar
14   conclusion concerning plaintiff's claim for indirect profits deriving from use of the
15   infringing material in a discrete Mountain Dew promotion.  *Id.* (plaintiff satisfied
16   its burden of establishing the infringer's relevant gross revenue by presenting sales
17   figures showing that the Mountain Dew promotion generated $564,000 in sales).

18       The third category of indirect profits in *Polar Bear*, a so-called "brand
19   premium analysis," was premised upon the expert's theory that an increase in the
20   average price of the watch model was partially attributable to "enhanced brand
21   premium" created by use of the infringing material.  *Id.* at 713.  The court
22   determined that the expert's analysis failed to establish the necessary causal nexus
23   because "Polar Bear shoulders the burden of *demonstrating that the infringement is*
24   *causally linked to the revenues from the sales of all Expedition watches.*"  *Id.*  As

25

26   _____
     [14] Plaintiff raised this argument at the hearing on Skechers' motion for
27   clarification, and claimed that "what was really important in *Polar Bear* and really
     important in *Andreas* was—was the infringing material shown to consumers.
28   Because . . . once the ultimate consumer is exposed to the infringing material, then
     you make your nexus."  (Welsh Decl., Ex. I (12/3/12 Tr.) at 32:9-18.)

1   the foregoing makes clear, in each of these scenarios the court's decision turned on

2   connecting the infringing activity to a discrete revenue stream—not merely

3   showing that consumers saw the material in question.[15]

4        Not only is Plaintiff's proposed "end user exposure test" contrary to

5   applicable copyright law, such an approach would not save Connelly's analysis for

6   the simple reason that he fails to distinguish between Skechers' admittedly *non-*

7   infringing use of Plaintiff's photographs and the asserted infringing uses.  Even

8   Plaintiff acknowledges that Skechers had the right to use Plaintiff's photographs in

9   its marketing images for particular periods of time, nor does he claim he is entitled

10  to any portion of Skechers' profits derived from consumers who were exposed to

11  Skechers' *non*-infringing uses of Plaintiff's photographs.  However, as Skechers

12  has pointed out before, neither Plaintiff nor Connelly's expert report makes any

13  attempt to distinguish Skechers' revenues and profits derived from its admittedly

14  *non*-infringing uses from its allegedly infringing uses.  (Welsh Decl., Ex. I

15  (12/3/12 Tr.) at 67:6–16.)  Indeed, Connelly's indirect profits analysis simply

16  lumps in *all* of Skechers' revenues and profits over a four-year period, without

17  offering any evidence showing that marketing images containing Plaintiff's

---

18  [15] *Andreas* also supports Skechers' position. 336 F.3d 789.  *Andreas* involved an

19  artist whose work had been infringed by an Audi TT Coupe commercial.  The
    court found that plaintiff had established a sufficient causal nexus between the

20  infringing material and a relevant revenue stream by showing the dissemination
    and promotion of the commercial, and an increase in TT Coupe sales figures while

21  the commercial was being run. *Id.* at 796-97.  *Andreas* underscores the absurdity
    of Plaintiff's position that the dispositive factor in the causal nexus analysis is

22  mere exposure to the end consumer. (Mot. at 18:23-25.)  If *Andreas* stood for such
    a proposition, the plaintiff would have satisfied his causal burden by merely

23  showing that Audi ran a nationwide commercial with his intellectual property in it.
    If that were sufficient, the court's lengthy discussion of plaintiff's causation

24  burden is utter surplusage.

    Plaintiff's argument was also rejected in *Taylor* where, even in the face of
25  defendant's concession of infringement, the court nonetheless rejected plaintiff's
    indirect profits analysis, which merely "lumped" defendants' gross profits together
26  and performed calculations on the resulting figure. 712 F.2d at 1122.  The court
    stated, "Taylor could have made out a prima facie case for an award of infringer's
27  profits *by showing Meirick's gross revenues from the sale of the infringing maps.*
    It was not enough to show Meirick's gross revenues from the sale of everything he
28  sold, which is all, really, that Taylor did." *Id.*

---

                                          SKECHERS' OPP. TO
                                          PLF'S MOTION *IN LIMINE*
                                          CV10-7181-DDP (SSX)

photographs continuously appeared in all of Skechers' outlets over this period of time.  (Dkt. No. 180 (Errata Supp. Connelly Rep.) at 8.)  Had Plaintiff bothered to provide Connelly with the evidence of Skechers' actual use of the marketing images in question, it would have become readily apparent that this assumption was factually incorrect.[16]

Short of relieving Plaintiff of any burden of proof, there is simply no alternative formulation of the causal nexus requirement that saves Connelly's flawed indirect profits analysis.[17]  This is not surprising given that Plaintiff never asked for, and Connelly was never provided, the basic financial information necessary to conduct such an analysis.  As demonstrated above, Plaintiff alone bears responsibility for these failures of proof.

## VII.   **CONCLUSION**

For all the foregoing reasons, Skechers respectfully requests that the Court deny Plaintiff's motion *in limine*.

Dated:  February 4, 2013

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Defendants Skechers U.S.A.,
Inc. and Skechers U.S.A., Inc. II

---

[16] Among other things, Skechers produced evidence showing that the marketing images containing Plaintiff's photographs were to be removed and replaced by new images roughly every six months.  (Welsh Decl. ¶ 10.)  There is no evidence suggesting that the marketing images remained visible in all of Skechers' stores for the entire four-year period included in Connelly's damages analysis.

[17] Plaintiff also claims that Skechers has articulated an erroneous bright-line test for causation, one which would require him to submit proof that consumers purchased footwear precisely because of the infringing material contained in the company's marketing images.  (Mot. at 19:19-22.)  This argument is a straw-man.  Skechers' prior comment that "there's no evidence…of any sales where there is a causal connection between a sale and an infringing use" simply meant that there was no factual basis to believe that the allegedly infringing use of Plaintiff's images had contributed to any of Skechers' sales, let alone its profit margin.  Skechers was not arguing, as Plaintiff contends, that Plaintiff must "put customers on the witness stand" to testify about their purchasing decisions.  *Polar Bear*, 384 F.3d at 715.  Skechers was merely citing one of the many reasons why Connelly's flawed theory of causation falls short.