O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RICHARD REINSDORF, an individual,

                Plaintiff,

    v.

SKECHERS U.S.A, a Delaware corporation; SKECHERS U.S.A.., INC., II, a Delaware corporation,

                Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 10-07181 DDP (SSx)

**AMENDED ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, MOTIONS IN LIMINE, AND OBJECTIONS TO EVIDENCE**

[Dkt. No. 198]

Presently before the court is Defendant Skechers U.S.A. ("Skechers")'s Motion for Summary Judgment. Having considered the submissions of the parties and heard oral argument, the court grants the motion in part, denies the motion in part, and adopts the following amended order.[1]

**I.   Background**

As explained in this court's earlier order denying Defendant's Motion to Dismiss, Skechers is a shoe company. (Declaration of

_____

[1] This order supercedes the court's October 9, 2012 Order Denying Summary Judgment (Dkt. No. 196) and addresses the issues raised, briefed, and argued by the parties in relation to Skechers' subsequent Motion for Clarification (Dkt. No. 198).

Robert Welsh in support of Motion ("Welsh Dec.") Ex.19.)  Beginning

in 2005, Skechers hired Plaintiff Richard Reinsdorf ("Reinsdorf"),

a photographer, to conduct several photo shoots.  (Undisputed Fact

¶ 6).  Between 2006 and 2009, Skechers engaged Reinsdorf to conduct

five photo shoots at issue here, in connection with Skechers's

marketing efforts.  (Complaint ¶¶ 14-15, 18-19, 22-23, 25, 29-30.)

Prior to each photo shoot, Skechers explained to Reinsdorf the type

of images Skechers hoped to capture.  (Welsh Dec., Ex. 44 ¶¶

10,12.)  These explanations included storyboards and photographic

examples, as well as drawings depicting particular poses for

Skechers' selected models.  (Id. ¶¶ 12, 14.)  During the shoots,

Reinsdorf posed models, arranged lighting and props, and otherwise

directed the photography sessions.  (Compl. ¶ 23.)  Reinsdorf

delivered raw photographs ("the photographs") to Skechers at the

conclusion of each photo shoot.  (UF ¶ 22.)

Upon receiving the photographs from Reinsdorf, Skechers

proceeded to modify the images for use in Skechers advertisements.

(Welsh Dec., Ex. 44 ¶ 17.)  The alterations varied with each image,

and ranged from slight modifications in models' skin tone to the

substitution of models' body parts and the addition of substantial

graphic effects. (Id. ¶¶ 17, 21.)  These enhanced images were then

used in Skechers advertisements ("the advertisements"). (Id. ¶

16.)  No raw, unaltered photograph was ever incorporated into a

finished advertisement.  (Id.)

Reinsdorf submitted invoices to Skechers for his services, and

contends that he granted Skechers a limited license to use the

photographs. (Compl. ¶¶ 442; Statement of Genuine Issues ¶¶ 16-20,

22).  Reinsdorf brought suit in this court alleging copyright

infringement, as well as state law causes of action for breach of contract and unfair competition, alleging that Skechers utilized his copyrighted images as part of Skechers' marketing efforts in violation of the temporal and geographic limits of the use licenses.  (Compl. ¶ 6.)  Skechers now moves for summary judgment.

**II.  Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from the evidence must be drawn in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

3

which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. <u>Carmen v. San Francisco Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).  The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." <u>Id.</u>

**III. Discussion**

A.   Procedural History

Skechers previously brought a Motion to Dismiss for lack of jurisdiction, arguing that the advertisements at issue in this case are joint works created by both Reinsdorf and Skechers. Because the jurisdictional issues were inextricably entwined with the merits of the case, this court applied the more rigorous standard applicable to motions for summary judgment under Federal Rule of Civil Procedure 56.  (See March 9, 2012 Order Denying Defendant's Motion to Dismiss ("Order"), Dkt. No. 28.)

As explained in the court's earlier Order, a joint work is a copyrightable work prepared by (1) two or more authors who (2) make independently copyrightable contributions and (3) intend that those contributions be "merged into inseparable or interdependent parts of a unitary whole." Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 969 (9th Cir. 2008). Co-authors in a joint work cannot be held liable to one another for infringement of the copyright in the joint work. Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984); Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998).

This court found that the first two factors, authorship and independently copyrightable contributions, were not at issue. With respect to authorship, the court expressly declined to determine whether Reinsdorf was the sole author of the raw photographs because, even if that were the case, the finished advertisements at issue here would nevertheless be the product of contributions from two authors, Reinsdorf (raw photographs) and Skechers (graphical additions and modifications). (Order at 5 n.3.)

The court focused, therefore, on the third factor necessary to establish the existence of a joint work: the intent of the parties to merge independent contributions into a unitary whole. After concluding that the record did not establish that Reinsdorf intended his raw photographs to be merged into a finished advertisement, the court denied Skechers' motion. (Id. at 7.) Reinsdorf did not move for reconsideration or otherwise challenge the court's conclusions.

Now, after the conclusion of discovery, Skechers seeks summary judgment on the joint work issue. Skechers argues that the fully-

1 developed record now demonstrates that Reinsdorf did indeed intend
2 for his raw photographs to be merged with Skechers' graphical
3 enhancements into a finalized marketing image.

