1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   DREW E. BREUDER (S.B. #198466)
    dbreuder@omm.com
3   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
4   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
5   Facsimile:   (310) 246-6779

6   ROBERT C. WELSH (S.B. #130782)
    rwelsh@bakerlaw.com
7   BAKER & HOSTETLER LLP
    12100 Wilshire Boulevard, 15th Floor
8   Los Angeles, CA 90025-7120
    Telephone:  (310) 442-8852
9   Facsimile:   (310) 820-8859

10  Attorneys for Defendants
    Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II
11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14  RICHARD REINSDORF,                  Case No. CV10-7181-DDP (SSx)

15              Plaintiff,              Hon. Dean D. Pregerson

16       v.                            DEFENDANTS SKECHERS U.S.A.,
                                        INC. AND SKECHERS U.S.A., INC. II'S
17  SKECHERS U.S.A., INC.;              MEMORANDUM OF POINTS AND
    SKECHERS U.S.A., INC. II; and       AUTHORITIES IN OPPOSITION TO
18  DOES 1-10,                          PLAINTIFF'S MOTION FOR
                                        RECONSIDERATION OF THE
19              Defendants.             COURT'S AMENDED ORDER RE:
                                        SUMMARY JUDGMENT;
20                                      SUPPLEMENTAL DECLARATIONS
                                        OF JENNIFER CLAY AND JOHN
21                                      DAVID MOODY; AND
                                        DECLARATION OF ROBERT C.
22                                      WELSH IN SUPPORT THEREOF

23                                      Courtroom:    3 (2nd Floor)
24                                      Hearing Date: March 25, 2013
                                        Time:         10:00 a.m.
25
                                        Pretrial Conference:  May 6, 2013
26                                      Trial Date:           May 14, 2013

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    INTRODUCTION ................................................................................ 1

II.   LEGAL STANDARD ........................................................................ 5

III.  SKECHERS HAS ACCURATELY REPRESENTED THE ABSENCE OF ANY FORMAL MARKETING PLANS OR DOCUMENTS ANALYZING THE EFFECTIVENESS OF ITS MARKETING EFFORTS. ............................................................. 6

    A.    Skechers Produced All Documents Responsive to Plaintiff's Document Requests ............................................................. 6

    B.    Financial and Sales Information. ......................................... 8

    C.    Marketing Plans. ............................................................. 11

IV.  UNCONTROVERTED EVIDENCE SHOWS THAT SKECHERS HAS NOT WITHHELD ANY RESPONSIVE DOCUMENTS. ............... 14

    A.    The 2011 PowerPoint Is Not a "New Fact" and Is Not Material. ..... 14

    B.    Plaintiff Has Known About the 2011 PowerPoint Since At Least February 2012 ..................................................... 17

V.   SKECHERS DID NOT FAIL TO DISCLOSE DOCUMENTS REFERENCED IN ITS INITIAL DISCLOSURES. ................................. 19

VI.  PLAINTIFF'S UNSUBSTANTIATED ASSERTION THAT SKECHERS HAS SPOLIATED EVIDENCE IS COMPLETELY FALSE AND MADE IN BAD FAITH. ...................................................... 20

VII.  DENIAL OF PLAINTIFF'S RECONSIDERATION MOTION WOULD NOT RESULT IN "MANIFEST INJUSTICE," AND PLAINTIFF IS NOT ENTITLED TO RELIEF UNDER RULE 60(B). ..... 22

VIII. CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allflex U.S.A., Inc. v. Avid Identification Sys., Inc.*,
No. EDCV-06-1109-SGL, 2009 WL 8591843 (C.D. Cal. Oct. 30,
2009) ...............................................................................................................20

*Anderson v. Cryovac, Inc.*,
862 F.2d 910 (1st Cir. 1988) ...........................................................................23

*BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*,
No. 09-00181 DAE-KSC, 2011 WL 1230144 (D. Haw. Mar. 28,
2011) ...............................................................................................................23

*Cummings v. Gen. Motors Corp.*,
365 F.3d 944 (10th Cir. 2004), *abrogated on other grounds by
Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394
(2006)...............................................................................19, 23, 24, 25

*Fay Corp. v. BAT Holdings I, Inc.*,
651 F. Supp. 307 (W.D. Wash. 1987) ........................................................5, 17

*Feature Realty, Inc. v. City of Spokane*,
331 F.3d 1082 (9th Cir. 2003) .....................................................................5, 17

*Hudson v. Moore Bus. Forms*,
836 F.2d 1156 (9th Cir. 1987) ...........................................................................4

*In re Air Crash Disaster*,
86 F.3d 498 (6th Cir. 1996) .............................................................................19

*In re Novellus Sys., Inc. Deriv. Litig.*,
No. C06-03514 RMW (HRL), 2007 WL 46076 (N.D. Cal. Jan. 5,
2007) ...............................................................................................................19

*Jumbo Bright Trading Ltd. v. Gap, Inc.*,
No. CV 12-8932 DDP (MANx), 2013 WL 149660 (C.D. Cal.
Jan. 14, 2013)....................................................................................................5

*Kona Enters., Inc. v. Estate of Bishop*,
229 F.3d 877 (9th Cir. 2000) .............................................................................5

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
740 F.2d 718 (9th Cir. 1984) .............................................................................4

*Mackie v. Rieser*,
296 F.3d 909 (9th Cir. 2002) ...........................................................................19

*Nat'l Ass'n of Radiation Survivors v. Turnage,*
115 F.R.D. 543 (N.D. Cal. 1987) ...................................................23

*Polar Bear Prods. v. Timex Corp.,*
384 F.3d 700 (9th Cir. 2004) ........................................................19

*Rozier v. Ford Motor Co.,*
573 F.2d 1332 (5th Cir. 1978) .......................................................23

*Welch v. Centex Home Equity Co.,*
224 F.R.D. 490 (D. Kan. 2004) .................................................24, 25

*Wingnut Films, Ltd. v. Katja Motion Pictures Corp.,*
No. CV 05-1516-RSWL SHX, 2007 WL 2758571 (C.D. Cal.
Sept. 18, 2007)...........................................................................23

## STATUTES

28 U.S.C. § 1927.............................................................................4

## OTHER AUTHORITIES

Schwarzer, Tashima, et al., *California Practice Guide: Federal Civil
Procedure Before Trial* (2011) § 12:158.1 ..........................................5

## RULES

C.D. Cal. L.R. 7-18.....................................................................5, 21

Fed. R. Civ. P. 11(c)(3)...................................................................4

Fed. R. Civ. P. 26 Advisory Committee's Note (2000 am.) ..............18, 19

Fed. R. Civ. P. 26(a)(1)(A)(ii) ........................................................18

Fed. R. Civ. P. 60(b)..................................................................23, 24

Fed. R. Civ. P. 60(b)(3) ................................................................23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Once again, Plaintiff asks the Court to blame Skechers for his own repeated failures to diligently prosecute his case during the almost two-year discovery period.  Despite multiple motions encompassing 150 pages of briefing and two lengthy hearings, Plaintiff seeks reconsideration of the Court's order granting summary judgment on his $33 million indirect profits claim ("Amended Order," Dkt. No. 225) under the pretense that Skechers has misrepresented the existence of key documents and spoliated evidence.  As demonstrated below, there are no "new facts" and no "new documents" here that warrant reconsideration, and no "manifest injustice" will result if the Court's Amended Order stands.  Plaintiff only has himself to blame for the fact that he is little more than two months from trial and finds himself without the necessary evidence or expert testimony to prevail on his claims.