4    Reinsdorf's opposition to the motion does not dispute
5 Skechers' contentions regarding his intent with respect to the
6 synthesis of the parties' independent contributions.  Instead,
7 Reinsdorf now challenges the second, authorship element of the
8 joint work test, arguing that the marketing images at issue here
9 are not the creations of two or more authors.  (Opp. at 8-16.)

10    B.  Joint Authorship

11    This case presents an unusual set of circumstances.  In most
12 cases, a plaintiff seeks to establish that he is the sole author of
13 a work, see, e.g., Morrill, 157 F. Supp. 2d at 1122, or at least a
14 co-author of a work, see, e.g., Aalmuhammed v. Lee, 202 F.3d 1227,
15 1230 (9th Cir. 2000), so as to enjoy the benefits of copyright
16 ownership (or co-ownership).  Here, in contrast, Plaintiff
17 Reinsdorf seeks to disavow any authorship role in the finished
18 marketing works.

19    Reinsdorf's position is understandable in light of the fact
20 that, as explained above, a co-author in a joint work cannot be
21 liable to another co-owner for infringement of the copyright in
22 that work.  Oddo, 743 F.2d at 632-33 (9th Cir. 1984).  Furthermore,
23 and perhaps more importantly, "[i]n a joint work, . . . each author
24 obtains an undivided ownership in the whole of the joint work,
25 including any portion thereof.  Consequently, one joint author
26 thereby obtains the right to use or license that portion of the
27 joint work that was the sole creation of the other joint author."
28 1 Nimmer on Copyright § 6.06[A].  Thus, to bring a successful

6

infringement claim against Skechers, Reinsdorf must establish that his role in the creation of the final marketing images did not rise to the level of authorship.

The criteria for joint authorship include whether 1) an alleged author exercises control over a work, serves as "the inventive or master mind," or creates or gives effect to an idea; 2) there exists an "objective manifestation of a shared intent to be coauthors; and 3) "the audience appeal turns on both contributions and the share of each in its success cannot be appraised." Aalmuhammed, 202 F.3d at 1233-35 (internal quotations and citations omitted). Due to the variety of creative relationships to which these factors apply, however, the factors "cannot be reduced to a rigid formula." Id. at 1235.

        1. Control

Courts in this district have found the joint control criterion satisfied where "both parties had creative control over separate and indispensable elements of the completed product." Morrill v. Smashing Pumpkins, 157 F. Supp. 2d 1120, 1124 (C.D. Cal. 2001); see also Eagle Rock Entm't. Inc. v. Coming Home Prods., Inc., No. CV 3-571 FMC; 2004 WL 5642002 *13 (C.D. Cal. Sept. 1, 2004). Here, the parties appear to agree on their respective degrees of control over the constituent parts of the marketing images. Reinsdorf's opposition argues that "[a]lthough . . . Skechers controlled the latter half of the creative process here, namely the graphic design of its marketing images, it exercised little to no control over Reinsdorf's authorship of his underlying photographs. . . ." (Opp. at 9.) Similarly, Reinsdorf asserts that "[j]ust as Skechers had minimal involvement in Reinsdorf's authorship of his photographs,

1  [Reinsdorf] likewise did not exercise any supervisory powers over

2  the design of Skechers' marketing images . . . ."  (Opp. at 11

3  (internal quotation omitted).)  Skechers does not dispute these

4  characterizations.  (Reply pp. 7-10.)  Thus, as in Morrill and

5  Eagle Rock Entertainment, each party had exclusive, or near-

6  exclusive, power over the distinct constituent parts of the unitary

7  whole.  The "supervisory" or "control" factor thus weighs in favor

8  of joint authorship.

9          2.  Audience Appeal

10      While acknowledging that the audience appeal of the marketing

11  images could be attributed to both parties' contributions,

12  Reinsdorf argues that the bulk of the images' appeal can be

13  attributed to Reinsdorf's photos, and quantified.  Reinsdorf

14  contends that the relative appeal of the parties' separate

15  contributions can be appraised by a casual comparison of the raw

16  photographs with the finished images.  (Opp. at 17.)  "From that

17  basis," Reinsdorf claims, "one can fairly easily parse how much of

18  the audience appeal of the work originates" from the various

19  elements.  (Id.)  This conclusory assertion notwithstanding, the

20  only evidence Reinsdorf cites is a survey study by Dr. Frank Luntz.