This time, however, Plaintiff has gone well beyond the bounds of legitimate argument.  Plaintiff and his counsel have represented to the Court that Skechers has withheld documents—a statement that *they know to be false*.  This is not the first time Plaintiff has advanced this argument.  At its core, Plaintiff's motion for reconsideration ("MRR," Dkt. No. 229) simply repeats many of the same baseless contentions originally presented in his withdrawn Motion *in Limine* Re Profits Relating to Indirect Profits ("MIL," Dkt. No. 218.)  Skechers filed an opposition to the MIL, including sworn declarations from Skechers' employees, demonstrating the falsity of each of Plaintiff's contentions.  (Dkt. No. 222.)  Incredibly, and in complete bad faith, Plaintiff not only ignores the evidence set forth in Skechers' opposition to the MIL, he simply repeats the same demonstrably false arguments— thereby necessitating yet another round of needless motion practice.  Even worse, Plaintiff now claims—on the basis of no evidence whatsoever—that Skechers has

intentionally destroyed evidence.  Yet, the very documents which Plaintiff alleges

Skechers has destroyed were produced to him in discovery.

*First*, Plaintiff's contention that Skechers failed to fully respond to

Plaintiff's discovery requests and misrepresented the existence of key documents

is meritless.  As discussed fully in Skechers' opposition to Plaintiff's MIL and

repeated below, Skechers provided timely written objections and responses to each

of Plaintiff's requests, and produced thousands of pages of responsive documents.

Plaintiff had ample opportunity during discovery to test the adequacy of Skechers'

responses *but never did so*.  It is undisputed that during the entire discovery period,

Plaintiff only filed one motion to compel in January 2012.  (Dkt. No. 44.)  That

motion was denied without prejudice by Magistrate Judge Segal for failure to

properly meet and confer.  (Dkt. No. 51.)  Plaintiff neither renewed that motion nor

brought any other motion seeking further discovery from Skechers prior to the

close of discovery in May 2012.  There is simply no legitimate basis— and

Plaintiff provides none— that would justify entitlement to relief from Plaintiff's

own discovery failures and omissions.

*Second*, Plaintiff's contention that Skechers wrongfully withheld a 2011

PowerPoint document (the "2011 PowerPoint") cannot withstand scrutiny.  In its

opposition to Plaintiff's MIL, Skechers submitted declarations from the individuals

who created and administered the policies and systems referenced in the 2011

PowerPoint.[1]  These declarations established that the 2011 PowerPoint has

absolutely nothing to do with any issue in this case because (1) it did not refer to

materials that used Plaintiff's photographs, and (2) the information referenced in

the document would not allow Skechers or anyone else to assess the effectiveness

of any of Skechers' marketing campaigns.  Additionally, Skechers demonstrated

---

[1] For the Court's convenience, Skechers has resubmitted the February 4, 2013 declarations of Jennifer Clay and John David Moody as supplemental declarations filed with these opposition papers.

that even though not responsive to any of Plaintiff's discovery, Plaintiff's contention that the 2011 PowerPoint document "ha[d] been recently discovered" was demonstrably false. In truth, Plaintiff knew about and had access to the document during discovery. Indeed, based on the two additional documents Plaintiff filed under seal with the MRR, it appears that Plaintiff learned about the file site (the "Media Share website") containing the 2011 PowerPoint from documents provided by Skechers in February 2012—roughly three months before the close of discovery and more than one year ago.

*Third*, Plaintiff's contention that Skechers has intentionally destroyed and "spoliated" documents is equally fallacious. As demonstrated by the Supplemental Declaration of John David Moody, the fact that Plaintiff cannot access from Skechers' Media Share website files containing old marketing images that Skechers utilized in 2007 and 2008 is not because Skechers destroyed documents following notice of Plaintiff's claims. To the contrary, and consistent with the many thousands of pages of documents Skechers has produced in this case, Skechers had a regular business policy of replacing old marketing images with new images at roughly six-month intervals. Mr. Moody routinely removed the Media Share files containing old marketing images once he was provided with the new set of approved images so that Skechers' foreign distributors only had access to the current approved images. As a result, the files that Plaintiff belatedly complains about were all removed years *before* Skechers received notice of Plaintiff's claims in 2010. Additionally, as Plaintiff should know if he bothered to review Skechers' production, Skechers produced hundreds of pages of material from its files showing the identical marketing images containing Plaintiff's photographs that were provided to Skechers' foreign distributors—*including the very same marketing images Plaintiff erroneously claims were spoliated.* Plaintiff's counsel never mentioned in the meet and confer that Plaintiff would be making a spoliation claim. (Welsh Decl. ¶ 18.) Instead, consistent with Plaintiff's

all-to-familiar "shoot first, aim later" style of litigation, Plaintiff makes these very serious accusations without ever bothering to determine whether Skechers produced the allegedly "spoliated" documents.

It is clear that Plaintiff cannot prevail on his MRR. It is also clear that prevailing on this motion is not Plaintiff's chief objective. Instead, the MRR, like the earlier MIL,[2] appears to be part of Plaintiff's continued attempt to embroil Skechers in needless motion practice, thereby forcing Skechers to spend its time and resources defending against these baseless motions rather than preparing for trial. Enough is enough. Skechers respectfully requests that in addition to denying Plaintiff's motion, the Court make such additional orders as it deems necessary to stop Plaintiff's vexatious proliferation of baseless motion practice.[3]

---

[2] Plaintiff's original MIL sought, among other things, to prevent Skechers from "arguing or contending" that Connelly's Supplemental Report ("CSR") was "deficient" or that Plaintiff "did not meet his burden of proof in showing a causal nexus between the infringement and Skechers' gross revenue." *See* Dkt. No. 218 (Notice of Ex Parte Motion at 1). During the parties' meet and confer, Skechers pointed out that the admissibility of the CSR was already pending before the Court in connection with Skechers' Motion for Clarification, and that Plaintiff's MIL would necessarily become moot if the Court ruled favorably on Skechers' Fed. R. Civ. P. 37(e) objections to the CSR and/or motion for summary judgment regarding Plaintiff's claim for indirect profits. Plaintiff refused to wait for the Court's ruling. As a result, Skechers was forced to expend substantial time and expense reviewing multiple hearing transcripts, correspondence and deposition transcripts, as well as obtaining declarations from Skechers' employees, in order to demonstrate the falsity of Plaintiff's arguments. Two days after Skechers' filed its opposition papers to the MIL (Dkt. No. 222), the Court issued its Amended Order (Dkt. No. 225). Two days later, Plaintiff withdrew his MIL (Dkt. No. 226).