21  (Opp. at 17.)  Dr. Luntz' survey was designed to test brand

22  recognition, not to appraise the relative audience appeal of the

23  various elements in the finished advertisements.  Putting aside for

24  the moment Skechers' objections to Dr. Lunz's opinions, it does not

25  appear that Dr. Lunz ever compared Reinsdorf's raw photographs to

26  the finished Skechers advertisements.  Nor did Dr. Luntz present

27  either Skechers' complete advertisements or Reinsdorf's raw

28  photographs to survey participants.  (Declaration of Dr. Carol

1  Scott in Support of Motion to Exclude Luntz Report ¶ 46.)  Without
2  such a comparison, Skechers cannot credibly argue that the relative
3  audience appeal of the joint authors' contributions has been
4  ascertained, and has failed to demonstrate that the share of appeal
5  attributable to each element can be appraised.  The audience appeal
6  factor therefore weighs in favor of joint authorship.
7          3.  Objective Manifestations of Intent
8      With respect to manifestations of intent, in the absence of a
9  contract, the inquiry here must focus on the facts.  <u>Aalmuhammed</u>,
10 202 F.3d at 1235.  Here, Skechers has presented facts that it
11 suggests evince the parties' intent to be joint authors.  Reinsdorf
12 testified, for example, that his goal was to do a "great job,"
13 defined as "capturing great moments" that "Skechers could use in
14 its advertising and marketing materials."  (Reinsdorf Deposition,
15 Welsh Dec., Ex. 50 at 323:3-6.)  Reinsdorf did not expect anything
16 in particular about the finished images, as "[Skechers] could do
17 whatever," and never did anything creatively with the pictures that
18 it was not allowed to do.  (Reinsdorf Depo. at 314:18-19; 330: 2-
19 6.)  Indeed, Reinsdorf had created similar images, which Skechers
20 subsequently modified for use in advertising materials not at issue
21 in this case, for Skechers at an earlier photo shoot, the "Michelle
22 K" photo shoot.  (<u>Id.</u> at 393.)  As with the earlier Michelle K
23 shoot, Reinsdorf understood that he would be taking photos for
24 Skechers to use in its catalogs and other marketing materials.
25 (<u>Id.</u> at 396:10-20.)  Reinsdorf's representative, Robert Heller
26 ("Heller"), acknowledged in an e-mail to Skechers personnel that
27 Skechers' intended to "digitally play" with or otherwise "decorate"
28 Reinsdorf's raw images.  (Ex. 53 to Welsh Dec. at 128.)

1   Heller also testified that, as Reinsdorf's representative, he

2   affirmatively wanted Skechers to do something with the images, "to

3   make beautiful ads for their company." (<u>Id.</u> at 130.)   Indeed,

4   Reinsdorf facilitated Skechers' manipulation of the images by

5   suggesting that Skechers use a gray or white background so as to

6   facilitate digital alteration of Reinsdorf's photos. (<u>Id.</u> at

7   125:5-7.)   When Reinsdorf received samples of the finished

8   advertisements, his representative did not express shock or

9   confusion, but rather stated, "These came out great!  Love the art

10  direction in the graphics!!"  (Ex. 24 to Welsh Dec.)   Even after

11  the commencement of this suit, Reinsdorf displayed the finished

12  marketing images on his personal website.  (Dec. of William Briggs

13  in Opposition to Motion, Ex. 46.)[2]

14  While these actions and communications provide an indication

15  of Reinsdorf's intent that the parties' separate contributions be

16  merged into a unified whole, that is not the question here.

17  Rather, the issue is whether the parties manifested an intent to be

18  co-authors.  The difference is important.  While intent to merge

19  separate contributions is a necessary element of a joint work, it

20  is not equivalent to an intent to be joint authors.

21  <u>Aalmuhammed</u> itself provides a useful illustration of the

22  distinction.  There, the plaintiff wrote certain passages and

23  scenes that appeared in a movie.  <u>Aalmuhammed</u> 202 F.3d at 1231-32.

24

25  [2] The exhibit in question is not an image of Reinsdorf's
    website, but rather a cease and desist letter sent to Reinsdorf by
26  Skechers, referencing the use of the advertisements.  In its reply,
    Skechers asserts that it sought to prevent Reinsdorf from
27  displaying Skechers trademarks and logos, but not the marketing
    images.  (Reply at 10.)  It is unclear whether the website
28  displayed Skechers logos or trademarks separate and apart from the
    advertising images themselves.

1  The court found that the parties all intended for the plaintiff's

2  contributions to be merged into independent parts of the movie as a

3  whole.  Id. at 1332.  That intent, however, had no bearing on

4  whether the parties intended the contributing plaintiff to be an

5  "author" of the film.  Id. at 1232-35.  Applying the control,

6  audience appeal, and intent factors described above, the

7  Aalmuhammed court ultimately determined that, despite the parties'

8  intent to merge their independent contributions, the parties did

9  not intend for the plaintiff to be a co-author of the movie and the

10  plaintiff was not an author of the film.  Id. at 1235.

11     Skechers' evidence that the parties here intended Reinsdorf's

12  photos to be merged with Skecher's digital alterations and

13  additions therefore does not resolve the authorship issue.  Indeed,

14  the parties behaved in ways uncharacteristic of joint authors.

15  Perhaps most importantly, Reinsdorf charged Skechers thousands of

16  dollars for his work.  Not only did Reinsdorf charge for his time

17  and effort, but also for "usage" of the photographs.  (Declaration

18  of Robert Heller in Opposition to Motion, Ex. 11.)  Reinsdorf also

19  attempted to limit Skechers' use of its ads by including temporally

20  and geographically restrictive language in his invoices to

21  Skechers.  Skechers, for its part, also sought to prevent Reinsdorf

22  from making use of the finished images on his personal website,

23  even during the pendency of this suit.  (Briggs Dec., Ex. 46.)

24     A party intending to jointly produce a finished work generally

25  would not require payment from a co-author and, conversely, would

26  not likely agree to pay for a purported co-author's contribution.