[3] *See, e.g.*, 28 U.S.C. § 1927 (authorizing court to require counsel who "so multiplies the proceedings in any case unreasonably and vexatiously…to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct"); *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 727 (9th Cir. 1984) (sanctioning party under 28 U.S.C. § 1927 for unreasonably and vexatiously repeating the same allegations without regard to the responses already filed by opposing counsel); Fed. R. Civ. P. 11(c)(3) ("On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)" (emphasis added)); *Hudson v. Moore Bus. Forms*, 836 F.2d 1156, 1162-63 (9th Cir. 1987) (district court dismissed counterclaim as frivolous and, on its own motion, imposed monetary sanction against counsel).

## II.     LEGAL STANDARD

Reconsideration is an "extraordinary remedy, to be used sparingly." *Jumbo Bright Trading Ltd. v. Gap., Inc.*, No. CV 12-8932 DDP (MANx), 2013 WL 149660, at *1 (C.D. Cal. Jan. 14, 2013) (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)).  As such, motions for reconsideration are generally unwelcome. *Id.* (quoting Schwarzer, Tashima, et al., *California Practice Guide: Federal Civil Procedure Before Trial* (2011) § 12:158.1, at 12-60.)  Under the Central District's Local Rules, motions for reconsideration are only allowed in the following narrow circumstances:

> (a) a material difference in fact or law from that presented to the
> Court before such decision that in the exercise of reasonable diligence
> could not have been known to the party moving for reconsideration at
> the time of such decision, or (b) the emergence of new material facts
> or a change of law occurring after the time of such decision, or (c) a
> manifest showing of a failure to consider material facts presented to
> the Court before such decision.

C.D. Cal. L.R. 7-18.  In addition, "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." *Id.*

Where a party seeks reconsideration on the basis of the discovery of new or material facts, as Plaintiff does here, courts are clear that "[m]otions for reconsideration . . . are not justified on the basis of new evidence which could have been discovered prior to the Court's ruling [on summary judgment]." *Fay Corp. v. BAT Holdings I, Inc.*, 651 F. Supp. 307, 309 (W.D. Wash. 1987) (collecting cases). Nor is evidence that was in possession of the party before the court ruled on summary judgment "newly discovered" for the purposes of reconsideration. *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003). Moreover, evidence in possession of prior counsel but not made known to new

counsel is not "newly discovered" evidence sufficient to warrant reconsideration, since such evidence is properly attributable to the party himself. *Id.*

Here, Plaintiff claims that reconsideration is warranted because of the following alleged "new facts": (i) Skechers "misrepresented the existence of documents crucial to Reinsdorf's indirect profits claim;" (ii) Skechers failed to provide documents referenced in its Initial Disclosures; and (iii) Skechers "engaged in spoliation of evidence." (MRR at 4:7-19.) As demonstrated below, Plaintiff's allegations are all demonstrably false and no basis exists for reconsideration .

## III. SKECHERS HAS ACCURATELY REPRESENTED THE ABSENCE OF ANY FORMAL MARKETING PLANS OR DOCUMENTS ANALYZING THE EFFECTIVENESS OF ITS MARKETING EFFORTS.

### A. Skechers Produced All Documents Responsive to Plaintiff's Document Requests.

Plaintiff's motion is predicated on the fallacy that "[f]rom the outset of this case, Reinsdorf sought the discovery and information from Skechers that would allow him to build his case for indirect profits." (MRR at 4:26-28.) What the underlying record really shows is that Plaintiff made a calculated choice to focus his discovery efforts on obtaining what he hoped would be *analyses conducted by Skechers* on the effectiveness of its advertising and marketing activities, and thereby avoid incurring the cost and expense of having his own expert conduct an analysis.

This is best demonstrated by the manner in which Plaintiff framed the specific document requests and deposition topics referenced in the MRR:

- Documents reflecting sales of products *attributable to Skechers' marketing efforts* that used Reinsdorf's images (RFP No. 179);
- Documents *reflecting the impact* of Skechers' marketing efforts that used Reinsdorf's images had on the sale of products (RFP No. 180);

- Documents *reflecting the impact* of the infringing photos on sales of specific product lines (Cali, Men's USA, Women's USA, Men's Active, Women's Active, Men's Sport, Women's Sport, Shape Ups) (RFP Nos. 182-189); and

- Testimony concerning revenues and profits *attributable to Skechers' marketing campaigns* for the relevant time period (Fed. R. Civ. P. 30(b)(6) Deposition Notice, Topic No. 13).

Plainly, this discovery does not seek basic facts or information; rather it seeks *analyses* assessing whether the marketing images containing Plaintiff's photographs were responsible for particular sales. In other words, Plaintiff sought to compel Skechers to produce the very analysis that Plaintiff's expert, David Connelly, was supposedly retained to conduct.

Even after repeatedly being advised that Skechers had not conducted and did not have these types of analyses, Plaintiff simply asserted (as he continues to do now) that such documents must exist.[4] The one thing Plaintiff never bothered to do, however, was propound appropriate discovery requests seeking the basic, underlying facts and information his own expert requested to conduct an indirect profits analysis. For example, Plaintiff never requested that Skechers identify the specific shoe styles and product lines featured in the marketing images. Similarly, Plaintiff never requested yearly sales data for any specific product lines identified by Skechers, even though his expert, David Connelly, identified such documents as necessary for his analysis.[5] Even Plaintiff now acknowledges that "potential missteps [] may have occurred" during discovery, and that Plaintiff never filed

---

[4] *See* MRR at 13:5-9 ("Basic business acumen suggests that a company as large as Skechers . . . would be expected to maintain records that track the effectiveness of its various marketing initiatives and advertising.").

[5] *See* Dkt. No. 180 (Errata Supp. Connelly Rep.) at 2 n.2. Plaintiff claims that "implicit in Skechers' [discovery] response was that Skechers had no documents regarding sales of specific product lines for the relevant time period." (MRR at 10:21-23.) But Skechers never represented that it had no such documents, and Plaintiff never asked it this question.

"whatever motion to compel [that was] needed to be filed…[to] gather the information that needs to be gathered…."  (Welsh Decl., Ex. I (12/3/12 Tr.) at 60:4-61:21.)

Indeed, Plaintiff's discovery shortcomings were confirmed by Connelly's deposition testimony, which was taken one day before the May 15, 2012 discovery cutoff.  Specifically, Connelly admitted that he had yet to receive any of the data he believed was necessary for conducting an indirect profits analysis:

> Q:  Let me rephrase my question.  You have not seen
>
> sufficient data for you to make a determination of any
>
> indirect profits attributable specifically to the use of Mr.
>
> Reinsdorf's images, correct?
>
> A:  As of today.
>
> Q:  As of today, yes.
>
> A:  Correct.