27  More importantly, a co-author would not attempt to constrain an

28  intended co-author's use of a collaborative work.  Other courts

11

1  have come to similar conclusions under similar circumstances.  In

2  Tang v. Putruss, 521 F. Supp. 2d 600 (E.D. Mich. 2007), for

3  example, a contract between a photographer and a purported co-

4  author required that the second party pay the photographer money

5  before using the photographer's photos.  Id. at 607.  The court

6  found such a provision inconsistent with an intent to be joint

7  authors.  Id.

8       The court in Robinson v.Buy-Rite Jewelery, Inc., No. 03 CIV

9  3619(DC), 2004 WL 1878781 (S.D.N.Y. Aug. 23, 2004), addressed

10  circumstances similar to, but critically different from, those

11  here.  In Robinson, as here, a photographer was hired for a fashion

12  shoot, and yielded all subsequent decision-making authority as to

13  how the photos would be used.  Id. at *3.  Unlike here, however,

14  the photographer agreed that the other contracting party could use

15  the photographs without limitation.  Id.  Relying on this

16  "critical" fact, the court concluded that the parties did intend to

17  be joint authors.  Id.

18       This court's analysis of the three Aalmuhammed authorship

19  factors indicates that while the control and audience appeal

20  factors suggest plural authorship, the parties' behavior toward one

21  another could indicate a lack of intent to be joint authors of the

22  finished works.  There remains, therefore, a genuine dispute of

23  material fact as to whether Skechers' finished advertisements are

24  the products of multiple authors.[3]  See S.O.S., Inc., v. Payday,

25  Inc., 886 F.2d 1081, 1086 (9th Cir. 1989) ("Authorship is a

26

27       [3] As discussed at argument, it is unclear at this juncture
   whether Skechers intends to pursue its joint authorship theory,
28  which might give rise to a claim for an accounting.  See Harper &
   Row Publishers v. Nation Enters., 471 U.S. 539, 568 (1985).

1  question of fact."); <u>Gaylord v. U.S.</u>, 595 F.3d 1364, 1377 (Fed.

2  Cir. 2010); <u>Medforms, Inc. v. Healthcare Management Solutions,</u>

3  <u>Inc.</u>, 290 F.3d 98, 110 (2d Cir. 2002).

4      C.  License Issues

5          1.  Exclusivity

6      The complaint alleges that "Reinsdorf entered into a series of

7  written license agreements with Skechers for its exclusive use of

8  his photos . . . ."  (Compl. ¶ 55.)  In February 2012, Reinsdorf

9  confirmed that the facts asserted in his complaint were accurate to

10  the best of his knowledge.  (Reinsdorf Depo. at 16:14-16.)

11      Three months later, however, over two months after the

12  deadline to make changes to the deposition transcript, Reinsdorf

13  purported to completely change his answer to "Skechers did not

14  actually get exclusive use of the pictures."  (Supplemental Dec. of

15  Robert Welsh, Ex. 6.)  Reinsdorf has not provided any explanation

16  for the untimely reversal.  Reinsdorf also now states in opposition

17  to the instant motion for summary judgment that he "never granted

18  Skechers an exclusive right to use my photographs."  (Reinsdorf

19  Dec. at 17.)  A party may not, however, create an issue of fact by

20  contradicting prior deposition testimony.  <u>Van Asdale v. Int'l Game</u>

21  <u>Tech.</u>, 577 F.3d 989, 998 (9th Cir. 2009).  The court finds that

22  there is a clear inconsistency between Reinsdorf's initial

23  testimony, in which he confirmed the complaint's allegation that he

24  granted Skechers an exclusive license, and his later untimely

25  correction and declaration that he did <u>not</u> grant Skechers an

26  exclusive license.  Reinsdorf's subsequent affidavit is a sham, and

27  is therefore stricken.  <u>Id.</u>

28          2.  Copyright Infringement vs. Breach of Contract

Skechers also argues that it is entitled to summary judgment because the invoices Reinsdorf sent to Skechers are not copyright licenses as a matter of law.  Instead, Skechers contends, the licenses are ordinary contracts that do not give rise to copyright protections or remedies.  In Skechers' words, "the invoices merely reflect the transfer of ownership of a complete set of Plaintiff's raw photographs for Skechers' 'exclusive use,' subject only to a *contractual* obligation to provide Plaintiff with additional compensation for uses that may have extended beyond the six month usage period." (Reply in Support of Motion for Clarification ("C.Reply") at 16:18-21; 17:20-23.)

Skechers relies primarily on the Ninth Circuit's decision in UMG Recordings Inc. v. Augusto, 628 F.3d 1175 (9th Cir. 2011).  In Augusto, a record company sent out unsolicited promotional CDs to music critics and other industry professionals, but affixed "promotional use only, not for sale" – type language to the discs. Augusto, 628 F.3d at 1177-78.  The defendant somehow acquired several of the promotional CDs and re-sold them.  Id. at 1178.  The record company then brought a copyright action for violation of its exclusive right to distribute the CDs.  Id.  The question presented was whether the record company's mailing served to transfer title to the CDs to the recipients, thus enabling a first sale defense, or whether the "promotional use only" language on the CDs constituted a copyright license rather than a transfer of ownership.  In that context, the court looked to several factors before concluding that no copyright license existed, and that the record company's initial distribution of the CDs effected a sale. Id. at 1179-83.