(*Id*., Ex. K (5/14/12 Connelly Dep.) at 92:22-93:3.)  In short, Plaintiff's failure to prosecute his case—not Skechers' purported withholding of documents—explains why he lacks the information his own expert said he needed to conduct an analysis that would satisfy the "causal nexus" requirement.[6]

## B.    Financial and Sales Information.

In his motion, Plaintiff claims that Skechers refused to provide various "financial and sales" documents and testimony supposedly needed to prove his indirect profits claim.  (MRR at 4:23-5:23.)  However, for each of the discovery

---

[6] To be clear, Skechers maintains that even if Connelly had been provided the basic information he claims he needed, he would not have been able to produce a reliable analysis establishing the requisite "causal nexus" between Skechers' purportedly infringing use of marketing images containing Plaintiff's photographs and any increases in Skechers' sales or profits.  *See* Dkt. No. 128-2 (Expert Report of D. Hanssens) at ¶¶ 11-14; Dkt. No. 183-3 (Supp. Report of D. Hanssens) at ¶ 10 (explaining all the additional information that would be required to conduct a proper econometric analysis assessing whether the marketing images containing Plaintiff's photographs—distinct from all of Skechers' other advertising and marketing campaigns—had any positive impact on sales).

1    requests Plaintiff identified, Skechers produced responsive documents, indicated
2    that it had no responsive documents, or made witnesses available to testify.
3    Plaintiff accepted the written responses, documents and testimony provided by
4    Skechers, and *never sought relief from the Court concerning any of these*
5    *particular discovery requests*.

6        For example, Request No. 158 sought documents "sufficient to evidence
7    YOUR revenues and profits from 2006 until the present." Skechers responded by
8    indicating that it had already produced its annual reports, which reflect the
9    company's overall revenues and profits during the years in question. Plaintiff
10   never raised any further issues with Skechers' response, and never moved to
11   compel further documents in response to this request. (Welsh Decl. ¶ 10, Ex. L
12   (1/6/12 letter to H. Self) at 3-4.)

13       In addition, Plaintiff sought documents (Request No. 171) and testimony
14   (Topic No. 14) concerning Skechers' "deductible expenses and/or elements of
15   profit…that YOU contend are attributable to factors other than YOUR alleged
16   infringements of photographs taken by Reinsdorf." (*Id*., Ex. O (4/30/12
17   Objections) & Ex. N (3/21/12 Objections).) As explained in its written objections
18   and to the Court, Skechers believed that "all of [its] 'elements of profit' and
19   expenses are attributable to factors other than" its alleged infringement:

20           [Request No. 171 and Topic No. 14] basically say
21           "Produce all evidence of any profit or any costs that are
22           not attributable to these ads." Your Honor, it's
23           tantamount to requiring the company to produce its entire
24           general ledger because, as [Skechers' C.O.O. and C.F.O.]
25           Mr. Weinberg would testify, Skechers doesn't attribute
26           any particular sales to any particular advertising
27           campaign. It wouldn't know how to do that. It doesn't
28           track data in such a way that would allow it to do it. It

looks at its advertising as a whole.  It --this is a company

that sells 3,000 different styles of shoes every year.  They

have multiple different lines and brands.

(*Id*., Ex. H (5/8/12 Tr.) at 19:10-20:5.)  Ultimately, however, Skechers produced a

version of its general ledger that recorded sales and expense data for the relevant

period.  As Plaintiff well knows, and contrary to what he told the Court in the

MRR, Skechers produced the general ledger data on May 15, 2012, which was six

days *before* it filed its Motion for Summary Judgment, not four days after.  (*See id*.

¶ 16; MRR at 6 n.3 (claiming that Skechers produced its general ledger "four days

after [it] filed its motion for summary judgment").)

Skechers also made its apex witness, chief operating officer and chief

financial officer David Weinberg, available for deposition concerning these subject

matters, even though Skechers' motion for protective order was pending before the

Court.[7]  Incredibly, Plaintiff spent less than *one hour* deposing Mr. Weinberg and

asked only three questions bearing on indirect profits:

Q:  Do you believe it's possible to analyze which of

Skechers' marketing campaigns or efforts result in any

particular sales or at least--at least quantities of revenue?

A:  On a quantitative basis, no.

*****

Q:  Do you believe that [it] would or would not be

possible to somehow measure the impact that Skechers'

marketing efforts have had on the sales of particular

---

[7] Again, Plaintiff falsely suggests to the Court he was prevented from asking Mr. Weinberg any questions about Topic No. 14 because the Magistrate Judge Segal ultimately granted Skechers' motion for protective order.  However, the Court only granted Skechers' motion *after* Mr. Weinberg was deposed.  (*See* Dkt. No. 109 at 9 (Court grants protective order because "no witness could competently testify on" Topic Nos. 13 and 14).)  Plaintiff thus had free reign to ask Mr. Weinberg whatever questions he wanted concerning these subject matters, but chose not to do so.

product lines…?

A: I'm not sure. I think it depends on the premises you start with and what you think you're looking for.

Q: So my question is…whether Skechers internally could or does measure the impact that those…particular campaigns have on their…respective product lines?

A: That's no.

(Welsh Decl., Ex. J (5/8/12 D. Weinberg Dep.) at 30:5-10, 33:24-35:1.) Plaintiff never asked any follow-up questions, never showed Mr. Weinberg any documents or other material challenging the accuracy of his testimony, and never moved to compel on Topic No. 14 or Request No. 171.

## C. Marketing Plans.

Plaintiff also claims that Skechers withheld or misrepresented the existence of various "marketing" documents allegedly required for his indirect profits claim. (MRR at 8:23-9:6.) During discovery, Plaintiff sought:

- "All DOCUMENTS that constitute, evidence, reflect, describe, relate or refer to YOUR Marketing Plan for 2006, 2007, 2008, 2009 and 2010." (Request No. 145); and

- Copies of agreements between Skechers and its domestic and foreign retailers and distributors "that relate or refer to Skechers' marketing plans and/or advertisements." (Request Nos. 149-152.)

Skechers objected to these Requests on various grounds, including that they were overbroad and unduly burdensome, and offered to meet and confer. (Welsh Decl., Ex. M (9/12/11 Objections).) Unable to resolve their differences during the parties' meet and confer, Plaintiff moved to compel on these and other requests. (Dkt. No. 44.) At the hearing, Magistrate Judge Segal repeatedly questioned why Plaintiff needed "such broad discovery" (Request No. 145) and agreed that Skechers' offer to produce "documents relating to Skechers' marketing efforts that

pertain to any of the images…at issue in th[e] lawsuit" was "sufficient." (Welsh Decl. at Ex. E (1/26/12 Tr.) at 4:23-5:2, 6:15-7:15.)  Magistrate Segal also expressed doubts about the relevance and scope of Request Nos. 149-152.  (*Id.* at 13:5-14 (Court: "Yes, I guess I don't see the relevance of [Request Nos. 149-152], either….I mean, it's just too broad.").)  The Court later denied Plaintiff's motion for failure to comply with Local Rule 37, and ordered the parties to meet and confer in-person.  (Dkt. No. 51.)  Notably, Plaintiff never again moved to compel on these or any of the other nearly 200 document demands he propounded on Skechers in this case.  (Welsh Decl. ¶¶ 10-11.)