14

1    The question here, however, is not whether a particular

2    transfer constituted a copyright license or a transfer of

3    ownership, but rather whether a particular breach of a license

4    constituted a copyright violation or a run-of-the-mill breach of

5    contract.  <u>Augusto</u> is, therefore, inapposite.

6    Rather, the situation presented here is controlled by <u>MDY</u>

7    <u>Industries, Inc., LLC, v. Blizzard Entertainment, Inc.</u>  629 F.3d

8    928 (9th Cir. 2011).  As the Ninth Circuit explained in <u>MDY</u>,

9    contractual terms that limit a license's scope are "conditions,"

10   the breach of which constitutes copyright infringement.  <u>MDY</u>, 629

11   F.3d at 939.  All other license terms are covenants, "the breach of

12   which is actionable only under contract law."  <u>Id.</u>  "Wherever

13   possible, equity construes ambiguous contract provisions as

14   covenants rather than conditions."  <u>Id.</u>

15   A breach of a license agreement only gives rise to a copyright

16   claim if the licensee "(1) exceeds the license's scope (2) in a

17   manner that implicates one of the licensor's exclusive statutory

18   rights."  <u>Id.</u> At 940.  As the Federal Circuit has illustrated:

19       [C]onsider a license in which the copyright owner grants
         a person the right to make one and only one copy of a
20       book with the caveat that the licensee may not read the
         last ten pages. Obviously, a licensee who made a hundred
21       copies of the book would be liable for copyright
         infringement because the copying would violate the
22       Copyright Act's prohibition on reproduction and would
         exceed the scope of the license. Alternatively, if the
23       licensee made a single copy of the book, but read the
         last ten pages, the only cause of action would be for
24       breach of contract, because reading a book does not
         violate any right protected by copyright law.
25

26   <u>Storage Tech. Corp. v. Custom Hardware Engineering & Consulting,</u>

27   <u>Inc.</u>, 421 F.3d 1307, 1316 (Fed. Cir. 2005).

28

1    The issue presently before this court is not whether
2  Reinsdorf's licenses constitute copyright licenses or non-copyright
3  contracts, but whether Skechers' conduct violated a condition or a
4  covenant of the agreements between the parties.   The parties appear
5  to agree that Skechers was licensed to use Reinsdorf's photographs
6  for only six months.  (Complaint ¶¶ 5-6; C.Reply at 16.)  Reinsdorf
7  alleges that Skechers copied his photographs beyond the temporal,
8  geographical, and media limitations of the licenses.  (Compl. ¶ 6.)
9  Such unauthorized use would encroach upon Reinsdorf's exclusive
10  right to copy his works, conferred upon him by the Copyright Act,
11  and would therefore violate a condition of the license rather than
12  a covenant.   Thus, the breaches at issue here give rise to a
13  copyright infringement claim.   See Storage Tech., 421 F.3d at 1316
14  ("[U]ses that violate a license agreement constitute copyright
15  infringement only when those uses would infringe in the absence of
16  any license agreement at all.") (internal quotation omitted).

17    D.  Evidentiary Issues

18    Skechers filed Motions in Limine seeking to exclude the
19  testimony of Plaintiff's experts Frank Luntz and Jamie Turner, and
20  raised an evidentiary objection to the Supplemental Report of
21  expert David Connelly.  Under Federal Rule of Evidence 702, an
22  expert witness may offer opinion testimony if 1) that specialized
23  knowledge will aid the trier of fact, 2) the testimony is based on
24  sufficient information, 3) the testimony is the product of reliable
25  methods, and 4) the expert has properly applied those methods to
26  the facts of the particular case.   Fed. R. Evid. 702.

27    1.  Frank Luntz

28

16

1    Plaintiff's expert Dr. Frank Luntz ("Luntz") conducted a
2  survey designed to test 1) whether Reinsdorf's photographs were
3  directly linked to the Skechers brand and 2) whether Reinsdorf's
4  photos influenced consumers' decision to purchase a product.  (Opp.
5  at 5.)  Skechers contends that this survey was fatally flawed, in
6  that it was directed at an unrepresentative population, employed
7  improper stimuli that produced biased responses, and failed to use
8  adequate controls.  (Mot. at 1).

9    Although Dr. Luntz knew that Skechers' customer base is
10 disproportionately female, he surveyed an even number of men and
11 women aged sixteen to twenty-four.  (Decl. of Carol Scott ¶ 9;
12 Luntz Depo. at 119).  Luntz selected that age range because,
13 according to his research, that demographic is the "meat of the
14 athletic wear purchaser."[4]  (Declaration of Jeffrey A. Barker ¶ 5.)
15 Skechers, however, has submitted evidence that it is not an
16 "athletic wear" company, but rather a "fashionable footwear"
17 company that sells products ranging from "active" apparel to
18 "dress[wear]".  Luntz surveyed participants from five geographical
19 regions, but did not compare the distribution of participants to
20 the distribution of Skechers' advertising and sales.  (Luntz
21 Deposition at 113-15.)  Nor did Luntz determine whether the ads
22 used in the survey had actually been displayed in participants'
23 home regions.