On January 31, 2012, the parties met and conferred in-person concerning their outstanding discovery disputes.  At the meeting, Plaintiff again demanded that Skechers produce all documents responsive to Request Nos. 145 and 149-152 as written, and refused to narrow the scope of the requests.  Skechers again advised that it did not have "formal marketing plans," but that it would be producing "the documents that will show the Skechers…marketing activities[] with regard to any and all photographs…that were shot by" Reinsdorf.  (*Id.*, Ex. F (1/31/12 Tr.) at 8:21-10:4, 14:18-15:11.)  Skechers also made clear that Plaintiff would have to seek further relief from the Court if he continued to seek broader categories of documents:

> I think there's a fundamental disconnect here, which is
> that what we have agreed to produce, pending entry of
> the protective order, are documents showing how the
> images at issue were marketed.  Okay?  This [Request
> No. 145], as I read it -- we have told you we don't have a
> formal marketing plan.  You have since told us today you
> view "marketing plan" as being broader, anything
> reflecting or relating [to] that marketing plan.  *As I read*
> *that, that calls for every single piece of paper in the*

1    *marketing department of Skechers.  Now, if you guys are*

2    *seeking that level of granularity, then I think it needs to*

3    *be teed up with the Magistrate or the Court in some*

4    *fashion because we've agreed to produce marketing*

5    *documents relating to the ads.*  You guys seem to want

6    any piece of paper that deals on a broader level with

7    Skechers' marketing, which I just don't see the relevance

8    [of].

9    (*Id.*, Ex. F at 19:11-20:4 (emphasis added).)  Shortly thereafter, Skechers produced

10   more than 2,400 pages of "usage" documents evidencing how, when, and where

11   the marketing images were utilized by the company.  Plaintiff never complained or

12   sought further relief with respect to Request No. 145.  (*Id.* ¶¶ 10-11.)

13          Plaintiff also declined to further pursue Request Nos. 149-152 until more

14   than a month later, when he re-raised the subject during a March 1, 2012 informal

15   discovery conference with Magistrate Judge Segal.  During that conference,

16   Magistrate Segal suggested—in order to resolve the parties' impasse—that

17   Skechers provide Plaintiff with a representative exemplar of one of the company's

18   distributor agreements so that he could review the document.  (*Id.*, Ex. G (3/1/12

19   Tr.) at 16:1-17:10.)  Consistent with Magistrate Judge Segal's recommendation,

20   Skechers produced a redacted exemplar of one of its foreign distribution

21   agreements on March 27, 2012.  (*Id.* ¶ 12.)  The exemplar distribution agreement

22   confirmed Skechers' representations to the Court.  That document makes no

23   reference to marketing plans by *Skechers*, but instead refers only to the preparation

24   of marketing plans *by the foreign distributor*.  (*See* Dkt. No. 220 (Ruga Decl. ¶ 8,

25   Ex. 7 at p. 8 (quoting Article 9 of the agreement)).)  Additionally, this provision

26   clearly states that "SKECHERS shall not be responsible for and *shall not*

27   *prescribe* any business plan for DISTRIBUTOR."  (*Id.* (emphasis added).)  In

28   short, the terms of Skechers' distribution agreement simply confirm these

agreements do not "refer or relate to any Skechers' marketing plans" and therefore were not responsive to Plaintiff's document request.

Following his receipt of the exemplar distribution agreement, Plaintiff could have propounded additional discovery requesting the marketing plans prepared by Skechers' foreign distributors had he thought it important. Plaintiff never did so. (Welsh Decl. ¶ 12.) Nor did Plaintiff ever contend that marketing plans by Skechers' foreign distributors were encompassed by his original request.

## IV. UNCONTROVERTED EVIDENCE SHOWS THAT SKECHERS HAS NOT WITHHELD ANY RESPONSIVE DOCUMENTS.

### A. The 2011 PowerPoint Is Not a "New Fact" and Is Not Material.

The record clearly demonstrates that Skechers did not misrepresent the existence of relevant documents and fully responded to the discovery served by Plaintiff. Unable to refute these facts, Plaintiff simply repeats his argument from the MIL that he has "recently discovered" evidence showing that Skechers does possess formal marketing plans and/or documents analyzing the effectiveness of Skechers' various advertising and marketing campaigns. The entirety of Plaintiff's evidence is a 2011 PowerPoint entitled, "*International Advertising & Marketing Systems & Procedures.*" As Plaintiff knows, but studiously avoided telling the Court,[8] in opposition to the MIL Skechers submitted sworn declarations from the persons who drafted the 2011 PowerPoint and supervised the systems and procedures referenced in the document. *See* Dkt. Nos. 222-1, 222-4. These declarations make clear that the 2011 PowerPoint contains no information remotely relevant to this case or responsive to Plaintiff's document requests.

As Skechers has explained, the 2011 PowerPoint discusses various corporate systems and procedures in effect as of 2011 that were applicable to Skechers'

---

[8] Tellingly, Plaintiff's MRR completely ignores the prior facts set forth in the February 4, 2013 declarations of Ms. Clay and Mr. Moody explaining what the 2011 PowerPoint is and why it is not relevant to this case.

international subsidiaries.  (Supp. Clay Decl. ¶ 4.)  Skechers' international subsidiaries are wholesalers; they sell Skechers footwear and related products (collectively "footwear") to foreign wholesale accounts.  These subsidiaries do not sell Skechers footwear directly to consumers.  (*Id*. ¶ 8.)  Nonetheless, Skechers' foreign subsidiaries will engage in advertising to promote the sales of Skechers footwear by its wholesale customers.  The 2011 PowerPoint simply sets forth the systems and procedures that Skechers' international subsidiaries were requested to follow regarding their use of Skechers advertisements or marketing materials, as well as other placements that feature Skechers footwear.  (*Id*.)

Plaintiff insists the information that Skechers requested its international subsidiaries to provide would include data analyzing the effectiveness of Skechers' advertising and marketing campaigns.  *This is completely untrue*.  As demonstrated by the very pages highlighted by Plaintiff, the information provided by Skechers' international subsidiaries pursuant to these systems and procedures would not allow Skechers (or anyone else) to reach any conclusions about the "effectiveness" of Skechers' advertising in generating specific sales.  (*Id*. ¶ 12.)

*Pages 25–26.*  These pages discuss some of the steps international subsidiaries were requested to follow if they wished to make changes to the footwear featured in Skechers print advertisements and marketing materials.  Page 25 states that "For all print ad selection with shoe changes, the country contact must submit a request to JD [Moody] in which they provide Requested Shoe Sku Styles and Colors and the pairs *ordered* for each style."  Page 26 simply provides an exemplar of how the information referenced on Page 25 should be presented to Skechers as part of the review and approval process.  (*Id*. ¶ 11.)