24    Luntz attempted to evaluate the link between Reinsdorf's
25 photos and Skechers' brand by showing survey participants an image,
26 then asking the participants to identify the company the image was

27 _____

28    [4]  Luntz did not keep any written records of his demographic research.

17

promoting.  (Luntz Depo., Ex. 511.)  Respondents had the option to
choose between Skechers, Adidas, Converse, Nike, and Reebok.  (Id.)
There was no "I don't know" option.  (Id.)  As described above,
Skechers sells a broad range of products, including dress apparel.
Luntz later acknowledged that all survey options other than
Skechers are principally athletic apparel companies.  (Luntz Depo.
at 172-73.)

   Skechers argues that the survey format produced biased,
unreliable results.  (Barker Dec. ¶ 6.)  For example, at question
10, participants were shown an image of a woman in heavy makeup,
tight, shiny, purple leather pants, a revealing top, and raised-
heel, strapped, polka dot shoes.  (Luntz Depo., Ex. 511).  Survey
respondents were then asked whether the image promoted Adidas,
Converse, Nike, Reebok, or Skechers.  (Luntz Depo., Ex. 511).
Question 11, in contrast, poses the same brand-identification
inquiry with respect to an image of a baseball player on a baseball
field, in uniform and batting helmet, lifting a weighted baseball
bat.  (Id.)  The survey is replete with other examples of Skechers
ads featuring models in leather jackets and jewelry staring
straight into the camera, while all non-Skechers ads feature action
and sports scenes.  (Id.)

   Later in the survey, respondents were again presented with the
same ads they had already seen.  This time, ads from all five
companies were presented to respondents side-by-side.  The survey
asked participants to identify which of the five ads ("disco girl"
with sunglasses, baseball player, gymnast, etc) was a Skechers ad.
(Id.)  Skechers argues that the obvious differences between
Skechers "fashionable" ads and the other companies' athletic-themed

18

1   ads skewed identifications toward Skechers and render the Luntz

2   survey fundamentally deficient.

3       Lastly, Skechers contends that the Luntz survey failed to use

4   adequate controls.  (Mot. at 11-12.)  Survey participants were not

5   shown any ads that did not contain any Reinsdorf images, nor were

6   they shown any unaltered Reinsdorf images.  Instead, respondents

7   were only shown images containing both Reinsdorf's photographs and

8   alterations and enhancements made by Skechers.  Participants were

9   never asked why they associated a particular ad with Skechers.

10  Skechers argues that absent any controls, such as ads containing

11  photos other than Reinsdorf's or Reinsdorf's unaltered photos, the

12  survey provides no basis upon which to conclude that Reinsdorf's

13  photos are the motivating force behind consumers' association of

14  the ads in question with Skechers' brand.

15      Reinsdorf makes virtually no attempt to defend Luntz's

16  methods.  Instead, Reindsdorf contends that Skechers has merely

17  "nitpicked" the Luntz survey, and that any questions regarding the

18  survey's technical reliability is a question of weight to be

19  determined at trial.  (Opp. at 1, 5); see E. & J. Gallo Winery v.

20  Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992).  The first

21  step in the court's analysis of any survey, however, is to

22  determine whether the survey is admissible, relevant, and conducted

23  according to accepted principles.  Clicks Billiards, Inc. v.

24  Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001).  The court

25  must, therefore, determine whether a preponderance of the evidence

26  establishes that the reasoning or methodology underlying expert

27  testimony is scientifically valid.  Daubert v. Merrell Dow Pharms.,

28  Inc., 509 U.S. 579, 593 (1993).  Unless survey evidence is

conducted according to accepted principles, it is not admissible in
the first instance.  Fortune Dynamic, Inc. v. Victoria's Secret
Stores Brand Mgm't, Inc., 618 F.3d 1025, 1036 (9th Cir. 2010).

Here, the preponderance of the evidence indicates that the
Luntz survey was not conducted according to accepted scientific
principles.  Luntz did not identify any basis, save for his own
undocumented research, for selecting the survey population that he
used.  There is no indication that the survey population had any
relationship to the relevant population of Skechers consumers.
Skechers fashion-focused ads were presented alongside obviously
distinctive sportswear ads in closed-ended brand identification
questions with no "I don't know" option.  Furthermore, though the
survey purported to examine the role that Reinsdorf's photos played
in consumers' association of certain ads with Skechers' brand, the
survey did not include any controls or basis for comparison.

These inadequacies speak not merely to the weight that should
be accorded to the survey, but rather to the fundamental
reliability of Luntz's approach.  Reinsdorf does not identify any
scientific principles underlying the Luntz survey, which appears to
violate numerous accepted practices in the field of survey
research.  (Scott Dec. ¶¶ 24-25, 31; Shari S. Diamond, Reference
Guide on Survey Research, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE
373-408 (Fed. Judicial Center 3d ed. 2011).  Accordingly, Skechers'
Motion to Exclude Luntz's testimony and report is GRANTED.[5]

---

[5] The court further notes that Reinsdorf did not comply with
the Magistrate Judge's order regarding the production of raw data
from the Luntz survey.  Though Reinsdorf eventually produced the
data, he did so after the expiration of the deadline set by the
Magistrate Judge and after the filing of the instant motion.
(continued...)