In the context of the international subsidiary's wholesale business, the reference to "pairs ordered for each style" refers to the number of pairs of shoes that the subsidiary *had already sold* to its wholesale customers.  (*Id*. ¶ 12.)  Skechers requested this information in order to make an assessment whether the

volume of the subsidiary's existing wholesale sales warrants modification of Skechers print ads. For example, if a subsidiary wished to change the footwear style in a particular advertisement from a work boot to a sandal, Skechers requested the subsidiary to indicate the number of sandals it has already sold to its wholesale accounts. This information cannot be used to evaluate the effectiveness of any modified advertisements or marketing images, as Plaintiff imagines, since the order information provided by the subsidiary reflected orders that were placed *before* any advertisements had appeared, not after. (*Id.*)

***Pages 31-32.*** If possible, the information referenced on these pages is even more irrelevant to Plaintiff's indirect profits claims as it does not even concern the use of Skechers' own advertising or marketing materials. As is clearly indicated, these pages set forth the systems and procedures applicable to a subsidiary's use of so-called "advertorials." To be clear, an advertorial is not a Skechers advertisement. Rather, an advertorial is a separate feature that appears in many fashion magazines in which the magazine agrees to highlight particular products. (*Id.* ¶ 13.) As an example, if the prevailing trend for a particular season featured boots with fur tops, Skechers' international subsidiaries might decide to work with a magazine to develop an advertorial featuring Skechers boots with fur tops. Such advertorials would typically feature pictures of the selected Skechers footwear along with editorial copy provided by the magazine. (*Id.*)

Advertorials are also different from advertisements because the information that would normally appear in Skechers advertisements or marketing images, such as the prominent use of the Skechers logo and placement of Skechers' well-known trademarks, do not typically appear in advertorials. (*Id.* ¶ 14.) As a result, Skechers is concerned that an advertorial may not be as "effective" as an advertisement in clearly identifying the source of the featured footwear. Thus, Skechers requested its international subsidiaries to provide the magazine with contact information so that consumers would be able to contact Skechers about the

products featured in the advertorial.  (*Id.*)  But this contact information has no bearing on the ability to assess the "effectiveness" of the advertorial in boosting sales of the featured products.  Indeed, all information relating to the use of advertorials by Skechers' international subsidiaries is irrelevant to this case because it does not appear that Plaintiff's photographs were ever used in advertorials.  (*Id.* ¶ 13 ("To my knowledge and belief, such advertorials did not contain any marketing images featuring photographs taken by Mr. Reinsdorf.").)

In short, far from calling Skechers' representations into question, the 2011 PowerPoint only confirms that Skechers did not gather data from its international subsidiaries that would allow it to undertake the types of analyses called for by Plaintiff's document requests.[9]

## B. Plaintiff Has Known About the 2011 PowerPoint Since At Least February 2012.

It is also clear that Plaintiff's alleged "new facts" are anything but new, as Plaintiff was acutely aware of the 2011 PowerPoint during discovery.  At the April 30, 2012 deposition of Skechers' International Marketing Manager, John David ("JD") Moody, Plaintiff specifically questioned Mr. Moody about a Skechers website (http://share.skechers.com/media, "the Media Share website") that contained a copy of the 2011 PowerPoint, and marked as an exhibit an index of FTP files located on the Media Share website which included the 2011 PowerPoint.  (Supp. Moody Decl. ¶¶ 5, 7.)  Mr. Moody, who is the author of the 2011 PowerPoint, posted the document on the Media Share website in mid-January 2011.  (*Id.* ¶¶ 3-4.)  The 2011 PowerPoint was thus fully accessible to Plaintiff for many months prior to the close of discovery.[10]  (*Id.* ¶ 8.)

---

[9] Plaintiff supposes from the 2011 PowerPoint that "there is a trove of other documents that should have been produced" (MRR at 15:18-20), but never identifies what these other documents are.  As Skechers has demonstrated, the 2011 PowerPoint is completely irrelevant to this case and there is no basis to assume that Skechers has allegedly withheld any material documents.

[10] In fact, it appears that Plaintiff learned about Skechers' Media Share website as

1    Next, Plaintiff complains that Skechers was somehow remiss in failing to

2    correct Mr. Moody's deposition testimony that he believed the materials on the

3    Media Share website were not accessible to the public.[11]  (MRR at 13:20-14:9.)

4    Tellingly, however, Plaintiff makes no contention that he did not access the

5    documents on the Media Share website before deposing Mr. Moody.  After all, it is

6    undisputed that Plaintiff was fully aware of the website and had the index of the

7    FTP files located on the website before Mr. Moody's deposition.  All Plaintiff had

8    to do was double-click on any of the files to access the documents they contained.

9    Undoubtedly, if Plaintiff had any problem accessing these files, he would have

10   brought it up at Mr. Moody's deposition and demanded access.

11       Even more absurd is Plaintiff's suggestion that Mr. Moody's deposition

12   testimony somehow stopped Plaintiff from accessing the files.  The conduct of

13   Plaintiff's current counsel, Mr. Ruga, belies any such contention.  According to

14   Mr. Ruga, he had no trouble accessing the file in December 2012 despite Mr.

15   Moody's testimony.  That Plaintiff long had access to this document is also

16   indicated by the carefully crafted way in which Mr. Ruga describes how he first

17   learned about it.  All he says is that *he* first accessed the document in December

18   2012.  He makes no statement that Plaintiff or his prior counsel had not accessed

19   the document well before that time.  Undoubtedly, if it were the case that Plaintiff

20   or prior counsel had not seen the document before December 2012, Mr. Ruga

21   would have said so directly.  Instead, counsel attempts to mislead the Court by

22   early as February 20, 2012, when Skechers produced documents from Mr.
     Moody's files which referenced the URL for the Media Share website—including
23   the documents attached as Exhibits 8 and 9 to Mr. Ruga's declaration.  (Welsh
     Decl. ¶ 19.)  *See Fay Corp.*, 651 F. Supp. at 309 ("[m]otions for reconsideration . .
24   . are not justified on the basis of new evidence which could have been discovered
     prior to the Court's ruling [on summary judgment]"); *Feature Realty,* 331 F.3d at
25   1093 (evidence in possession of plaintiff prior to court's summary judgment ruling
     was not "newly discovered" for purposes of reconsideration).
26
     [11] Though Mr. Moody testified at his deposition that he believed the materials on
27   the Media Share website were not accessible to the public, he learned shortly after
     his deposition that the documents could be accessed by the public.  (Supp. Moody
28   Decl. ¶ 8.)

omission and thereby create an impression that he knows to be false.  As is clear, Plaintiff has long known of the document and concluded it was not relevant.