2.   Jamie Turner

A copyright owner is entitled to recover "any profits of [an]
infringer that are attributable to the infringement." 17 U.S.C. §
504(b).  Recoverable profits include an infringer's "indirect
profits," which generally arise when an infringer uses "a
copyrighted work to sell another product." Garcia v. Coleman, No.
C-07-2279 EMC, 2009 WL 799393 at *2-3 (N.D. Cal. Mar. 24, 2009)
(citing Polar Bear Prods. v. Timex Corp., 384 F.3d 700 (9th Cir.
2004)).  Because only those profits "attributable to the
infringement" are recoverable under the Copyright Act, "a causal
link between the infringement and the monetary remedy sought is a
predicate to recovery" of any kind. Polar Bear, 384 F.3d at 708.

It is the plaintiff's burden to establish a non-speculative
causal connection between an infringement and the infringer's
profits. Id. at 708, 711; Mackie v. Rieser, 296 F.3d 909, 914-16
(9th Cir. 2002).  A plaintiff cannot merely present an infringer's
gross revenue, but rather must identify a particular revenue stream
that bears a "legally sufficient relationship" to the infringement.
Polar Bear, 383 F.3d at 711.

Reinsdorf seeks to introduce the testimony of Jamie Turner to
establish the amount of Skechers' profits attributable to Skechers'
use of Reinsdorf's photographs.  Turner summarized his analysis as
follows:

> 1.   [W]e can broadly conclude that more than 0% but
> less than 100% of the net profits generated by
> Skechers during this period can be attributable
> to Mr. Reinsdorf's brand imagery.

---

[5](...continued)
Nevertheless, Skechers does not appear to have been unduly
prejudiced by the late production.

  2. We know there was already some value to Skechers [sic] brand . . . so it is safe to assume that Mr. Reinsdorf's images are worth less than 100% of the net profits . . . .

  3. [W]e know that Mr. Reinsdorf's brand imagery was used around the globe . . . .

  4. We also know that this brand imagery was a foundational element of the marketing program . . . .

  5. [W]e know that the residual value of the brand imagery will continue for approximately five years . . . .

  6. Therefore, based on the above facts and based on my experiences working with brands such as The Coca Cola Company, AT&T and CNN . . ., it is reasonable to conclude that the value that Mr. Reinsdorf's copyrighted brand images contributed to the net profits for the corporation fall somewhere between 50% and 75% of the net profits . . . .

(Turner Report at 14-15.)

  Turner's entire contribution to this dispute essentially amounts to, "I have a lot of experience with brands and marketing, therefore I can divine that 50-75% of this large, successful, company's profits come from Reinsdorf's photographs."  This "analysis" identifies no causal link, let alone a non-speculative connection, between Skechers' alleged infringement and any particular revenue stream.  Turner somehow settles upon an indirect profits figure between $161 million and $241.1 million without any specific data or discernible methodology, and in reliance on such "facts" as "it is safe to assume that Mr. Reinsdorf's images are worth less than 100% of the net profits."[6]  Turner's opinion is not

---

  [6] The court does not consider Turner's newly proffered opinion, submitted as an opposition to Skechers' Motion in Limine. See Fed. R. Civ. P. 37(c)(1).  Even if the court were to consider Turner's declaration, the result here would not change.  The declaration is internally inconsistent, referring at one point to financial reports from 2007 through 2009 and elsewhere to reports spanning from 2008 to 2010, and purports to rely on other late-filed declarations that conflict with Turner's statements and
                     (continued...)

based upon sufficient facts and is not the product of reliable methods.  Because Turner's opinion fails to illustrate a relationship of any kind between infringing conduct and specific income, it cannot serve as a basis for granting Reinsdorf Skechers' indirect profits.  Skechers motion to exclude Turner's testimony is GRANTED. [7]

3.  David Connelly

After the close of discovery, Reinsdorf provided a Supplemental Report by expert David Connelly as an exhibit to Plaintiff's opposition to Skechers' Motion for Summary judgment. Skechers objects to the Connelly Supplemental Report ("Supplmental Report" or "CSR").[8]

Parties bear a duty to supplement expert reports or deposition testimony if the disclosure is somehow incomplete or incorrect. Fed. R. Civ. P. 26(e). "Supplementation . . . means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the

_____

[6](...continued)
conclusions.

[7] Having concluded that Turner's opinion is inadmissible for failure to apply reliable methods and rely upon sufficient information, the court does not address Skecher's contention that Turner is not qualified to present expert testimony.

[8] A party may challenge the admissibility of summary judgment evidence by objection or by a motion to strike.  Pfingston v. Ronan Eng'g Co., 284 F.3d 999, 1003.  Skechers raised an objection to and Motion to Strike the Connelly report (and the supplemental declaration from Jamie Turner, see n.6, supra) all in a single document, filed twenty-one days prior to the noticed hearing date. (Dkt. No. 185.)  Because the court considers Skechers' objection to the Connelly Supplemental Report timely raised, the court does not address whether a Motion to Strike need comply with Central District of California Local Rule 6-1.

23

initial disclosure." <u>Keener v. United States</u>, 181 F.R.D. 639, 640
(D.Mont. 1998).  The duty to supplement "does not give license to
sandbag one's opponent with claims and issues which should have
been included in the expert witness' [original] report." <u>Rojas v.
Mako Zaninovich, Inc.</u>, No. 09-cv-00705 AWI JLT, 2011 WL 4375297 at
*2 (E.D. Cal. Sept. 19, 2011) (citation omitted).