## V.  SKECHERS DID NOT FAIL TO DISCLOSE DOCUMENTS REFERENCED IN ITS INITIAL DISCLOSURES.

Plaintiff's second alleged "new fact" is that Skechers' "catch-all" initial disclosure—which states that Skechers possesses "[d]ocuments and correspondence related to the facts, allegations, clams and defenses referenced in the operative pleadings" that it may use in defense of this action—obligated it to produce the evidence Plaintiff never himself requested during discovery.  (MRR at 11:8-15.)  But Skechers' initial disclosures only extend to documents it intends to use to "support *its claims or defenses*."  Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added).  Contrary to Plaintiff's position, Rule 26 does not require Skechers to disclose witnesses or documents that it does not intend to use.  Fed. R. Civ. P. 26 Advisory Committee's Note (2000 am.); *see also In re Novellus Sys., Inc. Deriv. Litig.*, No. C06-03514 RMW (HRL), 2007 WL 46076, *2 (N.D. Cal. Jan. 5, 2007).

To circumvent this obvious shortcoming in his argument, Plaintiff asserts that Skechers "put Reinsdorf's lack of sales information for specific product lines squarely at issue," thereby triggering "an absolute duty to produce the information in its possession that bore on that issue."  (MRR at 12:12-16.)  Plaintiff cites no authority for this proposition, however.  Moreover, the Advisory Committee Notes to Rule 26 are clear:  the initial disclosure requirement does not indiscriminately require disclosure of all documents related to the particular allegations in the pleadings.  *See* Fed. R. Civ. P. 26 Advisory Committee's Note (2000 am.); *see also Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 956 (10th Cir. 2004), *abrogated on other grounds by Unitherm Food Sys, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006) (rejecting argument that initial disclosures required defendant to produce any document "relevant" to the disputed facts at issue).  Plaintiff's argument would also improperly shift the burden of proof on indirect profits to Skechers.  As the

Court knows, Skechers argued for summary judgment on indirect profits because of Plaintiff's failure to carry his burden of proffering non-speculative evidence demonstrating a "causal nexus" between shoe sales and Skechers' use of Plaintiff's photographs in its marketing images. Under Plaintiff's theory, once Skechers decided to argue that no non-speculative evidence existed on the "causal nexus" issue, the burden shifted to Skechers to formulate for Plaintiff the very evidence he was missing. The case law does not support such an absurd result. *See Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004); *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

Plaintiff also argues that Skechers was required to supplement discovery under Rule 26(e). (MRR at 11:21-12:11.) But Rule 26(e) "does not require that a party volunteer information not fairly encompassed by [an] earlier request," *In re Air Crash Disaster*, 86 F.3d 498, 539 (6th Cir. 1996), nor does Plaintiff's authority suggest otherwise. *See*, *e.g.*, *Allflex U.S.A., Inc. v. Avid Identification Sys., Inc.*, No. EDCV-06-1109-SGL, 2009 WL 8591843, at *4 (C.D. Cal. Oct. 30, 2009) (duty to supplement existed only where counsel conceded that unproduced documents "would have been considered responsive documents" to plaintiff's document requests).

## VI. PLAINTIFF'S UNSUBSTANTIATED ASSERTION THAT SKECHERS HAS SPOLIATED EVIDENCE IS COMPLETELY FALSE AND MADE IN BAD FAITH.

Plaintiff's third "new fact" in support of reconsideration is that Skechers has allegedly spoliated evidence in this case. Plaintiff's document destruction claim is based solely on the fact that he is no longer able to access specific files on the Media Share website that were referenced in email correspondence sent in 2007 and 2008 between Mr. Moody and certain of Skechers' foreign distributors. (MRR at 15:23-16:10.) Illustrative of Plaintiff's bad faith tactics, counsel never advised Skechers he would be making a claim of spoliation during the parties' meet and confer. (Welsh Decl. ¶ 18.) Even more disturbing, Skechers' production contains

the very documents that Plaintiff claims Skechers has destroyed—which suggests that counsel lodged this serious and unsubstantiated accusation either knowing that it was false or based on his own failure to review the documents Skechers produced.

As established by Mr. Moody's Supplemental Declaration, not only has there been no spoliation of documents, but Skechers has already produced the very documents Plaintiff claims to be missing. As Mr. Moody explains, Skechers' "business practice is to regularly rotate its marketing images in order to keep its marketing fresh." (Supp. Moody Decl. ¶ 10). One of Mr. Moody's responsibilities is to "provide Skechers' international distributors with the current set of approved marketing images for use in their marketing initiatives." (*Id*.) Skechers typically released new marketing images approximately twice each year. (*Id*.) Mr. Moody would receive the new approved marketing images from the company's Graphics Department, and would make them available to Skechers' foreign distributors via links on the Media Share website. At the same time, Mr. Moody would request Skechers' distributors to replace their old marketing images with the new set of images. (*Id*.) To help ensure that distributors only used the appropriate marketing image files, he would remove from the Media Share website the marketing image files containing the old and outdated marketing images. (*Id*.) As Mr. Moody states, he removed the marketing image file referenced in his November 2007 email "sometime in 2008," and removed the marketing image files referenced in the August 2008 email "sometime in late 2008 or early 2009." (*Id*. ¶ 12.) Plainly, these files were removed as part of Skechers' regular business practices, and were removed years before Plaintiff ever asserted his claims in this case in 2010.

Though Skechers regularly removed old marketing image files from the Media Share website, Skechers did not destroy the old files. In fact, Skechers produced during discovery the very marketing image files referenced in Mr. Moody's 2007 and 2008 emails. Copies of these marketing image files are

attached to Mr. Moody's Supplemental Declaration.  (*Id.* ¶ 13, Exs. C-D (bearing bates nos. SKR 00002083 & SKR 00002088-2089; Welsh Decl. ¶ 21).  In light of these facts, there appears to be only one of two explanations for Plaintiff's ill-considered accusation of spoliation:  either Plaintiff never bothered to review the documents produced by Skechers, or, once again, Plaintiff advances positions he knows, or reasonably should have known, are false.

As established above, Plaintiff has hopelessly failed to establish his right to reconsideration.  He has not presented the Court with any new "facts," but instead relies on irrelevant documents that he learned about in discovery or simply repeats the same arguments he made in opposing Skechers' summary judgment motion.[12]  *See* C.D. Cal. L.R. 7-18 ("[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.").

## VII.  DENIAL OF PLAINTIFF'S RECONSIDERATION MOTION WOULD NOT RESULT IN "MANIFEST INJUSTICE," AND PLAINTIFF IS NOT ENTITLED TO RELIEF UNDER RULE 60(B).

Plaintiff's final argument for reconsideration—that "manifest injustice" will result unless the Court reverses its Amended Order—is equally specious.  Plaintiff pretends as though Skechers obtained summary judgment on his indirect profits claim because Plaintiff was unable to obtain during discovery certain Skechers documents.  (MRR at 1:2-13, 17:4-12.)  But that is not what happened at all, as the Court well knows.  Rather, summary judgment was granted because Plaintiff failed—on many fronts—to carry his burden of proffering *any* non-speculative evidence of the causal nexus required for recovery indirect profits.  (*See* Dkt. No. 225 (Amended Order) at 21:1-26:8 (detailing all of the substantive flaws in the indirect profits analysis provided by Turner and Connelly).)[13]

---

[12] *See, e.g.*, Dkt. No. 149 at 35:1-36:14 (Plaintiff opposes summary judgment on indirect profits on the grounds that Skechers allegedly "fail[ed] or refuse[d] during discovery to produce evidence of sales or net profits from specific product lines").