In his Supplemental Report, Connelly states that he initially
did not have access to "sufficiently detailed financial information
to enable an assessment of Skechers [indirect] profits." (CSR at
1.)  Connelly explained at his deposition that he would need
"[a]dditional information concerning the particular product lines
at Skechers" before he could perform an indirect profits analysis.
(Connelly Deposition at 96::1-2.)  Later, after his initial report
and deposition, Connelly received "general ledger type transaction
records," which he then used to perform an indirect profits
analysis in the Supplemental Report.  (CSR at 1.)  The Supplemental
Report ultimately concludes that $33,479,171 of Skechers' profits
are attributable to its infringing uses of Reinsdorf's photos.
(<u>Id.</u> at 10; Ex. B.)

Skechers argues that Connelly's report is a new opinion rather
than a supplement, and that his reliance on the newly available
"general ledger type" data is a mere pretext.  The court agrees.
Connelly initially opined that he could not perform an indirect
profits analysis without specific product line information.  By
Connelly's own admission, however, the "new" evidence, upon which
the Supplemental Report's indirect profits calculation is
ostensibly based, does "not attribute [Skechers'] sales to specific

product lines."[9]  (CSR at 6.)  Indeed, the CSR explains that because "at least 87.4% of the net sales transactions reported in Skechers' transaction records were described only in very general terms, and not attributed to specific products, . . . the recently produced records do not provide sufficient detail concerning Skechers sales . . . ."  (CSR at 7.)  The new general ledger data, therefore, cannot possibly serve as the basis for Connelly's indirect profits analysis.  There is no indication that the other information underlying Connelly's newly formed conclusion was unavailable at the time of Connelly's initial report and deposition.  Skechers' objection to the CSR is therefore sustained, and the CSR is excluded.  Fed. R. Civ. P. 37(c)(1).

Furthermore, even if the CSR had been timely produced, it suffers from serious methodological and factual deficiencies that raise serious questions as to its admissibility and relation to Reinsdorf's indirect profits claim.  Despite the CSR's acknowledgment that the required product-line data is lacking, the CSR goes on to reach an indirect profits figure of over $33 million.  To reach that figure, the CSR begins with the baseless assumption that 100% of sales not attributed to a specific product line (see n.9, supra) were the result of Skechers' infringing uses of Reinsdorf's photos.  (CSR at 8.)  Although it is undisputed that Skechers was authorized to use the photos for at least six months, the CSR makes no attempt to break out sales resulting from

_____

[9] The CSR explains that the general ledger information did include some product-specific data, but only for lines not associated with Resindorf's photos and not at issue in this case. These "fashion and street brand" sales represented only 12.6% of Skechers' reported revenue.  (CSR at 6-7.)

authorized uses.  In addition, that CSR relies upon the fatally flawed Luntz survey, described above, to support the conclusion that Reinsdorf's photos were responsible for Skechers' increasing gross revenues.[10]  (CSR at 3, 11.)  The CSR is not grounded upon reliable methods or data, and does no more than establish a speculative relationship between Skechers' profits and its infringing uses of Reinsdorf's photographs.  Fed. R. E. 702; <u>Polar Bear</u>, 384 F.3d at 7011; <u>Mackie</u>, 296 F.3d at 914-16.

E.    Statutory Damages and Attorney's Fees

Skechers seeks summary judgment on Reinsdorf's claims for statutory damages and attorney's fees due to his failure to register his photographic works within the period contemplated by the Copyright Act.  Plaintiff does not oppose the motion with respect to these issues.  Having reviewed the record, the court GRANTS Skechers' Motion for Summary Judgment with respect to statutory damages and attorney's fees.

**IV.  Conclusion**

Skechers has not demonstrated that the parties intended to be co-authors of the finished marketing images, which are, therefore, not joint works.  Nor has Skechers demonstrated, as a matter of law, the lack of a copyright license agreement or breach of such argument.  Accordingly, Skechers' Motion for Summary Judgment is DENIED in these respects.

The expert opinions of Frank Luntz and Jamie Turner do not satisfy the requirements of Federal Rule of Evidence 702.

---

[10] The CSR's conclusion that Skechers enjoyed above-average sales growth is itself based upon a somewhat suspect comparison to only a narrow subset of Skechers competitors.  (CSR at 8 n.12 (excluding Nike's high growth rate from comparison.))

1   Accordingly, Skechers' Motions in Limine to exclude those opinions

2   are GRANTED.  Skechers' objection to the Supplemental Report of

3   David Connelly is SUSTAINED.

4        Given Plaintiff's failure to adequately demonstrate a causal

5   link between Skechers' profits and its allegedly infringing

6   conduct, Skechers' motion for summary judgment on Plaintiff's

7   indirect profits claim is GRANTED.  Skechers' unopposed motion for

8   summary judgment with respect to statutory damages and attorney's

9   fees is also GRANTED.

10

11

12  IT IS SO ORDERED.

13

14

15  Dated: February 6, 2013

16                                 DEAN D. PREGERSON
                                   United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28