[13] For instance, the Court found that Connelly's Supplemental Report contained

That summary judgment was granted on indirect profits is not surprising, given the lack of time and resources Plaintiff invested in his case. Plaintiff was the master of his claim, and presumably could have adopted any number of methods to demonstrate the existence of a causal nexus between shoe sales and Skechers' use of Plaintiff's photographs. Instead, Plaintiff gambled that Skechers would have the very analysis his experts should have provided. Upon learning that Skechers had no such analyses, Plaintiff elected not to seek additional discovery and to instead rely on the expert report of Jamie Turner for his indirect profits claim. Of course, the Court later excluded Turner's report on the basis that it "fails to illustrate a relationship of any kind between infringing conduct and specific income…." (Dkt. No. 225 at 21:1-23:6.) Plaintiff also made the tactical decision to wait until the eleventh-hour—after discovery had closed and in response to Skechers' summary judgment motion—to submit the now-excluded Connelly Supplemental Report. Put simply, the proposition that "timely production of the discovery withheld by Skechers would have changed the outcome of the summary judgment motion" is wholly untenable. (MRR at 17:12-14.) .) Skechers fully complied with its discovery obligations and Plaintiff alone is responsible for any failure of proof.

Nor do Plaintiff's Rule 60(b) authorities apply here. (*See*, *e.g.*, MRR at 18-22.) First, Rule 60(b) does not apply to non-final orders like the Amended Order.[14]

numerous methodological flaws such as: (1) assuming that 100% of Skechers' sales were the result of infringing use (Amended Order at 25:19-22); (2) making no attempt to break out sales resulting from authorized use (*id.* at 25:22-26:1); (3) relying on the excluded Luntz survey to establish that Plaintiff's photographs had a positive effect on profits (*id.* at 26:1-4); and (4) excluding Nike from his calculation of competitors' sales when concluding that Skechers enjoyed above-average growth as a result of its use of Plaintiff's photographs (*id.* at 26 n.10).

[14] Plaintiff's cases rely on Fed. R. Civ. P. 60(b)(3), which provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party . . . ." While Skechers addresses Plaintiff's arguments in this section, Rule 60(b) only applies to final judgments, not partial summary judgments. *See, e.g., BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc.*, No. 09-00181 DAE-KSC, 2011 WL 1230144, at *4 (D. Haw. Mar. 28, 2011).

Even if it did, Plaintiff's unsupported accusations fall far short of the "clear and convincing" evidentiary standard required for relief due to alleged discovery misconduct. *See Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988).[15]

In any event, where, as here, the moving party's discovery requests did not seek the allegedly undisclosed material, relief will be denied because, as this Court has noted on several occasions, it is each party's responsibility to seek discovery relevant to his claims and defenses. (Welsh Decl., Ex. I (12/3/12 Tr.) at 36:11-21.) The Court of Appeal's decision in *Cummings* is illustrative. Plaintiffs brought suit against General Motors ("GM") claiming that the defective design of a seat belt and seat in a car led to injuries suffered during a car accident. 365 F.3d at 947. The jury returned a verdict for GM, and plaintiffs brought a motion for relief from judgment under Rule 60(b), which was denied, and from which they appealed. *Id.* In support of the appeal, plaintiffs asserted that GM had conducted relevant acceleration tests in connection with another case but which had not turned over. *Id.* In assessing whether GM had committed misconduct, the court held that plaintiffs "fail[ ] to point to any discovery requests that would encompass the videos in question." *Id.* at 956. The Court of Appeal also rejected plaintiffs' argument that GM was required to produce the videos as part of its initial disclosures, pointing out that Rule 26 only requires parties to produce documents

---

[15] The cases on which Plaintiff relies are readily distinguishable. In every one, relief was only available upon a clear showing that the party accused of discovery misconduct had withheld documents that were directly responsive to the moving party's discovery requests. In other words, "[t]hese cases merely stand for the principle that failure to disclose in response to a request for production . . . may constitute misconduct under Rule 60(b)(3)." *Cummings*, 365 F.3d at 956 (distinguishing *Anderson*, 862 F.2d 910, and *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978)). But, as Skechers has established, it did not withhold any responsive documents or violate any court order. Likewise, Plaintiff's sanctions cases only establish that "failure to provide documentary evidence clearly responsive to multiple requests made by plaintiffs during the course of discovery is sanctionable . . . ." *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 554 (N.D. Cal. 1987); *see also Wingnut Films, Ltd. v. Katja Motion Pictures Corp.*, No CV 05-1516-RSWL SHX, 2007 WL 2758571, at *16 (C.D. Cal. Sept. 18, 2007) (holding defendant's conduct caused plaintiff to be denied access to documents the court had already found to be discoverable).

they intend to use. *Id.* at 956. The court affirmed the denial of plaintiffs' Rule 60(b) motion. *See also Welch v. Centex Home Equity Co.*, 224 F.R.D. 490, 496 (D. Kan. 2004).[16]

In sum, Plaintiff's Rule 60(b) cases are completely inapposite to the situation presented here. Plaintiff's failure to obtain the evidence he claims he needs was entirely the result of Plaintiff's tactical discovery choices. Rule 60(b) simply does not entitle Plaintiff to relief from his own discovery choices. *Cummings*, 365 F.3d at 956-57; *Welch*, 224 F.R.D. at 495.

## VIII. <u>CONCLUSION</u>

There is simply no truth to Plaintiff's repeated and ever-escalating accusations that Skechers has engaged in discovery misconduct. The cases cited by Plaintiff are equally unavailing because, as demonstrated above, Plaintiff alone bears responsibility for the fact he finds himself without the evidence or expert testimony he needs to prevail at trial.

For all the foregoing reasons, Skechers respectfully requests that the Court deny Plaintiff's MRR. Skechers also requests that the Court issue additional orders as it deems necessary to stop Plaintiff's vexatious proliferation of unmeritorious motion practice.

Dated: March 4, 2013

By:_/s/ Daniel M. Petrocelli_____
Daniel M. Petrocelli
Attorneys for Defendants Skechers U.S.A.,
Inc. and Skechers U.S.A., Inc. II

---

[16] In *Welch*, the court considered Plaintiff's argument that defendants committed discovery misconduct by not producing evidence establishing that the defendant paid certain invoices at issue. 224 F.R.D. at 494-495. In denying the plaintiff's motion, the court concluded that the plaintiff failed to produce clear and convincing evidence of discovery misconduct since: (1) the only evidence that the purported undisclosed documents existed was a witness's speculative statement that they may exist, *id.* at 495; (2) defendants represented to the court that there was no additional evidence left to produce, *id.* at 495-96; and (3) the invoices themselves contained information sufficient to "alert plaintiff of the possibility that further evidence might exist in this case" but plaintiff failed to pursue this discovery—a failure which the court refused to attribute to defendants. *Id.*